UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANSELL HEALTHCARE PRODUCTS, LLC, and ANSELL PROTECTIVE PRODUCTS, INC.,** | ) ) ) | |
| | ) | |
| **Counterclaimants,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:08-CV-00585-RMC** |
| | ) | |
| | ) | |
| **TILLOTSON CORPORATION,** | ) | |
| | ) | |
| **Counterclaim Defendant.** | ) | |
| _____ | ) | |

**TILLOTSON CORPORATION'S MOTION TO DISMISS FOR
<u>IMPROPER VENUE OR IN THE ALTERNATIVE TO TRANSFER</u>**

Counterclaim Defendant Tillotson Corporation ("Tillotson") hereby moves, pursuant to

Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406, to dismiss the

counterclaim filed by Counterclaimants Ansell Healthcare Products, LLC ("Ansell Healthcare")

and Ansell Protective Products, Inc. ("Ansell Protective Products") (collectively, "Ansell") on

the ground of improper venue.  In the alternative, Tillotson hereby moves, pursuant to 28 U.S.C.

§ 1404(a), to transfer the case to the Northern District of Georgia.  This Motion is based on the

following:

1.      All pleadings that have been filed in this action; and

2.      The accompanying Brief in Support of Tillotson Corporation's Motion to Dismiss

for Improper Venue or in the Alternative to Transfer.

A proposed Order is attached pursuant to Local Rule 7(c).

WHEREFORE, Tillotson respectfully requests that the Court grant this Motion to Dismiss for improper venue or in the alternative transfer the case to the Northern District of Georgia.

Dated: May 15th, 2008

Respectfully submitted,

/s   Brian Meiners
Brian Meiners
Washington D.C. Bar No. 482039

KING & SPALDING LLP

1700 Pennsylvania Ave, NW
Suite 200
Washington, D.C. 20006-2706
(202) 737-0500 (telephone)
(202) 626-3737 (facsimile)

Attorney for Tillotson Corporation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ANSELL HEALTHCARE PRODUCTS, LLC, and ANSELL PROTECTIVE PRODUCTS, INC.,** | ) ) ) ) | |
| **Counterclaimants,** | ) ) | |
| **v.** | ) ) | **CASE NO. 1:08-CV-00585-RMC** |
| **TILLOTSON CORPORATION,** | ) ) ) ) | |
| **Counterclaim Defendant.** | ) ) ) | |

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**
**FOR IMPROPER VENUE OR IN THE ALTERNATIVE TO TRANSFER**

Ansell's[1] Amended Counterclaim fails to allege facts sufficient to establish that a "substantial part" of the events or omissions giving rise to its claims occurred in the District of Columbia. The Court should therefore dismiss Ansell's claims. See 28 U.S.C. § 1406. In the alternative, the Court should transfer this case to the Northern District of Georgia. Transfer there, rather than litigation here, best serves the interest of justice because a substantial part of the events alleged in Ansell's counterclaim occurred, if anywhere, in the Northern District of Georgia. See 28 U.S.C. § 1404(a).

**FACTUAL RECORD AND PROCEDURAL BACKGROUND**

Tillotson owns United States Patent RE 35,616 (filed Nov. 13, 1995) (published Sept. 30, 1997) ("the '616 patent"), titled "Elastomeric Covering Material and Hand Glove Made Therewith." On May 30, 2007, Tillotson filed a Section 337 Complaint[2] with the International

---

[1] Tillotson refers here to the plaintiffs collectively as "Ansell."

[2] 19 U.S.C. § 1337 and 19 C.F.R. § 210.12 authorizes complaints to be filed with the ITC for investigations into unfair practices in import trade.

Trade Commission ("ITC") requesting that the ITC institute an investigation into the unlawful sale and importation into the United States of certain nitrile gloves that utilize the invention claimed in Tillotson's '616 patent.  See In the Matter of Certain Nitrile Gloves, U.S. Int'l Trade Comm'n, Inv. No. 337-TA-608, Fed Reg. 37052 (July 6, 2007).  The ITC action named Ansell's parent company, Ansell Ltd., a respondent in that investigation.[3]  See id.

On September 6, 2007, Tillotson moved to amend its original complaint to include several additional respondents, including Ansell.  See Order 21, In the Matter of Certain Nitrile Gloves, U.S. Int'l Trade Comm'n, Inv. No. 337-TA-608.  The ITC granted that motion on September 20, 2007.  See 72 Fed. Reg. 58884 (Oct. 17, 2007).  Trial is scheduled to begin in the ITC investigation on May 19, 2008.

Ansell filed this Counterclaim with the ITC on April 4, 2008, and a day later removed the Counterclaim to this Court.  Notice of Removal (filed April 4, 2008), ¶¶ 2, 3.  19 U.S.C. § 1337(c); 19 C.F.R. § 210.14(e).[4]  Ansell's Counterclaim seeks damages from Tillotson's alleged "unfair competition" and "tortious interference with contract and/or prospective economic advantage."  Counterclaim, ¶¶ 17-24.  On April 24, 2008, Tillotson filed a Motion for a More Definite Statement asking this Court to order Ansell to amend its counterclaim to allege

---

[3] On August 16, 2007, the ITC instituted Investigation Number 337-TA-612, which also involves Tillotson's patented nitrile gloves.  See In the Matter of Certain Nitrile Rubber Gloves, U.S. Int'l Trade Comm'n, Inv. No. 337-TA-608, 72 Fed. Reg. 47072 (Aug. 22, 2007).  On September 19, 2007, the ITC consolidated Investigation Number 337-TA-608 with Investigation Number 337-TA-612.  See Order 19, In the Matter of Certain Nitrile Gloves, U.S. Int'l Trade Comm'n, Inv. No. 337-TA-608, 72 Fed. Reg. 58884 (October 17, 2007).

[4] Under 19 U.S.C. § 1337(c) and 19 C.F.R. § 210.14(e), a counterclaim timely filed in the ITC can be removed to a federal district court in which the venue for any of the counterclaims raised by the respondent is appropriate.  As argued below, Ansell's mistake lay in removing its counterclaim to a district that meets the venue requirements.  28 U.S.C. § 1391 ("venue appropriate in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred …").

additional facts that would provide Tillotson with sufficient notice of the nature and material elements of Ansell's counterclaims.  In apparent response, Ansell filed an Amended Counterclaim on April 28, 2008 alleging several new facts, but not identifying which, if any, of Tillotson's alleged representations or omissions occurred in this district.  See id., ¶¶ 14.

Significantly, this is not the first suit between these parties involving the '616 Patent. The issues raised by Ansell in this suit directly relate to litigation between the parties already pending in Northern District of Georgia (the "Georgia Litigation").  See Tillotson Corporation v. Shijiazhaung Hongray Plastic Products, Ltd. et al, Civ. A. No. 4:05-cv-00118 (N.D. Ga.).[5]  Filed on June 7, 2005, the Georgia Litigation involves the alleged infringement of the '616 patent by certain gloves manufactured by Shijiazhaung Hongray Plastic Products, Ltd. ("Hongray") and sold by Darby Dental Supply Co. ("Darby Dental") and Island Dental Co., Inc. ("Island Dental"). See Complaint (Exhibit A); Second Amended Complaint (Exhibit B).  Island Dental and Darby Dental counterclaimed for non-infringement and invalidity of the '616 Patent, and filed a third-party cross-claim against Ansell.  See Answer and Counterclaim (Exhibit C); Third Party Complaint (Exhibit D).  The Georgia Litigation thus involves the same issues as this Counterclaim: the infringement and validity of the '616 Patent.  See Complaint, ¶ 10; Second Amended Complaint, ¶ 20; Answer and Counterclaim, ¶¶ 3-4; Third Party Complaint, ¶ 9.

As such, if this case goes forward then Ansell and Tillotson will be litigating the same issues involving the same patent in two different fora - the Northern District of Georgia and the District of Columbia.  For these reasons, this Court should grant Tillotson's Motion and dismiss

---

[5] In addition to the Georgia Litigation, Ansell filed a complaint against Tillotson in Delaware, which also dealt with the validity of the '616 Patent (the "Delaware Litigation"). Amended Counterclaim, ¶ 11.

the suit for improper venue or, in the interest of judicial economy and efficiency, transfer it to the Northern District of Georgia.

## ARGUMENT

### I.    Summary

Ansell claims that venue is proper in this action pursuant to 28 U.S.C. § 1391(a)(2).  In order to establish venue under this statute, Ansell must establish that a "substantial part" of the events or omissions giving rise to a claim occurred in the district, or a "substantial part" of property that is the subject of the action is situated in this district.  See 28 U.S.C. § 391(a)(2).  In the instant case, Ansell fails to meet its burden of proof because it did not plead facts sufficient to support a finding that a "substantial part" of the events or omissions occurred in the District of Columbia.  Therefore, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406, this case should be dismissed for improper venue.

In the alternative, pursuant to 28 U.S.C. § 1404(a), the Court in its discretion should transfer this case to the Northern District of Georgia.  The purpose behind 28 U.S.C. § 1404(a) is "to prevent the waste of 'time, energy and money' and 'to protect the litigants, witnesses, and the public against unnecessary inconvenience and expense.'"  Van Dusen v. Barrack, 376 U.S. 612, 616 (1964) (citation omitted).  In determining whether to exercise its discretion to transfer this case, the Court should balance "case specific factors which include the private interests of the parties and public interests such as efficiency and fairness."  Great Yellowstone Coal. v. Bosworth, 180 F. Supp.2d 124, 127 (D.D.C. 2001) (citation omitted).  In the instant case, an examination of the case specific and private interest factors supports a finding that transferring this case to the Northern District of Georgia is in the parties' and public's best interest.

II.    **The Court Should Dismiss Ansell's Counterclaim.**

A.    **Ansell must allege facts establishing venue in the District of Columbia.**

Ansell bears the burden of alleging facts that demonstrate venue is proper in this Court. See Hunter v. Johanns, 517 F. Supp.2d 340, (D.D.C. 2007) ("[T]he plaintiff ... bears the burden of establishing that venue is proper.") (citations omitted); Modaressi v. Vedadi, 441 F. Supp.2d 51, 53 (D.D.C. 2006) ("Because it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper.") citing Freeman v. Fallin, 254 F. Supp.2d 52, 56 (D.D.C. 2003); see also Davis v. Amer. Soc. of Civil Engin., 290 F. Supp.2d 116, 121 (D.D.C. 2003) ("Although the D.C. Circuit has not identified the party who bears the burden in a challenge to venue, the majority of courts appear to place the burden on the plaintiff. 5A FED. PRAC. & PROC.2d § 1352 (noting that placing the burden on the plaintiff is consistent with the "plaintiff's obligation to institute his action in a permissible forum, both in terms of jurisdiction and venue.")).  Here, Ansell has not carried that burden.

B.    **Ansell fails to meet its burden of establishing venue is proper in this district.**

Ansell fails to provide sufficient facts to support its allegations that a "substantial part" of the events giving rise to the claim occurred in the District of Columbia.  In its Amended Counterclaim, Ansell alleges claims for unfair competition and tortious interference based on the following: Tillotson's alleged misrepresentations or omissions to the PTO; Tillotson's litigation to enforce the validity of the '616 Patent filed in Georgia; and publication of that litigation on the internet, all of which Ansell alleges interfered with its business and customers. See Amended Counterclaim, ¶¶ 10, 13, 14, 15.

Ansell, however, fails to identify how the alleged misrepresentations or omissions, litigation in Georgia or elsewhere, or threats of potential litigation has caused Ansell to lose sales or incur any damage in the District of Columbia. Moreover, Ansell fails to identify any action or event where a misrepresentation or omission, litigation or threat of litigation has caused Ansell to lose a customer or prospective customer in the District of Columbia. Alleged facts based on mere unsubstantiated assertions or mere speculation are not enough to establish venue. See Davis, 290 F. Supp. 2d at 122 ("[T]he Court will not accept mere speculation of such occurrences as sufficient to establish venue pursuant to 1391(b)."); Saudi v. Northrup Grumman Corp., 273 F. Supp.2d 101, 104 (D.D.C. 2003) (speculative facts are too far removed to establish venue); Mikkilineni v. Pennsylvania., No. Civ. A. 02-1205, 2003 WL 21854754 at 7 (D.D.C. Aug. 5, 2003) (attached as Exhibit E) (unsubstantiated statements that omissions occurred within the district were conclusory in nature and did not satisfy the requirements necessary to establish venue). As a result, Ansell's unsubstantiated and conclusory allegations that fail to identify where Ansell lost business or lost customers as a result of Tillotson's alleged unfair competition or tortious interference fails to meet the "substantial part" test necessary to establish that venue is proper in the District of Columbia.

Ansell also alleges that there is an ITC investigation pending in the District of Columbia involving the '616 Patent. Amended Counterclaim, ¶ 12. Ansell is correct that there is an investigation being conducted by the ITC in the District of Columbia. This one fact, however, is not enough to establish the "substantial part" of the events or omissions occurred in this district, which is necessary to establish venue under 28 U.S.C. § 1391(a)(2) or 28 U.S.C. § 1391(b)(2). See Crenshaw v. Antokol, 287 F. Supp.2d 37, 43 (D.D.C. 2003) (the fact that one defendant maintained an office in the district was not sufficient to establish that venue was proper in the

District of Columbia). [6]  Furthermore, Ansell has already had one opportunity to cure its failure

to plead the facts necessary to establish venue when it filed its Amended Counterclaim.  Thus, it

is fair to assume that if Ansell had other facts that could establish that venue was proper in this

district, then surely Ansell would have pled such facts when it filed its Amended Counterclaim.

Therefore, Tillotson respectfully submits that, pursuant to Rule 12(b)(3) of the Federal

Rules of Civil Procedure and 28 U.S.C. § 1406, this case should be dismissed for improper

venue.

**II.     If the Court decides not to dismiss this action for improper venue, then it is in the best interest of the parties and the public for the Court to exercise its discretion and transfer this case to the Northern District of Georgia.**

In the event that the Court does not dismiss this case for improper venue, the case should

be transferred to the Northern District of Georgia where related suits are already pending.

Pursuant to 28 U.S.C. § 1404, courts have broad discretion to transfer a case "for the

convenience of the parties" or "in the interest of justice."   See Flynn v. Veazey Constr. Corp.,

310 F. Supp.2d 186 (D.D.C. 2004) ("In addition, section 1404(a) vests "discretion in the district

court to adjudicate motions to transfer according to [an] individualized, case-by-case

consideration of convenience and fairness.") citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S.

22, 27 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612 (1964)).

The specific factors the Court should consider when deciding whether to transfer a case

include the following: (1) the plaintiff's choice of forum, unless the balance of convenience is

---

[6]  Ansell may contend that its allegation that the laws of the District of Columbia are controlling in this action supports a finding that venue is proper in the District of Columbia.  See Amended Complaint, ¶ 17.  Assuming that this contention is correct, this still is not enough to establish that venue is proper in the District of Columbia.  See Quarles v. Gen. Inv. & Dev. Co., 260 F. Supp.2d 1, 8 (D.D.C. 2003) ("The court, however, need not accept plaintiffs['] legal conclusions as true.") citing James v. Booz-Allen Hamilton, Inc., 227 F. Supp.2d 16, 20 (D.D.C. 2002).

strongly in favor of the defendants; (2) the defendant's choice of forum; (3) where the claim

arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the

plaintiff and defendant, to the extent that the witnesses may actually be unavailable for trial in

one of the fora; and (6) the ease of access to sources of proof.  See Bosworth, 180 F. Supp.2d at

127; (citing Trout Unlimited v. U.S. Dep't of Agric., 944 F.Supp. 13, 16 (D.D.C.1996) (citations

omitted)).  Here, these factors strongly favor transfer of this case to the Northern District of

Georgia.

First, Ansell is not entitled to deference in its choice of fora because the District of

Columbia has "no meaningful" ties to the controversy and no particular interest to the parties or

subject matter.  See Greater Yellowstone Coal. v. Kempthorne, Civ. A. No. 07-2111, 2008 WL

1862298 at 3 (Apr. 24. 2008) (Exhibit F) (plaintiff afforded substantial deference in all but those

cases in which the chosen forum has no meaningful ties to the controversy or parties) (citation

omitted).  For the reasons discussed above, Ansell has not established that its counterclaims have

any ties to this District of Columbia, except for the ITC investigation being held in the district.

Additionally, neither party has meaningful ties to this forum since Ansell is organized under the

laws of Delaware with a principal place of business in New Jersey and Tillotson is a

Massachusetts corporation.  See Amended Counterclaim, ¶¶ 2-3.

Second, transfer of the case to the Northern District of Georgia is in the best interest of

the parties and this Court because a transfer will be more efficient and save litigation costs.  The

Georgia Litigation involves the same parties who are litigating the same underlying issues, the

validity and infringement of the '616 Patent.  Therefore, transfer to the Northern District of

Georgia is in the best interest of judicial economy because the parties will not unnecessarily tie

up this Court's resources with a suit that is similar in nature to existing litigation being conducted

in another forum.  In addition, transfer of the case will save the parties litigation and travel costs as well as avoid the unnecessary duplication of evidence.

Third, the claims in this suit arguably arose in Georgia since a central thrust of Ansell's counterclaims for unfair competition and tortious interference involve the allegation that Tillotson is conducting "sham litigation."  Specifically, Ansell has alleged that "Tillotson has had a pattern of filing district court litigation in Georgia alleging infringement of the Reissue '616 patent that are not designed to obtain adjudication on the merits of the infringement, validity and enforceability of the Reissue '616 Patent."  Amended Counterclaim, ¶ 10.  As a result, a court sitting in the Northern District of Georgia may be better situated to make the determination whether such litigation was conducted in good faith.

Finally, and most importantly, transfer of the case is also in the best interest of the prospective witnesses because such witnesses will not have to travel to two different jurisdictions to testify regarding the validity or infringement of the '616 Patent.  See Mathis v. GEO Group. Inc., 535 F. Supp.2d 83, 87 (D.D.C. 2008) ("Indeed, 'the most critical factor to examine under U.S.C. § 1404(a) is the convenience of the witnesses.'"); citing Chung v. Chrysler Corp., 903 F. Supp 160, 164 (D.D.C. 1995).

Accordingly, if the Court declines to dismiss this case for improper venue, then in the interest of efficiency and judicial economy we respectfully submit that the Court in its discretion should transfer this case to the Northern District of Georgia.

## CONCLUSION

For the foregoing reasons, Tillotson's Motion to Dismiss for Improper Venue should be granted and this case dismissed for improper venue.  Alternatively, the case should be transferred to the Northern District of Georgia for reasons of efficiency and judicial economy.

9

Respectfully submitted this 15th day of May, 2008.

/s  Brian Meiners
Brian Meiners
Washington D.C. Bar No. 482039

KING & SPALDING LLP

1700 Pennsylvania Ave, NW
Suite 200
Washington, D.C. 20006-2706
(202) 737-0500 (telephone)
(202) 626-3737 (facsimile)

Attorney for Tillotson Corporation

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ANSELL HEALTHCARE PRODUCTS, LLC, and ANSELL PROTECTIVE PRODUCTS, INC.,** | ) ) ) | |
| | ) | |
| **Counterclaimants,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:08-CV-00585-RMC** |
| | ) | |
| | ) | |
| **TILLOTSON CORPORATION,** | ) | |
| | ) | |
| **Counterclaim Defendant.** | ) | |
| _____ | ) | |

**ORDER TO DISMISS FOR IMPROPER VENUE
OR IN THE ALTERNATIVE TO TRANSFER**

Upon consideration of the Motion to Dismiss for Improper Venue or in the Alternative to Transfer filed in the above-captioned action, the applicable law, and the record in this case, it is ORDERED that the motion shall be, and hereby is, GRANTED and the case shall be [DISMISSED] or [TRANSFERRED] to the Northern District of Georgia.

Dated: _____, 2008

_____
Rosemary M. Collyer
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANSELL HEALTHCARE PRODUCTS, LLC, and ANSELL PROTECTIVE PRODUCTS, INC.,** | ) )  ) |
| | ) |
| **Counterclaimants,** | ) |
| | ) |
| **v.** | )     **CASE NO. 1:08-CV-00585-RMC** |
| | ) |
| | ) |
| **TILLOTSON CORPORATION,** | ) |
| | ) |
| **Counterclaim Defendant.** | ) |
| | ) |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing Motion to Dismiss for Improper Venue or in the Alternative to Transfer, and accompanying Brief in Support of the Motion, were served, via U.S. Mail, this 15th day of May, 2008 upon:

>David M. Morris
>Morgan, Lewis, & Bockius LLP
>1111 Pennsylvania Ave, N.W.
>Washington, D.C. 20004

>/s  Brian Meiners
>Brian Meiners
>Washington D.C. Bar No. 482039

>KING & SPALDING LLP

>1700 Pennsylvania Ave, NW
>Suite 200
>Washington, D.C. 20006-2706
>(202) 737-0500 (telephone)
>(202) 626-3737 (facsimile)

>Attorney for Tillotson Corporation

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR IMPROPER VENUE OR IN THE <u>ALTERNATIVE TO TRANSFER</u>**

**EXHIBIT A**

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Rome

JUN - 7 2005

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| TILLOTSON CORPORATION, d/b/a/ BEST MANUFACTURING COMPANY )<br><br>Plaintiff, )<br>v. )<br><br>SHIJIAZHAUNG HONGRAY PLASTIC PRODUCTS, LTD., and GLOVECO, INC. )<br><br>Defendants. ) | Civil Action No. :<br><br>4 05-CV- 118-HLM |

## COMPLAINT

Plaintiff TILLOTSON CORPORATION, d/b/a BEST MANUFACTURING COMPANY, (hereinafter "Tillotson"), for its complaint against Defendants SHIJIAZHAUNG HONGRAY PLASTIC PRODUCTS, LTD. (hereinafter "Hongray") and GLOVECO, INC. (hereinafter "Gloveco"), alleges as follows:

1

## PARTIES

### 1.

Plaintiff Tillotson is a Massachusetts corporation having a place of business in Georgia at Best Manufacturing Company, Edison Street, Menlo, Georgia 30731.  Tillotson is engaged in the business of designing, using, manufacturing, offering for sale, and selling elastomeric materials and hand gloves made from elastomeric materials.

### 2.

Defendant Hongray is a Chinese company having a place of business at No. 135 Xinhua West Road, Shijiazhuang City, Hebei Province, P.R.C. 050081, China.  Hongray is engaged in the business of making, using, offering for sale, and selling hand gloves made from elastomeric materials.  On information and belief, Hongray has conducted business in the Northern District of Georgia.

### 3.

In its business, Hongray has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

2

4.

Defendant Gloveco is a California Corporation having a place of business at 3973 Schaefer Ave, Chino, California 91710, and is the U.S. branch of Defendant Hongray. Gloveco is engaged in the business of importing, offering for sale and selling hand gloves made from elastomeric materials. On information and belief, Gloveco has conducted business in the Northern District of Georgia.

5.

In its business, Gloveco has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

**JURISDICTION AND VENUE**

6.

This is an action for injunctive relief, damages, treble damages, interest, costs, and an award for attorney fees for Defendants' violations of the Patent Laws of the United States, Title 35 of the United States Code. This Court

3

has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1332, and 1338.

7.

Venue is proper in this Court under the provisions of 28 U.S.C. § 1391 and § 1400(b).

**FACTS COMMON TO ALL COUNTS**

8.

Neil E. Tillotson and Luc G. DeBecker (hereinafter "the inventors") have been involved in making, using, offering for sale, and selling hand gloves made from elastomeric materials for many years. Before May 11, 1990, the inventors conceived of a new and unobvious invention pertaining to hand gloves made from elastomeric materials.

9.

The inventors filed a patent application on May 11, 1990, directed to their invention. On May 14, 1991, United States Patent No. 5,014,362 was duly and legally issued for an invention titled "Elastomeric Covering Material and Hand Glove Made Therewith."

4

10.

On November 13, 1995, the inventors filed an application for the reissue of United States Patent No. 5,014,362.  On September 30, 1997, United States Reissue Patent No. Re. 35,616 (hereinafter "'616 Patent") was duly and legally issued for an invention titled "Elastomeric Covering Material and Hand Glove Made Therewith."  A copy of the '616 Patent is attached hereto as Exhibit 1.

11.

Hand gloves made from elastomeric materials in accordance with the '616 Patent are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced.

12.

By Assignment, the inventors assigned all right, title, and interest in and to the application that resulted in the '616 Patent to Tillotson.  Tillotson remains the owner of the '616 Patent.

5

13.

Defendants have been and are currently making, using, offering for sale, and/or selling hand gloves made from elastomeric materials covered by one or more of the claims of the '616 Patent. Defendants have been and are currently making, using, offering for sale, and/or selling hand gloves made from elastomeric materials in Georgia and in the Northern District of Georgia. One or more claims of the '616 patent covers the hand gloves made of elastomeric materials that Defendants have made, used, offered for sale, and/or sold in Georgia and in the Northern District of Georgia.

14.

The hand gloves made from elastomeric materials made, used, offered for sale, and/or sold by Defendants are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced.

6

15.

Tillotson has not granted a license or any other right to Defendants to make, use, offer for sale, or sell the invention defined by the claims of the '616 Patent to Defendants.

16.

Defendants knowingly and willfully infringed and continue to infringe the '616 Patent.

## COUNT I

## PATENT INFRINGEMENT

17.

Plaintiff Tillotson reasserts, realleges, and incorporates herein Paragraphs 1–16.

18.

By making, using, offering for sale, and/or selling their hand gloves made from elastomeric materials, Defendants have infringed at least one claim of

7

the '616 Patent. Such acts have seriously damaged and irreparably harmed Tillotson and will continue to do so unless enjoined by this Court. Consequently, Tillotson is without an adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tillotson prays that:

1.

Defendants and/or Defendants' officers, agents, servants, employees, and all others in active concert or participation with Defendants be permanently enjoined and restrained from:

    (a)    infringing United States Patent No. Re. 35,616; and

    (b)    otherwise causing, assisting in, participating in, or contributing to the infringement of said patent.

2.

Defendants be ordered to pay to Tillotson as damages all damages suffered by Tillotson, including profits lost by Tillotson by reason of the unlawful acts of Defendants as set forth in this Complaint.

8

3.

Defendants be ordered to pay to Tillotson as damages no less than a reasonable royalty by reason of the unlawful acts of Defendants as set forth in this Complaint.

4.

The Court increase the damages awarded to Tillotson from Defendants up to three times because of the willful infringement of United States Patent No. Re. 35,616 by Defendants.

5.

This case be adjudged an exceptional case.

6.

Defendants be required to pay to Tillotson the cost of this action, interest, and Tillotson's reasonable attorney fees and disbursements.

7.

Tillotson have such other and further legal and equitable relief as this Court deems just and equitable.

9

## JURY DEMAND

Plaintiff requests a trial by jury of any and all issues triable of right by a jury.

Dated:    June 6, 2005.

Respectfully submitted,

Anthony B. Askew
Georgia State Bar No. 025,300
Stephen M. Schaetzel
Georgia State Bar No. 628,653
Katrina M. Quicker
Georgia State Bar No. 590,859
Christopher J. Chan
Georgia State Bar No. 120,498
KILPATRICK STOCKTON LLP

1100 Peachtree St., Suite 2800
Atlanta, GA 30309-4530
Telephone: (404) 815-6500

Attorneys for Plaintiff
Tillotson Corporation

10

US00RE35616E

# United States Patent [19]

## Tillotson et al.

[11] E   Patent Number:   Re. 35,616

[45] Reissued   Date of Patent:   Sep. 30, 1997

[54] **ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH**

[75] Inventors: **Neil E. Tillotson**, Dixville Notch, N.H.; **Luc G. DeBecker**, Vancleave, Miss.

[73] Assignee: **Tillotson Corporation**, Boston, Mass.

[21] Appl. No.: **556,680**

[22] Filed: **Nov. 13, 1995**

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.:     **5,014,362**
    Issued:        **May 14, 1991**
    Appl. No.:     **522,390**
    Filed:         **May 11, 1990**

[51] Int. Cl.[6] .................................. A41D 19/00

[52] U.S. Cl. ................................ 2/168; 2/167

[58] Field of Search ................... 2/168, 161.7, 167, 2/169, 161.6, 159, 163, 164; 524/430, 432, 433, 434, 436; 526/338

[56]          **References Cited**

#### U.S. PATENT DOCUMENTS

2,577,345  12/1951  McEwen ........................... 128/294

| | | | |
|---|---|---|---|
| 2,880,189 | 3/1959 | Miller | 260/29.7 |
| 3,759,254 | 9/1973 | Clark | 128/79 |
| 4,096,135 | 6/1978 | Ohishi et al. | 260/79.5 B |
| 4,115,873 | 9/1978 | Stansbury | 2/163 |
| 4,508,867 | 4/1985 | Sato | 524/434 |
| 4,590,123 | 5/1986 | Hashimoto et al. | 428/316.6 |
| 4,684,490 | 8/1987 | Taller et al. | 264/296 |
| 4,834,114 | 5/1989 | Boarman | 128/830 |
| 4,855,169 | 8/1989 | McGlothlin et al. | 428/35.2 |
| 4,945,923 | 8/1990 | Evans et al. | 128/842 |
| 4,963,623 | 10/1990 | Miller et al. | 525/604 |
| 4,971,071 | 11/1990 | Johnson | 128/842 |

#### FOREIGN PATENT DOCUMENTS

59-124831  7/1984  Japan .

*Primary Examiner*—Amy B. Vanatta
*Attorney, Agent, or Firm*—Jones & Askew

[57]          **ABSTRACT**

An elastomeric material and gloves made therewith are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and have a relatively low resilience. The gloves conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced. The gloves are particularly useful in medical applications and most particularly useful as surgical gloves.

**21 Claims, 1 Drawing Sheet**



**EXHIBIT 1**

**U.S. Patent**        Sep. 30, 1997        **Re. 35,616**



FIG 1



FIG 2

Re. 35,616

<table>
<tr><td>1</td><td>2</td></tr>
</table>

ELASTOMERIC COVERING MATERIAL
AND HAND GLOVE MADE THEREWITH

Matter enclosed in heavy brackets [ ] appears in the
original patent but forms no part of this reissue specifi-
cation; matter printed in italics indicates the additions
made by reissue.

TECHNICAL FIELD

The present invention generally relates to elastomeric
materials, and more particularly relates to flexible latex
gloves useful in medical applications.

BACKGROUND OF THE INVENTION

Coverings made with elastomeric materials are well
known and find many useful applications. One such appli-
cation is known as the "latex glove." Latex gloves are made
from a variety of elastomers and during the glove-making
process the elastomers are normally in their latex form.
Latex gloves are often desirable because they can be made
light, thin, flexible, tightly-fitting and substantially imper-
meable to some liquids and gases such as liquid water and
water vapor.

The characteristics of latex make latex gloves useful in
medical applications, and particularly useful as surgical
gloves. Surgeons are required to perform delicate operations
with their hands while wearing latex gloves. Surgical opera-
tions often last for hours. To maintain accurate control over
instruments with their hands, surgeons must wear relatively
thin latex gloves which fit closely to their skin so that they
can grip and feel the instruments in their hand almost as if
they were not wearing gloves at all. Thus, conventional latex
surgical gloves are thin and undersized so as to fit tightly
onto the surgeons' hands. However, conventional latex
surgical gloves, which are often made of natural rubber, are
very resilient and, when stretched to fit about the wearer's
hand, apply pressure to the wearer's hand. With conven-
tional latex surgical gloves, this pressure is not appreciably
released until the wearer removes the gloves. The pressure
applied by conventional latex surgical gloves restricts the
blood vessels in the hands of the wearer and restricts the
movement of the wearer's fingers. Thus, when worn for an
extended period of time, the pressure applied by conven-
tional latex surgical gloves tends to numb and fatigue the
wearer's hands and causes general discomfort for the wearer.
During a long surgical operation, this can cause surgeons
some difficulty in controlling instruments with their hands.

Accordingly, there is a need for an elastomeric material
which is suitable as a covering, but which relaxes after being
stretched about an object. More particularly, there is a need
for a latex surgical glove that, when stretched to fit the
wearer's hand, conforms to fit closely about the wearer's
hand and then relaxes to relieve the pressure applied by the
glove to the wearer's hands and give the wearer greater
comfort and greater sensitivity in performing delicate tasks.

SUMMARY OF THE INVENTION

Accordingly, an object of the present invention is to
provide an improved latex glove.

Another object of the present invention is to provide a
latex glove which does not numb or fatigue the hand of the
wearer when worn for an extended period of time.

Another object of the present invention is to provide a
latex glove which conforms to the wearer's hand, but does
not exert pressure on the wearer's hand for an extended
period of time.

A further object of the present invention is to provide an
elastomeric material useful in forming a covering or glove
than when stretched to cover an object conforms to the shape
of the object and then relaxes to reduce the pressure exerted
upon the object.

This invention fulfills these and other objects by provid-
ing an elastomeric material characterized by being substan-
tially impermeable to water vapor and liquid water, having
a relatively high tensile strength, and having a relatively low
level of resilience. More specifically, the elastomeric mate-
rial of the present invention is characterized by having a
tensile strength of at least about 1500 psi as measured
according to ASTM D-412 on a sample of the elastomeric
material having a thickness from about 4.0 to about 4.5 mils,
and having elastic properties such that when the elastomeric
material is stretched from an initial configuration to fit about
an object, the elastomeric material conforms to the configu-
ration of the object, initially exerting a predetermined pres-
sure on the object and thereafter relaxing to exert on the
object a reduced pressure which is substantially less than
about 80% of the predetermined pressure.

Preferably, the material of the present invention com-
prises nitrile butadiene rubber and a metallic compound
which is substantially insoluble in water and is present in the
amount effective to impart sufficient tensile strength without
significantly stiffening the elastomeric material and altering
the elastomeric properties. More preferably, the material of
the present invention comprises carboxylated nitrile butadi-
ene rubber.

The metallic compound preferably comprises a metal
selected from the group consisting of lead, magnesium and
zinc. More preferably, the metallic compound is a metallic
oxide. Preferred metallic oxides include lead oxide, magne-
sium oxide and zinc oxide. Zinc oxide is the most preferred
metallic compound. Zinc oxide is preferably present in the
material in an amount from about 0.1 to about 0.5 parts per
100 parts nitrile butadiene rubber.

According to another aspect, the present invention com-
prehends a glove comprising a layer of the elastomeric
material of the present invention. The glove of the present
invention has an initial configuration adapted to receive a
hand. Because the glove of the present invention comprises
a layer of the elastomeric material of the present invention,
the glove of the present invention has elastic properties such
that when stretched from the initial configuration to fit about
a hand, the glove conforms to the configuration of the hand
initially exerting a predetermined pressure on the hand and
thereafter relaxing to exert on the hand a reduced pressure
which is substantially less than about 80% of the predeter-
mined pressure. In addition, the glove of the present inven-
tion has a relatively high tensile strength and is substantially
impermeable to water vapor and liquid water. Accordingly,
the glove of the present invention is particularly useful as a
surgical glove. After being donned by the wearer, the glove
of the present invention relaxes so that the pressure on the
wearer's hand is substantially reduced, but remains closely
fitted about the wearer's hand. Thus, the glove of the present
invention may be worn for an extended period of time
without diminishing the sensitivity of the wearer's hand or
becoming uncomfortable.

Other features, objects, and advantages of the present
invention will become apparent from the following detailed
description, drawings, and claims.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a graph comparing the percent of initial stress
required to maintain the stretch of a latex glove made

Re. 35,616

| 3 | 4 |

according to a preferred embodiment of the present invention to that required by a conventional latex glove.

FIG. 2 is a graph comparing the stress required to maintain the stretch of a latex glove mile according to a preferred embodiment of the present invention to that required by a conventional latex glove.

## DETAILED DESCRIPTION

Generally described, the elastomeric material of the present invention is characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low resilience. These properties make the elastomeric material of the present invention particularly useful as a covering, and even more particularly useful as a glove.

The elastomeric material of the present invention has the following properties as measured according to ASTM D-412 on a sample having a thickness from about 4.0 to about 4.5 mils; a tensile strength greater than about 1500 psi and preferably greater than about 2000 psi, and a elongation greater than about 700% and preferably greater than about 800%, and a 500% modulus less than about 350 psi and preferably between about 250 and about 300 psi. The tensile strength is the energy required to stretch the sample to the breaking point and the elongation is the percent stretch of the sample at the breaking point. The 500% modulus is a measure of the energy it takes to stretch the sample 500% of a predetermined length. The elastomeric material of the present invention and gloves made therewith also have a high level of puncture resistance. The elastomeric material of the present invention has a puncture resistance as measured according to ASTM D-120 on a sample having a thickness between 4.0 and 4.5 mils of greater than about 800 pounds per inch.

The high level of strength as illustrated by the foregoing properties, enables the elastomeric material of the present invention and gloves made therewith to be pulled and stretched a considerable amount before breaking. Thus, a glove made with the elastomeric material of the present invention can be made to fit closely to the wearer's skin because it can be pulled with a considerable amount of force when being donned by the wearer. This is particularly important for surgical gloves which must be thin and fit closely.

The relatively low resilience, allows the elastomeric material of the present invention and gloves made therewith to relax after being stretched while the stretch is maintained. In other words, the elastomeric material of the present invention has elastic properties such than when the elastomeric material is stretched from an initial configuration to fit about an object such as a hand, the elastomeric material conforms to the configuration or the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% or the predetermined pressure. Preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastic properties such that the significantly reduced pressure is reached within six minutes after the material is stretched to fit about the object or hand. More preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than about 50% of said predetermined pressure within about one minute after the material is stretched to fit about the object or hand. Most preferably, the elastomeric

material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than [bout 90%] *about 10%* of said predetermined pressure within about six minutes after the material is stretched to fit about the object or hand.

Accordingly, gloves made with the elastomeric material of the present invention are particularly useful as surgical gloves because they relax on the hands of the wearer after being donned so that there is little resistance to movement by the wearer's fingers and there is little restriction of blood vessels in the wearer's hands. Thus, gloves made with the elastomeric material of the present invention can be worn for extended periods of time without tiring or numbing the hands of the wearer, thereby giving the wearer greater comfort and greater sensitivity in performing delicate tasks. The elastic properties of the gloves of the present invention are illustrated in FIGS. 1 and 2 discussed hereinbelow.

Preferably, the elastomeric material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in an amount effective to impart sufficient tensile strength to the elastomeric material without significantly stiffening elastomeric material and altering the elastic properties of the elastomeric material. The nitrile butadiene rubber is preferably carboxylated nitrile butadiene rubber which when cured possesses a higher tensile strength than noncarboxylated nitrile butadiene rubber.

The metallic compound preferably comprises lead, magnesium or zinc. Representative compounds are metallic oxides, such as lead oxide, magnesium oxide or zinc oxide. Zinc oxide is preferred. In addition, zinc oxide is preferably present in the elastomeric material in an amount from about 0.1 to about 0.5 parts per hundred parts nitrile butadiene rubber. If the zinc oxide is not present or is present in an amount below this range, the tensile strength of the elastomeric material is reduced and gloves made therewith tear easily. If the zinc oxide is present in an amount above this range, the elastomeric material and gloves made therewith become more stiff and their resilience is reduced. At the higher resilience, gloves made with the elastomeric material maintain undesirable pressure on the hands of the wearer.

The gloves of the present invention are preferably made by dipping a glove form into a latex mixture, curing the latex mixture on the glove form at elevated temperatures, and then stripping the cured latex glove from the glove form. The resulting gloves preferably have a thickness from about 4.0 to about 4.5 mils.

The latex mixture preferably comprises carboxylated nitrile butadiene rubber latex having about a 40% dry rubber content and zinc oxide in the amount from about 0.1 to 0.5 parts per hundred parts rubber. The latex mixture may also include additives commonly used to make cured latex products such as processing agents, pH control agents, accelerating agents, curing agents, coagulants, and colorants. As will be appreciated by those skilled in the art, the amounts of these additives may be varied considerably. This preferred latex mixture is preferably cured in an oven for 30 to 40 minutes at 270 to 300 degrees Fahrenheit.

The present invention is further illustrated by the following example which is designed to teach those of ordinary skill in the art how to practice this invention and represent the best mode contemplated for carrying out this invention.

## EXAMPLE 1

Latex gloves were made as follows. A latex material having the formula set forth in Table 1 was thoroughly

Re. 35,616

<table>
<tr><td>5</td><td>6</td></tr>
</table>

mixed in a container. The amount of each component of the material is set forth in parts per hundred dry rubber (PHR). Table I shows the amount of dry carboxylated nitrile butadiene rubber present in the latex composition; however, the carboxylated nitrile butadiene rubber was added to the latex composition as a latex comprising 40% by weight of carboxylated nitrile butadiene rubber with the remainder water and surfactants. The sodium dodecylbenzene sulfonate is a processing agent, the potassium hydroxide is present as a pH control agent, the sulfur is a curing agent, the zinc dibutyl dithiocarbamate is an accelerating agent, the titanium dioxide is present as a pigment, the MICHEMLUBE 135 is a paraffin wax emulsion available from Michelman, Inc., Cincinnati, Ohio, and the COAGULANT WS is a polyetherpolysiloxane coagulant available from Bayer, Inc.

Glove forms were prepared by washing with a detergent and rinsing. The glove forms were then dipped in a coagulant mixture comprising calcium nitrate, water and a nonionic soap to promote congealing of the latex around the glove forms. After being dipped in the coagulant mixture, the glove forms were dipped in the latex material. The latex coated glove forms were then dipped in a leach consisting of warm water and then into a powder slurry consisting of powdered starch. The latex coated glove forms were then placed in an oven for 30 minutes at 285 degrees Fahrenheit to cure the latex. After removal from the oven, the cured latex coated glove forms were dipped in a post curing leach consisting of warm water. The cured latex gloves were then stripped from the glove forms and tumbled.

TABLE 1

EXAMPLE 1 LATEX FORMULATION

| | PHR |
|---|---|
| Carboxylated nitrile butadiene rubber (dry) | 100.0 |
| Sodium dodecylbenzene sulfonate | 0.25 |
| Potassium hydroxide | 0.7 |
| Sulfur | 1.0 |
| Zinc dibutyl dithiocarbamate | 1.0 |
| Zinc oxide | 0.5 |
| Titanium dioxide | 4.0 |
| MICHEMLUBE 135 | 3.0 |
| COAGULANT WS | 2.0 |
| STAN-TONE WD 2467 pigment | 0.1 |
| CHERRY FLAVOR #50767 pigment | 0.7 |

The gloves from Example 1 were subjected to a series of tests, the results of which are shown in Tables 2 and 3 and FIGS. 1 and 2. The tensile strength, elongation, and 500% modulus of the gloves made according to Example 1 were each measured according to ASTM D-412 and are shown in Table 2.

TABLE 2

Physical Properties-ASTM D-412

| | |
|---|---|
| Thickness | 4.5 mils |
| Tensile Strength | 2200 psi |
| Elongation | >800% |
| 500% modulus | 350 psi |

The puncture resistances of the gloves from Example 1, of a conventional natural rubber latex examination glove, and of a conventional natural rubber latex surgical glove were measured according to ASTM D-120 and the results are shown in Table 3. Table 3 illustrates the superior puncture resistance of the gloves made according to Example 1.

TABLE 3

PUNCTURE RESISTANCE-ASTM D-120

| Glove | lbs. | gauge | lbs./inch |
|---|---|---|---|
| NR examination | 1.9 | 6.7 | 281 |
| NR surgical | 2.9 | 7.5 | 396 |
| Example 1 | 3.9 | 4.7 | 842 |

The resilience of the gloves made according to Example 1 and a conventional natural rubber latex glove was tested as follows. A sample was cut from each glove and stretched 100% of its length to determine the initial 100% modulus according to ASTM D-412. The amount of stress required to maintain this 100% stretch was then recorded every minute for 30 minutes. The resulting data is shown in FIGS. 1 and 2. FIG. 1 is a plot of percent of initial stress versus time for the sample from the Example 1 glove and the sample from the conventional natural rubber glove. FIG. 2 is a plot of stress in psi versus time for the same samples. As can be seen from FIGS. 1 and 2, the stress required to maintain the 100% stretch of the Example 1 glove sample was substantially zero within six minutes after the initial stretch, while the stress required to maintain the 100% stretch of the conventional glove sample dropped to only about 80% of the initial stress over the 30 minute period.

The foregoing description relates only to preferred embodiments of the present invention, and numerous changes and modifications may be made therein without departing from the spirit and scope of the invention as defined in the following claims.

What is claimed is:

1. A *closely fitting* glove comprising a layer of elastomeric material (a) *comprising nitrile butadiene rubber*, (b) having an initial configuration adapted to receive *and fit closely about* a hand, and (c) characterized by (i) being substantially impermeable to water vapor and liquid water, (ii) having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness from about 4.0 to about 4.5 mils, and (iii) having a *thickness and* elastic properties such that *the glove is capable of being stretched to fit closely about the hand* and when stretched from the initial configuration to fit *closely* about the hand, the elastomeric material conforms to the configuration of the hand, initially exerting [a predetermined] *an initial* pressure on the hand and thereafter *still fitting closely about the hand, but relaxing, within about 6 minutes after the glove is stretched to fit about said hand,* to exert on the hand a reduced pressure which is [substantially] less than about [80%] *50%* of the [predetermined] *initial* pressure.

2. A glove as in claim 1, wherein the layer of elastomeric material *further comprises* [nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening the elastomeric material and altering said elastic properties.

3. A glove as in claim 2 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

4. A glove as in claim 2 wherein the metallic compound comprises metallic oxide.

5. A glove as in claim 4 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

6. A glove as in claim 2 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

Re. 35,616

7

7. A glove as in claim 1, wherein the *nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber and the* layer of elastomeric material *further* comprises [carboxylated nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening said elastomeric material and said elastic properties.

8. A glove as in claim 7 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

9. A glove as in claim 7 wherein the metallic compound comprises metallic oxide.

10. A glove as in claim 9 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

11. A glove as in claim 7 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

[12. A glove as in claim 1, wherein the layer of elasto-meric material is further characterized by having elastic properties such that said reduced pressure is reached within 6 minutes after the glove is stretched to fit about said hand.]

[13. A glove as in claim 1, further characterized by having elastomeric properties such that the reduced pressure is less than about 50% of said predetermined pressure.]

14. A glove as in claim [13] *1* further characterized by having elastic properties such that said reduced pressure is reached within about one minute after the glove is stretched to fit about said hand.

15. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties

8

such that said reduced pressure is less than about [90%] *10%* of said [predetermined] *initial* pressure.

[16. A glove as in claim 15, wherein the layer of elasto-meric material is further characterized by having elastic properties such that said reduced pressure is reached within about 6 minutes after the material is stretched to fit about said hand.]

*17. A glove as in claim 1, wherein the layer of elastomeric material has a thickness up to about 4.5 mils.*

*18. A glove as in claim 1, wherein the layer of elastomeric material has a thickness from about 4 to about 4.5 mils.*

*19. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a puncture resistance of greater than about 800 lbs/in.*

*20. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having an elongation of greater than about 800%.*

*21. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus up to about 350 psi.*

*22. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus in the range from about 250 to about 350 psi.*

*23. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastomeric properties such that said reduced pressure is about zero.*

*24. A glove as in claim 1, wherein the nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber.*

* * * * *

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS FOR IMPROPER VENUE OR IN THE
<u>ALTERNATIVE TO TRANSFER</u>**


**EXHIBIT B**



NOV 2 8 2005
LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| TILLOTSON CORPORATION,<br>d/b/a BEST MANUFACTURING<br>COMPANY<br><br>　　　　Plaintiff,<br>v.<br><br>SHIJIAZHAUNG HONGRAY<br>PLASTIC PRODUCTS, LTD.;<br>GLOVECO, INC.; SAS SAFETY<br>CORP.; PERMATEX, INC.;<br>AMERCARE, INC.; ISLAND DENTAL<br>CO., INC.; and DARBY DENTAL<br>SUPPLY CO.<br><br>　　　　Defendants. | Civil Action No. :<br>4:05-CV-118HLM |

## SECOND AMENDED COMPLAINT

Plaintiff TILLOTSON CORPORATION, d/b/a BEST
MANUFACTURING COMPANY, (hereinafter "Tillotson"), for its second
amended complaint against Defendants SHIJIAZHAUNG HONGRAY PLASTIC
PRODUCTS, LTD. (hereinafter "Hongray"); GLOVECO, INC. (hereinafter

"Gloveco"); SAS SAFETY CORP. (hereinafter "SAS Safety"); PERMATEX, INC. (hereinafter "Permatex"); AMERCARE, INC. (hereinafter "AmerCare"); ISLAND DENTAL CO., INC. (hereinafter "Island Dental"); and DARBY DENTAL SUPPLY CO. (hereinafter "Darby Dental"), alleges as follows:

## PARTIES

### 1.

Plaintiff Tillotson is a Massachusetts corporation having a place of business in Georgia at Best Manufacturing Company, Edison Street, Menlo, Georgia 30731. Tillotson is engaged in the business of designing, using, manufacturing, offering for sale, and selling elastomeric materials and hand gloves made from elastomeric materials.

### 2.

Defendant Hongray is a Chinese company having a place of business at No. 135 Xinhua West Road, Shijiazhuang City, Hebei Province, P.R.C. 050081, China. Hongray is engaged in the business of making, using, offering for sale, and

2

9023857.3

selling hand gloves made from elastomeric materials.  On information and belief,

Hongray has conducted business in the Northern District of Georgia.

3.

In its business, Hongray has committed tortious acts, including,

without limitation, patent infringement within the Northern District of Georgia, as

is more fully set forth herein.

4.

Defendant Gloveco is a California Corporation having a place of

business at 3973 Schaefer Ave, Chino, California 91710, and is the U.S. branch

and U.S. agent of Defendant Hongray.  Gloveco is also the U.S. agent and official

correspondent of Shijiazhuang Tillotson Rubber Products Co., Ltd., Gloveco's

Chinese manufacturer of nitrile gloves having a place of business at Donggao

Industrial Zone, Zanhuang, Hebei, China 050000.  Shijiazhuang Tillotson Rubber

Products Co., Ltd. is not sponsored by, affiliated with, approved by, or in any way

connected with Tillotson.  Gloveco is engaged in the business of importing,

offering for sale, and selling hand gloves made from elastomeric materials.  On

3

information and belief, Gloveco has conducted business in the Northern District of Georgia.

5.

In its business, Gloveco has committed tortious acts, including, without limitation, patent infringement and unfair competition within the Northern District of Georgia, as is more fully set forth herein.

6.

Defendant SAS Safety is a California Corporation having a place of business at 2401 E. Willow Street, Signal Hill, CA 90755. SAS Safety is engaged in the business of importing, offering for sale, and selling hand gloves made from elastomeric materials. On information and belief, SAS Safety has conducted business in the Northern District of Georgia.

7.

In its business, SAS Safety has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

4

9023857.3

8.

Defendant Permatex is a Delaware Corporation having a place of business at 10 Columbus Blvd., Hartford, CT 06106. Permatex is engaged in the business of importing, offering for sale, and selling hand gloves made from elastomeric materials. On information and belief, Permatex has conducted business in the Northern District of Georgia.

9.

In its business, Permatex has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

10.

Defendant AmerCare is a South Carolina Corporation having a place of business at 7450 Industry Drive; N. Charleston, SC 29418. AmerCare is engaged in the business of importing, offering for sale, and selling hand gloves made from elastomeric materials. On information and belief, AmerCare has conducted business in the Northern District of Georgia.

5

11.

In its business, AmerCare has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

12.

Defendant Island Dental is a New York Corporation having a place of business at 865 Merrick Avenue; Westbury, NY 11590. Island Dental is engaged in the business of offering for sale and selling hand gloves made from elastomeric materials. On information and belief, Island Dental has conducted business in the Northern District of Georgia.

13.

In its business, Island Dental has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

14.

Defendant Darby Dental is a New York Corporation having a place of business at 865 Merrick Avenue; Westbury, NY 11590. Darby Dental is engaged

6

in the business of offering for sale and selling hand gloves made from elastomeric materials. On information and belief, Darby Dental has conducted business in the Northern District of Georgia.

15.

In its business, Darby Dental has committed tortious acts, including, without limitation, patent infringement within the Northern District of Georgia, as is more fully set forth herein.

## JURISDICTION AND VENUE

16.

This is an action for injunctive relief, damages, treble damages, interest, costs, and an award for attorney fees for Defendants' violations of the Patent Laws of the United States, Title 35 of the United States Code; Unfair Competition Laws of the United States, Title 15 of the United States Code; Deceptive Trade Practice Laws of the State of Georgia, GA. CODE ANN. §10-1-370, et seq.; and Unfair Competition Law under the Common Law. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1332,

7

1338, and 15 U.S.C. § 1121.  Jurisdiction of the related state claims is invoked under the doctrine of pendent or supplemental jurisdiction.

17.

Venue is proper in this Court under the provisions of 28 U.S.C. § 1391 and § 1400(b).

**FACTS COMMON TO ALL COUNTS**

18.

Neil E. Tillotson and Luc G. DeBecker (hereinafter "the inventors") have been involved in making, using, offering for sale, and selling hand gloves made from elastomeric materials for many years.  Before May 11, 1990, the inventors conceived of a new and unobvious invention pertaining to hand gloves made from elastomeric materials.

19.

The inventors filed a patent application on May 11, 1990, directed to their invention.  On May 14, 1991, United States Patent No. 5,014,362 was duly

8

and legally issued for an invention titled "Elastomeric Covering Material and Hand Glove Made Therewith."

20.

On November 13, 1995, the inventors filed an application for the reissue of United States Patent No. 5,014,362.  On September 30, 1997, United States Reissue Patent No. Re. 35,616 (hereinafter "'616 Patent") was duly and legally issued for an invention titled "Elastomeric Covering Material and Hand Glove Made Therewith."  A copy of the '616 Patent is attached hereto as Exhibit 1.

21.

Hand gloves made from elastomeric materials in accordance with the '616 Patent are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced.

9

22.

By Assignment, the inventors assigned all right, title, and interest in and to the application that resulted in the '616 Patent to Tillotson. Tillotson remains the owner of the '616 Patent.

23.

Defendants have been and are currently making, using, offering for sale, and/or selling hand gloves made from elastomeric materials covered by one or more of the claims of the '616 Patent. Defendants have been and are currently making, using, offering for sale, and/or selling hand gloves made from elastomeric materials in Georgia and in the Northern District of Georgia. One or more claims of the '616 patent covers the hand gloves made of elastomeric materials that Defendants have made, used, offered for sale, and/or sold in Georgia and in the Northern District of Georgia.

24.

The hand gloves made from elastomeric materials made, used, offered for sale, and/or sold by Defendants are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and conform to the shape

10

of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced.

25.

Tillotson has not granted a license or any other right to Defendants to make, use, offer for sale, or sell the invention defined by the claims of the '616 Patent to Defendants.

26.

Tillotson has placed the required statutory notice on substantially all hand gloves made from elastomeric materials manufactured and sold under the '616 Patent.

27.

Defendants knowingly and willfully infringed and continue to infringe the '616 Patent.

28.

Tillotson has operated under and performed business under the trade names "Tillotson Rubber Company," "Tillotson Rubber Co.," "Tillotson Rubber Company, Inc.," and "Tillotson Rubber Co., Inc." (collectively "Tillotson's Trade

11

Name") for over seventy years with respect to the sale of various rubber products, including rubber gloves, balloons, and more recently, nitrile gloves.

29.

Under the trade name "Tillotson Rubber Co., Inc.," Tillotson filed with the Food and Drug Administration (FDA) numerous 510(k) premarket notifications of intent to market various rubber gloves, including at least one nitrile glove, in the United States. A true and correct copy of correspondence related to Tillotson's 510(k) premarket notifications showing use of Tillotson's Trade Name is attached as Exhibit 2.

30.

Based on exclusive use, as well as substantial advertising, promotion, and sales under the trade names "Tillotson Rubber Company," "Tillotson Rubber Co.," "Tillotson Rubber Company, Inc.," and "Tillotson Rubber Co., Inc.," Tillotson's Trade Name is a recognized and well known trade name throughout the United States.

12

Case 4:05-cv-00818-RLV   Document 34   Filed 11/28/2005   Page 14 of 25

31.

On information and belief, long after Tillotson's Trade Name had become known and identified in the mind of consumers as a source indicator of Tillotson's goods, Gloveco adopted and began using Tillotson's Trade Name in connection with the sale of rubber products in the United States. On or about September 1, 2004, Gloveco filed with the Food and Drug Administration (FDA) a 510(k) premarket notification of intent to market a nitrile glove in the United States. Gloveco listed the applicant for the 510(k) premarket notification as "Shijiazhuang Tillotson Rubber Products Co., Ltd." Gloveco is the official correspondent and U.S. agent for Shijiazhuang Tillotson Rubber Products Co., Ltd., Gloveco's Chinese manufacturer of nitrile gloves. A true and correct copy of Gloveco's correspondence related to the 510(k) premarket notification showing use of Tillotson's Trade Name by Gloveco is attached as Exhibit 3.

32.

Neither Gloveco nor Shijiazhuang Tillotson Rubber Products Co., Ltd. have any affiliation, association or connection with or authorization from Tillotson.

13

90231857.3

33.

Gloveco has infringed Tillotson's rights in Tillotson's Trade Name and has caused a likelihood of confusion in that consumers are likely to believe Gloveco or its business is in some way sponsored, connected, or associated with Tillotson.

34.

Gloveco's sale and offer for sale of Gloveco's products falsely indicate to the public that Gloveco, and the goods offered by Gloveco, including those goods listed by Gloveco's 510(k) premarket notification filed with the FDA under the name "Shijiazhuang Tillotson Rubber Products Co., Ltd.," are in some manner connected with, sponsored by, affiliated with, or approved by Tillotson.

35.

Gloveco's practice of placing Gloveco's products in the same markets as Tillotson is an intentional and bad faith effort to trade on the good will associated with Tillotson's Trade Name.

14

9023857.3

33.

Gloveco has infringed Tillotson's rights in Tillotson's Trade Name and has caused a likelihood of confusion in that consumers are likely to believe Gloveco or its business is in some way sponsored, connected, or associated with Tillotson.

34.

Gloveco's sale and offer for sale of Gloveco's products falsely indicate to the public that Gloveco, and the goods offered by Gloveco, including those goods listed by Gloveco's 510(k) premarket notification filed with the FDA under the name "Shijiazhuang Tillotson Rubber Products Co., Ltd.," are in some manner connected with, sponsored by, affiliated with, or approved by Tillotson.

35.

Gloveco's practice of placing Gloveco's products in the same markets as Tillotson is an intentional and bad faith effort to trade on the good will associated with Tillotson's Trade Name.

14

## COUNT I

## PATENT INFRINGEMENT

### 36.

Plaintiff Tillotson reasserts, realleges, and incorporates herein Paragraphs 1–35.

### 37.

By making, using, offering for sale, and/or selling their hand gloves made from elastomeric materials, Defendants have infringed at least one claim of the '616 Patent. Such acts have seriously damaged and irreparably harmed Tillotson and will continue to do so unless enjoined by this Court. Consequently, Tillotson is without an adequate remedy at law.

## COUNT II

## UNFAIR COMPETITION UNDER FEDERAL LAW

### 38.

Plaintiff Tillotson reasserts, realleges, and incorporates herein Paragraphs 1–37.

15

9023857.3

39.

By its unauthorized use of imitations of Tillotson's Trade Name, Gloveco has used and is using a false designation of origin, false description, and false representation which are likely to cause confusion or to cause mistake or to deceive in violation of 15 U.S.C. § 1125(a), by creating the false and misleading impression that its services and glove products are affiliated, connected or associated with Tillotson or have Tillotson's sponsorship, endorsement or approval, and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of the consuming public and, injury to Tillotson's good will and reputation as symbolized by Tillotson's Trade Name, for which Tillotson has no adequate remedy at law.

40.

On information and belief, Gloveco's actions have been committed intentionally, with actual notice of Tillotson's Trade Name and with the knowledge that such actions are likely to cause confusion or to cause mistake or to deceive. Gloveco's actions demonstrate an intentional, willful and bad faith intent to trade on the goodwill associated with Tillotson's Trade Name.

16

9023857.3

41.

Tillotson has been and will continue to be irreparably damaged by Gloveco's actions and Tillotson has no adequate remedy at law.

42.

Gloveco is causing, and is likely to cause, substantial injury to the public and to Tillotson, and Tillotson is entitled to injunctive relief and to recover Gloveco's profits and Tillotson's actual damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a), 1116, and 1117.

## COUNT III

### DECEPTIVE TRADE PRACTICES AND
### UNFAIR COMPETITION UNDER THE LAW OF GEORGIA

43.

Plaintiff Tillotson incorporates by reference the allegations contained in Paragraphs 1 - 42.

17

9023857.3

44.

Gloveco has engaged in deceptive trade practices in violation of the unfair and deceptive trade practices statutes of Georgia, particularly GA. CODE ANN. §10-1-370 (2003).

45.

Tillotson has been and will continue to be irreparably damaged by Gloveco's actions, including the incurring of attorneys' fees to bring this action. Tillotson has no adequate remedy at law.

## COUNT IV

## COMMON LAW UNFAIR COMPETITION

46.

Plaintiff Tillotson incorporates by reference the allegations contained in Paragraphs 1 - 45.

47.

Tillotson has used Tillotson's Trade Name throughout the United States, including Georgia, in connection with rubber products prior to Gloveco's adoption and first use or sale of Gloveco's products.  As a result of the continuing

18

use of Tillotson's Trade Name, it has become known and has become identified in the public mind as an indicator of the source and sponsorship of the services and products to which Tillotson's Trade Name is applied.

48.

Gloveco, without consent or authorization of Tillotson, has used imitations of Tillotson's Trade Name in connection with the production, distribution, offering for sale and sale of goods and such use is likely to cause confusion and mistake as to the source or origin of such goods and services.

49.

Gloveco has willfully and deliberately engaged in common law trademark infringement and unfair competition under the common law of Georgia. Tillotson has no adequate remedy at law for this injury.

50.

On information and belief, Gloveco has acted with full knowledge of Tillotson's rights to Tillotson's Trade Name and without regard to the likelihood of confusion of the public created by these activities.

19

51.

As a result of Gloveco's acts, Tillotson has been damaged in an amount not as yet determined or ascertainable. At a minimum, Tillotson is entitled to injunctive relief and to an award of Gloveco's profits and to Tillotson's actual damages. In light of the deliberately fraudulent and malicious imitation of Tillotson's Trade Name and the need to deter Gloveco's actions, Tillotson additionally is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tillotson prays that:

1.

Defendants and/or Defendants' officers, agents, servants, employees, and all others in active concert or participation with Defendants be permanently enjoined and restrained from:

(a)   infringing United States Patent No. Re. 35,616; and

(b)   otherwise causing, assisting in, participating in, or contributing to the infringement of said patent.

20

9023857.3

2.

Gloveco and/or Gloveco's officers, agents, servants, employees, and all others in active concert or participation with Gloveco be permanently enjoined and restrained from:

(a)   using   the   trade   name   SHIJIAZHUANG   TILLOTSON RUBBER PRODUCTS CO.;

(b)   otherwise using any other word, designation or other symbol or device that is confusingly similar to or likely to cause confusion with Tillotson's TILLOTSON RUBBER PRODUCTS CO. trade name, as a trademark, service mark, corporate name, trade name, or domain name;

(c)   making any express or implied description or representation that Gloveco's business, products, or services are in any way affiliated, associated, authorized, sponsored, endorsed, or otherwise connected with Tillotson;

(d)   engaging in false designation of origin, false descriptions, false advertising, or false representations or from otherwise engaging in unfair business or deceptive trade practices or competing unfairly with Tillotson;

21

Case 1:05-cv-00618-RLV   Document 64   Filed 11/28/2005   Page 24 of 26

(e)   any other conduct that is likely to cause confusion or to cause mistake or to deceive as to the source, affiliation, connection or association, approval or sponsorship of Gloveco's business, products, or services.

3.

Defendants be ordered to pay to Tillotson as damages all damages suffered by Tillotson, including all profits of the Defendants and all profits lost by Tillotson, by reason of the unlawful acts of Defendants as set forth in this Complaint.

4.

Gloveco be ordered to pay to Tillotson all damages suffered by Tillotson, including all profits obtained by Gloveco and all profits lost by Tillotson, by reason of the unfair competition and deceptive trade practices of Gloveco as set forth in this Complaint.

5.

Defendants be ordered to pay to Tillotson as damages no less than a reasonable royalty by reason of the unlawful acts of Defendants as set forth in this Complaint.

22

6.

The Court increase the damages awarded to Tillotson from Defendants up to three times because of the willful infringement of United States Patent No. Re. 35,616 by Defendants.

7.

The Court increase the damages awarded to Tillotson from Gloveco up to three times because of the willful infringement and use of Tillotson's TILLOTSON RUBBER PRODUCTS CO. trade name.

8.

The Court award punitive damages to Tillotson by reason of Defendants' intentional and unlawful acts as set forth in this Complaint.

9.

This case be adjudged an exceptional case.

10.

Defendants be required to pay to Tillotson the cost of this action, interest, and Tillotson's reasonable attorneys' fees and disbursements.

23

9023857.3

11.

Tillotson have such other and further legal and equitable relief as this

Court deems just and equitable.

### JURY DEMAND

Plaintiff requests a trial by jury of any and all issues triable of right by a

jury.

Dated:     November 8, 2005.

                    Respectfully submitted,

                    s/Anthony B. Askew
                    Anthony B. Askew
                    Georgia State Bar No. 025,300
                    Stephen M. Schaetzel
                    Georgia State Bar No. 628,653
                    Christopher J. Chan
                    Georgia State Bar No.  120,498
                    Katrina M. Quicker
                    Georgia State Bar No. 590,859
                    KILPATRICK STOCKTON LLP
                    1100 Peachtree St., Suite 2800
                    Atlanta, GA 30309-4530
                    Telephone:  (404) 815-6500
                    Facsimile: (404) 815-6555

                    Attorneys for Plaintiff Tillotson Corporation

24

9023857.3

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS FOR IMPROPER VENUE OR IN THE
<u>ALTERNATIVE TO TRANSFER</u>**


**EXHIBIT C**

IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

-------------------------------------------------------x

|  |  |
|---|---|
| TILLOTSON CORPORATION, d/b/a BEST MANUFACTURING COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>SHIJIAZHAUNG HONGRAY PLASTIC PRODUCTS LTD.; GLOVECO, INC.; SAS SAFETY CORP.; PERMATEX, INC.; AMERCARE, INC.; ISLAND DENTAL CO., INC.; and DARBY DENTAL SUPPLY CO.,<br><br>    Defendants. | Civil Action No.:<br>4:05-CV-118 (HLM) |

-------------------------------------------------------x

## ANSWER TO SECOND AMENDED COMPLAINT AND COUNTERCLAIM

Defendants Island Dental Co., Inc. ("Island") and Darby Dental Supply Co.,

Inc. ("Darby") (Island and Darby shall collectively be referred to as "Defendants"),

through their attorneys, state their defenses and answer to the Second Amended

Complaint (the "Complaint") of Plaintiff Tillotson Corporation, d/b/a Best

Manufacturing Company ("Plaintiff" or "Tillotson") as follows:

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Defendants Island and Darby have not infringed, are not infringing and will not infringe any claim of the '616 patent and Defendants Island and Darby are not liable for any act that would be construed as any form of infringement of the '616 Patent.

### SECOND DEFENSE

The '616 Patent is invalid and/or unenforceable and/or no damages may be received by Plaintiff pursuant to one or more provisions of 35 U.S.C. § 101, et. seq., including, but not limited to §§ 102, 103, 112, 286, 287 and 307(b).

### THIRD DEFENSE

Plaintiff has failed to state a claim against Island and/or Darby upon which relief may be granted.

### FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any injury or damage as a result of any conduct alleged in Plaintiff's Second Amended Complaint.

### FIFTH DEFENSE

Plaintiff is not entitled to the relief sought.

118736                                         2

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by various licenses given by Plaintiff to third parties that have sold or supplied allegedly infringing products to Defendants.

## SEVENTH DEFENSE

Defendants Island and/or Darby reserve the right to assert such other defenses as may appear as discovery proceeds in this case.

## EIGHTH DEFENSE

Further answering the specific allegations of Plaintiff's Complaint, Defendants respond to the individual paragraphs of Plaintiff's Complaint as follows:

1.      Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 1 of the Complaint and therefore deny same.

2.      Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint and therefore deny same.

3.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint and therefore deny same.

4.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint and therefore deny same.

5.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 5 of the Complaint and therefore deny same.

6.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint and therefore deny same.

7.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint and therefore deny same.

8.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint and therefore deny same.

Case 4:05-cv-00118-RLV   Document 65   Filed 06/15/2006   Page 5 of 16

9.      Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint and therefore deny same.

10.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 10 of the Complaint and therefore deny same.

11.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 11 of the Complaint and therefore deny same.

12.     Admit the allegations contained in paragraph 12, except deny that any gloves sold by Defendant Island infringe on Plaintiff's patent.

13.     Deny each and every allegation contained in paragraph 13.

14.     Admit the allegations contained in paragraph 14, except deny that any gloves sold by Defendant Darby infringe on Plaintiff's patent.

15.     Deny each and every allegation contained in paragraph 15.

16.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint and therefore deny same.

17.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint and therefore deny same.

18.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint and therefore deny same.

19.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint and therefore deny same.

20.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint and therefore deny same.

21.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint and therefore deny same.

22.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint and therefore deny same.

23.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 23 of the Complaint and therefore deny same.

24.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint and therefore deny same.

25.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 25 of the Complaint and therefore deny same, except Defendants admit that they do not have a license from Plaintiff.

26.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint and therefore deny same.

27.     Deny each and every allegation contained in paragraph 27.

28.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and therefore deny same.

29.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint and therefore deny same.

30.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint and therefore deny same.

31.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 31 of the Complaint and therefore deny same.

32.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint and therefore deny same.

33.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 33 of the Complaint and therefore deny same.

34.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 34 of the Complaint and therefore deny same.

35.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 35 of the Complaint and therefore deny same.

## COUNT I

36.     Defendants repeat and reallege each of their responses to paragraphs 1 through 35 above as their response to paragraph 36 of Plaintiff's Complaint.

37.     Deny each and every allegation contained in paragraph 37.

## COUNT II

38.     Defendants repeat and reallege each of their responses to paragraphs 1 through 37 above as their response to paragraph 38 of Plaintiff's Complaint.

39.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 39 of the Complaint and therefore deny same.

40.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 40 of the Complaint and therefore deny same.

41.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 41 of the Complaint and therefore deny same.

42.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 42 of the Complaint and therefore deny same.

## COUNT III

43.    Defendants repeat and reallege each of their responses to paragraphs 1 through 42 above as their response to paragraph 43 of Plaintiff's Complaint.

44.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 44 of the Complaint and therefore deny same.

45.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 45 of the Complaint and therefore deny same.

## COUNT IV

46.    Defendants repeat and reallege each of their responses to paragraphs 1 through 45 above as their response to paragraph 46 of Plaintiff's Complaint.

47.    Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 47 of the Complaint and therefore deny same.

48.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 48 of the Complaint and therefore deny same.

49.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 49 of the Complaint and therefore deny same.

50.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 50 of the Complaint and therefore deny same.

51.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 51 of the Complaint and therefore deny same.

Except as expressly admitted above, each and every allegation contained in Plaintiff's Complaint is denied.

WHEREFORE, having fully answered, Defendants pray that Plaintiff's Complaint be fully and finally dismissed with prejudice, at Plaintiff's cost, and that the Court grant Defendants such other and further relief as is just and equitable.

## COUNTERCLAIM AGAINST TILLOTSON CORPORATION d/b/a BEST MANUFACTURING COMPANY

NOW COMES Darby and Island and hereby present their Counterclaim against Plaintiff Tillotson as follows:

1.    Defendants counterclaim against Plaintiff pursuant to the patent laws of the United States, Title 35 U.S.C., with a specific remedy sought based upon the laws authorizing action for declaratory judgment in the courts of the United States, 28 U.S.C. §§ 2201, 2202 and Fed. R. Civ. P. 13.  The facts and allegations set forth above in paragraphs 1-57 are incorporated herein by reference.

2.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.  Plaintiff is subject to the personal jurisdiction of this Court in this district and elsewhere.

3.    An actual controversy exists between Island and/or Darby and Plaintiff by virtue of the allegations of the Complaint in this action and the answer as to whether the '616 Patent is invalid and not infringed by Island and/or Darby's products.

4.    Island and Darby have not infringed and are not infringing the claims of the '616 Patent.

118736                                    12

5.      The '616 Patent is invalid and/or unenforceable for failure to comply with one or more provisions of 35 U.S.C. et. seq., including but not limited to §§ 102, 103 and 112.

6.      Based on the foregoing, Island and/or Darby are entitled to a judgment holding that the '616 Patent is invalid, unenforceable and not infringed by Island or Darby.

**WHEREFORE**, Island and Darby pray for a judgment against Plaintiff:

A.      Adjudging U.S. Reissue Patent No. 35, 616 as invalid, unenforceable and not infringed by Island and/or Darby;

B.      Granting declaratory judgment in Island and Darby's favor that U.S. Reissue  Patent No. 35, 616 is invalid, unenforceable and not infringed; and

C.      Awarding Island and/or Darby their costs and reasonable attorney's fees; and such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Island and Darby hereby demand a trial by jury of all issues so triable in this action.

Respectfully submitted this 27th day of June, 2006.

        /s/ Michael S. French

Michael S. French
Georgia Bar No. 276680
Jeanine L. Gibbs
Georgia Bar No. 292590
Allison M. Gluvna
Georgia Bar No. 141632
WARGO & FRENCH LLP
1170 Peachtree Street, NE, Suite 2020
Atlanta, Georgia  30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501


Of Counsel:

Richard P. Romeo, Esq.
Salon, Marrow, Dyckman,
    Newman & Broudy, LLP
292 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 661-7100
Facsimile: (212) 986-6821

## CERTIFICATE OF SERVICE

This certifies that I have this day served a true and correct copy of the within

and foregoing **ANSWER TO SECOND AMENDED COMPLAINT AND**

**COUNTERCLAIM OF DEFENDANTS ISLAND DENTAL CO., INC. AND**

**DARBY DENTAL SUPPLY CO., INC.** upon counsel of record by U.S. Mail,

postage pre-paid, addressed as follows:

Anthony B. Askew, Esq.
Stephen M. Schaetzel, Esq.
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6000
Facsimile: (404) 815-6555
*Attorneys for Plaintiff Tillotson Corporation*

Ronald T. Coleman, Esq.
Christine S. Cox, Esq.
Parker, Hudson, Rainer & Dobbs LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
*Attorneys for Defendant Permatex, Inc.*

Gary M. Anderson, Esq.
Fulwider Patton Lee & Utecht
200 Oceangate, Suite 1550
Long Beach, CA 90802
Telephone: (562) 432-0453
Facsimile: (562) 435-6014
*Attorneys for Defendant SAS Safety Corp.*

118736

15

B. Craig Killough, Esq.
Barnwell Whaley Patterson & Helms, LLC
885 Island Park Drive
Charleston, SC 29402
Telephone: (843) 577-7700
Facsimile: (843) 577-7708
***Attorneys for Defendant AmerCare, Inc.***

This 27th day of June, 2006.

_____/s/ Michael S. French_____
Michael S. French

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS FOR IMPROPER VENUE OR IN THE
<u>ALTERNATIVE TO TRANSFER</u>**

**EXHIBIT D**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

-------------------------------------------------- x

TILLOTSON CORPORATION, d/b/a     :
BEST MANUFACTURING         :
COMPANY,                 :
                         :
         Plaintiff,       :       Civil Action No.:
                         :       4:05-CV-118 (HLM)
      v.               :
                         :
SHIJIAZHAUNG HONGRAY PLASTIC  :
PRODUCTS LTD.; GLOVECO, INC.;   :
SAS SAFETY CORP.; PERMATEX,   :
INC.; AMERCARE, INC.; ISLAND    :
DENTAL CO., INC.; and DARBY     :
DENTAL SUPPLY CO.,          :
                         :
         Defendants and   :
         Third-Party      :
         Plaintiffs,      :
                         :
      v.               :
                         :
ANSELL HEALTHCARE, CARDINAL  :
HEALTH, DEFEND-MYDENT, KNK   :
MEDICAL DENTAL SPECIALTIES,   :
LTD., and SUPERMAX          :
INCORPORATED CORP.,        :
                         :
         Third-Party      :
         Defendants.     :
                         :
                         :

-------------------------------------------------- x

## THIRD-PARTY COMPLAINT

Third-party plaintiffs, Island Dental Co., Inc. ("Island Dental") and Darby Dental Supply Company ("Darby Dental") ("Island Dental" and "Darby Dental" collectively "Third-Party Plaintiffs"), through their attorneys Wargo & French LLP, as and for their Third-Party Complaint against the third-party defendants, allege, upon information and belief, at all times hereinafter mentioned, as follows:

### THE PARTIES

1.    Upon information and belief, Ansell Healthcare ("Ansell") is a New Jersey corporation located at 200 Schulz Drive, Red Bank, New Jersey 07701 and is engaged in the manufacturing, sale and offering for sale certain hand gloves as described more fully in the Complaint.

2.    Upon information and belief, Cardinal Health ("Cardinal Health") is an Ohio corporation located at 7000 Cardinal Place, Dublin, Ohio 43017 and is engaged in the manufacturing, sale and offering for sale certain hand gloves as described more fully in the Complaint.

3.    Defend-Mydent ("Defend") is a New York corporation located at 80 Suffolk Court, Hauppauge, New York 11788 and is engaged in the manufacturing, sale and offering for sale certain hand gloves as described more fully in the Complaint.

2

4.      Upon information and belief, KNK Medical Dental Specialties, Ltd. (a/k/a Cranberry)("KNK") is a Pennsylvania corporation located at 5 Corporate Boulevard, Sinking Spring, Pennsylvania 19608 and is engaged in the manufacturing, sale and offering for sale certain hand gloves as described more fully in the Complaint.

5.      Upon information and belief, Supermax Incorporated Corp. ("Supermax") is an Illinois corporation located at 2225 White Oak Circle, Aurora, Illinois 60504 and is engaged in the manufacturing, sale and offering for sale certain hand gloves as described more fully in the Complaint.

6.      Third-party Defendants Ansell, Cardinal Health, Defend, KNK, Supermax are known individually as a "Manufacturer" and collectively as the "Manufacturers."

## JURISDICTION AND VENUE

7.      This cross-claim is brought under 28 U.S.C. §§ 2201 and 2202; Ga. Code § 11-2-312; N.Y. U.C.C. Law § 2-312, for a declaratory judgment adjudging that each respective Manufacturer is liable to Island Dental and/or Darby Dental for any claims, demands, causes of actions, damages, costs, attorneys fees or any other relief in connection with the subject matter and claims brought by Tillotson or any other party against Island Dental and/or Darby Dental.

3

8.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331,

1332(a), 1338(a) and 1367(a).  Venue is proper in this District pursuant to 28

U.S.C. §1391(b) and (c).

## FACTS GIVING RISE TO THE THIRD-PARTY COMPLAINT

9.      There exists a real and actual controversy between Island Dental

and/or Darby Dental and each of the respective Manufacturers concerning the

issues of liability and indemnity for any damages resulting from any finding of

infringement of the asserted '616 Patent.

10.     Tillotson has alleged that Island Dental and Darby Dental have

infringed the '616 Patent by offering for sale and selling hand gloves made from

elastomeric materials.

11.     Island Dental and Darby Dental deny any infringement of the '616

Patent.

12.     This Third-Party Complaint arises out of the same transactions and

occurrences that are the subject of the claims asserted against Island Dental and

Darby Dental in the Complaint filed by Tillotson in the above-captioned action.

13.     Each of the respective Manufacturers manufactured and sold hand

gloves made from elastomeric materials to Island Dental and/or Darby Dental.

4

14.    Tillotson's charge of infringement is for hand gloves made from elastomeric materials sold and supplied to Island Dental and/or Darby Dental by Manufacturers.

15.    Each of the respective Manufacturers is obligated to indemnify and hold Island Dental and/or Darby Dental harmless for any liability in connection with the offering for sale and/or selling of hand gloves made from elastomeric materials.

## AS AND FOR A FIRST CAUSE OF ACTION
## BREACH OF UCC WARRANTY

16.    Island Dental and Darby Dental repeat and reallege the allegations contained in paragraphs 1-15 of its cross-claims as if fully set forth herein.

17.    Island Dental and/or Darby Dental purchased the hand gloves from the Manufacturers.  Each of the respective Manufacturers is a merchant who regularly deals in goods including, but limited to, the hand gloves sold to Island Dental and Darby Dental.

18.    U.C.C. § 2-312(c), and state statutes adopting this provision, provide in part:

> Unless otherwise agreed a seller who is a merchant regularly dealing
> in goods of the kind warrants that the goods shall be delivered free of
> the rightful claim of any third person by way of infringement or the
> like but by a buyer who furnishes specifications to the seller must hold

5

the seller harmless against any such claim which arises out of compliance with the specifications.

19.    Each of the respective Manufacturers warranted that the hand gloves would be delivered to Island Dental and/or Darby Dental free of any title or ownership claims, including but not limited to any claim of patent infringement.

20.    Each of the respective Manufacturers has breached that warranty in view of the present claims asserted against Island Dental and/or Darby Dental by Tillotson.

21.    Island Dental and/or Darby Dental have/has been damaged as a result of each respective Manufacturer's breach of its UCC warranty, including, but not limited to, incurring costs and attorney's fees in connection with this litigation.

22.    Each of the respective Manufacturers is obligated to indemnify Island Dental and/or Darby Dental consistent with U.C.C. § 2-312(c). Each of the respective Manufacturers must therefore hold Island Dental and/or Darby Dental harmless against any such claims.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACTUAL AND/OR COMMON LAW INDEMNIFICATION

23.    Island Dental and Darby Dental repeat and reallege the allegations contained in paragraphs 1-22 of its cross-claims as if fully set forth herein.

24.    Each respective Manufacturer is contractually bound and/or has a common law duty to indemnify Island Dental and/or Darby Dental and hold Island Dental and/or Darby Dental harmless from the claims of Tillotson.

25.    Each respective Manufacturer has breached its obligations to Island Dental and/or Darby Dental by failing to indemnify and hold harmless Island Dental and/or Darby Dental.

26.    Island Dental and/or Darby Dental have/has suffered damages as a result of each Manufacturer's breach including, but not limited to, incurring the costs of this litigation and attorney's fees.

### JURY DEMAND

27.    Island Dental and Darby Dental respectfully request trial by jury as to its cross-claims.

**WHEREFORE,** Island Dental and/or Darby Dental pray(s) for a judgment as to its cross-claim:

A.    Declaring that each Manufacturer must indemnify and hold harmless Island Dental and/or Darby Dental from any claims arising from the offering for sale and/or selling hand gloves;

B.    Awarding Island Dental and/or Darby Dental its attorneys fees; and

7

C.    Awarding Island Dental and/or Darby Dental any and all relief to which

it may be entitled.

Dated:  July 12, 2006                Respectfully submitted,
Atlanta, Georgia
                                     WARGO & FRENCH LLP


                                     s/ Allison M. Gluvna
                                     Michael S. French
                                     Georgia Bar No. 276680
                                     Jeanine L. Gibbs
                                     Georgia Bar No. 292590
                                     Allison M. Gluvna
                                     Georgia Bar No. 141632
                                     1170 Peachtree Street
                                     Atlanta, Georgia 30309
                                     Telephone: (404) 853-1500
                                     Facsimile: (404) 853-1511

                                     *Attorneys for Defendants Island Dental
                                     Supply Co., Inc. and Darby Dental Supply
                                     Co., Inc.*


                                     Of Counsel:

                                     Richard P. Romeo, Esq.
                                     Salon, Marrow, Dyckman,
                                     Newman & Broudy, LLP
                                     292 Madison Avenue, 6th Floor
                                     New York, New York 10017
                                     Telephone: (212) 661-7100
                                     Facsimile: (212) 986-6821

## CERTIFICATE OF SERVICE

This certifies that I have this day served a true and correct copy of the within and foregoing **Third-Party Complaint** upon counsel of record by U.S. Mail, postage pre-paid, addressed as follows:

Anthony B. Askew, Esq.
Stephen M. Schaetzel, Esq.
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6000
Facsimile: (404) 815-6555
***Attorneys for Plaintiff Tillotson Corporation***

Ronald T. Coleman, Esq.
Christine S. Cox, Esq.
Parker, Hudson, Rainer & Dobbs LLP
1500 Marguis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
***Attorneys for Defendant Permatex, Inc.***

Gary M. Anderson, Esq.
Fulwider Patton Lee & Utecht
200 Oceangate, Suite 1550
Long Beach, CA 90802
Telephone: (562) 432-0453
Facsimile: (562) 435-6014
***Attorneys for Defendant SAS Safety Corp.***

B. Craig Killough, Esq.
Barnwell Whaley Patterson & Helms, LLC
885 Island Park Drive
Charleston, SC 29402
Telephone: (843) 577-7700
Facsimile: (843) 577-7708
***Attorneys for Defendant/Third-Party Defendant AmerCare, Inc.***

This 12th day of July, 2006.


                        s/ Allison M. Gluvna
                        Allison M. Gluvna
                        Georgia Bar No. 141632

576594_2

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR IMPROPER VENUE OR IN THE <u>ALTERNATIVE TO TRANSFER</u>**

**EXHIBIT E**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

Page 1

**H**
Mikkilineni v. Com. of Pennsylvania
D.D.C.,2003.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
M.R. MIKKILINENI, Plaintiff,
v.
COMMONWEALTH OF PENNSYLVANIA et al.,
Defendants.
Civil Action No.: 02-1205 (RMU).

Aug. 5, 2003.

M.R. Mikkilineni, Washington, DC, Pro Se Plaintiff.
Robert E. Leidenheimer, Jr., Assistant United
States Attorney, Washington, DC, for the Federal
Defendants.
David Patrick Durbin, Jordan, Coyne & Savits,
Washington, DC, for Defendant Forest Hills.
William F Fox, Catholic University of America,
Cardinal Station, Washington, DC, for Defendant
Glenn Engineering & Associates.
Eric Alan Kuwana, Patton Boggs, L.L.P., Washing-
ton, DC, for Defendant Pittsburgh Water and Sewer
Authority.
Devon Jacob, Office of the Attorney General, Har-
risburg, PA, for Defendant Commonwealth of
Pennsylvania.

### *MEMORANDUM OPINION*

RICARDO M. URBINA, District Judge.

### DENYING THE FEDERAL DEFENDANTS' MOTION TO STRIKE; GRANTING THE DEFENDANTS' RENEWED MOTIONS TO DISMISS

## I. INTRODUCTION

**\*1** This action arises from previously-litigated contract disputes and what the *pro se* plaintiff characterizes as the defendants' "fraud upon the Court(s)"

during this earlier litigation. Due to the plaintiff's dissatisfaction with the results of the previous cases, filed in Pennsylvania state and federal courts, he has re-filed similar claims in this district and added claims against the United States. Specifically, the plaintiff alleges civil rights, contract, and tort violations, and seeks monetary damages, a declaratory judgment, and a writ of mandamus compelling the Attorney General to conduct an investigation of the alleged violations.

This matter is before the court on the federal defendants' motion to strike the plaintiff's first amended complaint, the federal defendants' renewed motion to dismiss, and the private and state defendants' renewed motions to dismiss.[FN1] Because the federal defendants' arguments in their motion to strike are not well-substantiated by law from this circuit, the court denies this motion. In addition, because the plaintiff's claims against the federal defendants lack subject-matter jurisdiction and fail to state a claim, the court grants the federal defendants' renewed motion to dismiss. Because venue for the plaintiff's claims against the private and state defendants is improper in this district, the court grants the private and state defendants' renewed motions to dismiss. Finally, because the statute of limitations bars the plaintiff's claims against defendant Forest Hills, the court grants its renewed motion to dismiss.

> FN1. In his complaint, the plaintiff names two federal defendants: the United States, which he describes as including the federal judges who presided over his federal lawsuits and appeals and the judges' clerks; and Leonidas R. Mecham, the director of the Administrative Office of the U.S. Courts who denied the plaintiff's tort claims against the federal judges. First Am. Compl. ("Compl.") at 4-6. The plaintiff describes three state defendants: the Commonwealth of Pennsylvania ("Pennsylvania"), consisting of the state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

judges who presided over his state litigation, the Pennsylvania Department of Transportation, and the Pennsylvania Attorney General; the Borough of Forest Hills ("Forest Hills"), a municipality in Pennsylvania; and Pittsburgh Water and Sewer Authority ("Pittsburgh"), a government authority that manages Pittsburgh's water and sewer system.*Id.* Finally, the private defendant is Glenn Engineering and Associates, which the plaintiff describes as encompassing the engineering firm and its lawyer "attorney Shields" (collectively, "Glenn").*Id.*

## II. BACKGROUND

### A. Facts of the Case

In his first amended complaint, the plaintiff outlines contract disputes originating from (1) a 1989 contract between his corporation and defendant Pennsylvania to build a "box-culvert" in Clearfield, Pennsylvania; (2) a 1989 contract between his corporation and defendant Forest Hills to build storm sewers in Pennsylvania; (3) a 1989 contract with defendant Glenn involving a waterline project; and (4) a 1986 contract with defendant Pittsburgh to build a pump station. Compl. at 7, 11-12, 16-17, 20-22. The plaintiff makes vague allegations that all or some of the defendants committed "fraud upon the Court(s)" during the plaintiff's prior litigation involving these projects in Pennsylvania state and federal courts. *Id.* at 10-11, 15, 20, 23.

The plaintiff charges the private and state defendants with civil rights, contract, and tort violations. *Id.* at 25-26.In addition, the plaintiff charges that defendants Pennsylvania and the United States, through their respective judges, violated the Constitution when the judges ruled against the plaintiff. *Id.* at 9-10, 14-15, 19-20, 23-24.He also pleads, without specificity, that these judges conspired during the court proceedings to commit fraud and thereby deprive him of his right to a jury trial. *Id.* at 27.According to the plaintiff, defendant Mecham,

acting through the federal judges, deprived the plaintiff of his constitutional rights by creating a policy prohibiting corporations from appearing in court *pro se* and conspiring with the federal judges to use this policy to block the plaintiff's access to federal courts. *Id* . at 6-7, 27-28.Further, the plaintiff charges that the federal judges violated the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, by ruling against him. *Id.* at 27-30.

**\*2** The plaintiff asks for a writ of mandamus compelling the Attorney General to investigate the defendants' alleged conspiracy against the plaintiff. *Id.* at 27.Furthermore, the plaintiff seeks a declaratory judgment and monetary damages. *Id.* at 29.

### B. Procedural History

The plaintiff filed his original complaint on June 18, 2002.[FN2]On September 23, 2002, the United States filed a motion to dismiss the plaintiff's complaint. On October 10, 2002, after all of the defendants had filed motions to dismiss, the plaintiff filed a first amended complaint that added defendant Mecham. In response, the state and private defendants filed renewed motions to dismiss. The federal defendants, however, filed a motion to strike the first amended complaint. On June 6, 2003, the court directed the federal defendants to file a notice or motion stating whether they sought to renew their original motion to dismiss and apply it to the first amended complaint. In response, the federal defendants filed a renewed motion to dismiss that incorporates by reference the original motion to dismiss and adds grounds for the dismissal of the new claims against defendant Mecham. Finally, the plaintiff filed a motion requesting a hearing or telephone depositions on the issues of specific jurisdiction and venue.

> FN2. The plaintiff has filed eight different cases in the U.S. District Court for the District of Columbia: civil actions 01-0314, 01-2287, 02-0702, 02-0716, 02-0970, 02-1118, 02-1205, 02-2222.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 3
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

## III. ANALYSIS

### A. The Court Denies the Federal Defendants' Motion to Strike

The federal defendants move to strike the plaintiff's first amended complaint, arguing that Federal Rule of Civil Procedure 21 bars the plaintiff from adding a party in the first amended complaint without leave of court. Fed. Defs.' Mot. to Strike at 3-4. The D.C. Circuit, however, permits plaintiffs to amend complaints pursuant to Rule 15 "once as a matter of course" so long as the opposing party has not yet served a responsive pleading and the court has not ruled on a motion to dismiss. FED.R.CIV.P. 15(a); *James V. Hurson Assocs., Inc., v. Glickman,* 229 F.3d 277, 282-83 (D.C.Cir.2000); *Gov't of Guam v. Am. President Lines,* 28 F.3d 142, 150 (D.C.Cir.1994). A motion to dismiss is generally not considered to be a "responsive pleading" under Rule 15(a).*Id.* In addition, "[p]ro se litigants are allowed more latitude than litigants represented by counsel to correct defects in service of process and pleadings."*Moore v. Agency for Int'l Dev.,* 994 F.2d 874, 876;*James V. Hurson Assocs.,* 229 F.3d at 282-83.

In moving to strike the first amended complaint, the federal defendants do not cite to any cases demonstrating that Rule 21 trumps the mandate of Rule 15(a) and this circuit that a plaintiff can amend "once as a matter of course."Therefore, because this circuit favors permitting *pro se* plaintiffs to amend their complaints, and the amendment was of right, the court denies the federal defendants' motion to strike the first amended complaint. *Moore,* 994 F.2d at 876;*Gov't of Guam,* 28 F.3d at 150.

### B. The Court Grants the Federal Defendants' Renewed Motion to Dismiss

**\*3** This court dismisses all of the plaintiff's claims against the federal defendants because the plaintiff's claims do not survive the federal defendants' renewed motion to dismiss pursuant to Rule 12(b)(1) and (6). Evaluating the plaintiff's claims against defendant Mecham, the court determines that these claims are so "patently insubstantial" that the court lacks jurisdiction over them. Next, the court concludes that the plaintiff's claims against the defendant United States fail to state cognizable claims because the judges are protected by judicial immunity. Finally, the plaintiff's requests for a writ of mandamus and declaratory relief fail to state cognizable claims because these forms of relief are not legally permissible.

### 1. Legal Standard for a Motion to Dismiss

#### a. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."*Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89 (1938). On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir.1999); *Rasul v. Bush,* 215 F.Supp.2d 55, 61 (D.D.C.2002) (citing *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 182-83 (1936)). The court may dismiss a complaint for lack of subject-matter jurisdiction only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Empagran S.A. v. F. Hoffman-Laroche, Ltd.,* 315 F.3d 338, 343 (D . C.Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

In this circuit, courts must assume the truth of the allegations made and construe them in a light favorable to the plaintiff. *Id.* (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds, Harlow v. Fitzgerald,* 457 U.S. 800 (1982)). Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, however, a court resolving a Rule 12(b)(1) motion must give the complaint's factual allegations closer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 4
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

scrutiny than required for a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,*482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the case, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992).

**b. Rule 12(b)(6)**

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it need only provide a short and plain statement of the claim and the grounds on which it rests. FED.R.CIV.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 47 (1957). A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. FED.R.CIV.P. 12(b)(6); *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800 (1982). The plaintiff need not plead the elements of a prima-facie case in the complaint. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511-14 (2002) (holding that a plaintiff in an employment-discrimination case need not establish her prima-facie case in the complaint); *Sparrow v. United Air Lines, Inc.,* 216 F .3d 1111, 1114 (D.C.Cir.2000). Thus, the court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.*Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Atchinson v. District of Columbia,* 73 F.3d 418, 422 (D.C.Cir.1996). In reviewing a *pro se* plaintiff's submissions, the court must apply "less stringent standards" than it would in considering "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

**\*4** In deciding such a motion, the court must accept all of the complaint's well-pled factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *Scheuer,* 416 U.S. at 236. The court need not accept as true legal conclusions cast as factual allegations. *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

**2. The Court Dismisses the Claims Against Defendant Mecham**

The federal defendants argue that because the claims against defendant Mecham are patently insubstantial, the court should dismiss them for lack of subject-matter jurisdiction. Fed. Defs.' Renewed Mot. to Dismiss at 4-5. The court can dismiss a case for want of subject-matter jurisdiction "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial."*Bell v. Hood,* 327 U.S. 678, 682 (1946); *see also Oneida Indian Nation of N.Y. State v. County of Oneida,* 414 U.S. 661, 666 (1974). The D.C. Circuit has recognized that courts lack jurisdiction over claims that are "patently insubstantial," such as claims alleging bizarre conspiracy theories. *Best v. Kelly,* 39 F.3d 328, 330 (D.C.Cir.1994). Whereas Rule 12(b)(6) dismissals "cull *legally* deficient complaints[,]" the Rule 12(b)(1) substantiality doctrine is "reserved for complaints resting on truly fanciful *factual* allegations."*Id.* at 331 n. 5.

The plaintiff claims that defendant Mecham created a policy prohibiting *pro se* representation of corporations, and carried out that policy through, *inter alia,*"Chief Justice Rehnquist of the Supreme Court,""Chief Judge Becker of the Third Circuit," and "Chief Judge Ziegler of the U.S. Court in Pittsburgh."Compl. at 5-6, 27-28; Pl.'s 11/01/02 Opp'n at 7-9. The plaintiff further alleges that by conspiring with the judges to keep the plaintiff out of court, defendant Mecham deprived him of his constitutional rights. Compl. at 27-28.

The plaintiff's conspiracy theory is "patently insub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

stantial." *Best,* 39 F.3d at 330. Defendant Mecham is not responsible for the above-listed judges' rulings that corporations may not appear in court *pro se,* nor is he responsible for the creation of such a policy. Rather, the Supreme Court created this rule and the Third Circuit has followed this rule since long before the plaintiff's litigation began. *Rowland v. Cal. Men's Colony,* 506 U.S. 194, 201-02 (1993) (stating "[i]t has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel") (citing *Osborn v. President of Bank of U.S.,* 9 Wheat. 738, 829 (1824); *Simbraw, Inc. v. United States,* 367 F.2d 373, 373-74 (3d Cir.1966). Thus, the claims against defendant Mecham are so "patently insubstantial" as to deprive the court of jurisdiction over the claims. *Best,* 39 F.3d at 330;*Empagran,* 315 F.3d at 343.

**3. The Court Dismisses the Claims Against Defendant United States**

*\*5* The federal defendants argue that the plaintiff's claims against the federal judges fail to state a claim because judicial immunity protects the judges from suit. Fed. Defs.' Renewed Mot. to Dismiss at 6. The principle of judicial immunity is well-established. *Tinsley v. Widener,* 150 F.Supp.2d 7, 11 (D.D.C.2001) (citing *Stump v. Sparkman,* 435 U.S. 349 (1978); *Bradley v. Fisher,* 80 U.S. 335 (1871)). Absolute immunity is necessary for judges and their clerks to carry out their judicial functions because judges must "act upon [their] convictions, without apprehension of personal consequences to [themselves]."*Bradley,* 80 U.S. at 347;*Oliva v. Heller,* 839 F.2d 37, 40 (2d Cir.1988). Appealing to a higher court for relief is the only judicial procedure available to a litigant who seeks to challenge the legality of decisions made by a judge in her judicial capacity. *Dacey v. Clapp,* 1993 U.S. Dist. LEXIS 15815, at *5 (D.D.C. Oct. 29, 1993). The acts of assigning a case, ruling on pretrial matters, and rendering a decision all fall within a judge's judicial capacity. *John v. Barron,* 897 F.2d 1387, 1391 (7th Cir.1990), *cert. denied,*498 U.S. 821

(1990). Judicial immunity, however, does not extend to judges' administrative, legislative, or executive functions. *Forrester v. White,* 484 U.S. 219, 227 (1988).

The plaintiff asserts that defendant United States, through the federal judges and their clerks, acted unconstitutionally and in violation of the FTCA by dismissing the plaintiff's previous civil actions and appeals. Compl. at 27-28. Because the alleged tortious acts are judicial acts, the judicial immunity defense applies to the federal judges and the clerks. 28 U.S.C § 2674; *John,* 897 F.2d at 1391. In addition, defendant United States is entitled to assert judicial immunity when sued for the actions of the judiciary because this defense is available to the judicial officers whose acts are the basis for these claims. 28 U.S.C. § 2674. Accordingly, this court dismisses the plaintiff's claims against the judges and their law clerks for failure to state a viable claim. *Hishon,* 467 U.S. at 73.

**4. The Court Dismisses the Petition for a Writ of Mandamus**

The federal defendants move the court to dismiss the plaintiff's petition for a writ of mandamus because it fails to state a legally cognizable claim. Fed. Defs.' Renewed Mot. to Dismiss at 5. A writ of mandamus is "an extraordinary [remedy], and it is to be utilized only under exceptional circumstances."*Haneke v. Sec'y of Health, Educ. & Welfare,* 535 F.2d 1291, 1296 (D.C.Cir.1976)."[M]andamus generally will not issue unless there is [ (1) ] a clear right in the plaintiff to the relief sought, [ (2) ] a plainly defined and nondiscretionary duty on the part of the defendant to honor that right, and [ (3) ] no other adequate remedy."*Ganem v. Heckler,* 746 F.2d 844, 852 (D.C.Cir.1984). The plaintiff has the burden to satisfy this three-part test.*Id.; see also Whittle v. Moschella,* 756 F.Supp. 589, 596-97 (D.D.C.1991). Failure to meet any one of these three requirements is fatal to the plaintiff's request. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

Page 6

**\*6** The plaintiff asserts that the court should compel the Attorney General to conduct an investigation into the civil conspiracy, bad faith acts, and "fraud upon the Court(s)" of all of the defendants. Compl. at 27. In his complaint, the plaintiff alleges that the Attorney General has a duty to investigate these claims. *Id.* The court, however, need not accept as true the plaintiff's legal conclusion. *Kowal,* 16 F.3d at 1276. The plaintiff's baseless assertions that the Attorney General has a duty to investigate his claims fails to satisfy his burden of demonstrating a "nondiscretionary duty on the part of the defendant" to investigate. Pl.'s 6/16/03 Opp'n at 4-5; Pl.'s 10/10/02 Opp'n at 26-29; *Ganem,* 746 F.2d at 852. Consequently, the plaintiff's petition for a writ of mandamus fails to state a cognizable claim. *Hishon,* 467 U.S. at 73.

**5. The Court Dismisses the Request for Declaratory Relief**

As with the petition for a writ of mandamus, the federal defendants move the court to dismiss the plaintiff's petition for declaratory relief because it fails to state a legally cognizable claim. Fed. Defs.' Renewed Mot. to Dismiss at 3. The Declaratory Judgment Act "does not provide a means whereby previous judgments by state or federal courts may be reexamined, nor is it a substitute for appeal[.]"*Shannon v. Sequeechi,* 365 F.2d 827, 829 (10th Cir.1966). Therefore, courts "will refuse to entertain a declaratory judgment action where the controversy has been settled by the decision of some other tribunal."*Baier v. Parker,* 523 F.Supp. 288, 290 (M.D.La.1981) (internal citations omit- ted).

The plaintiff seeks a declaration by this court that the federal judges' decisions in the plaintiff's previous civil actions are erroneous. Compl at 29. The Declaratory Judgment Act, however, does not permit this court to reexamine the decisions of other tribunals. *Shannon,* 365 F.2d at 829. Thus, the plaintiff's petition for a declaratory judgment fails to state a cognizable claim. *Hishon,* 467 U.S. at 73.

**C. The Court Grants the Renewed Motions to Dismiss for Improper Venue Filed By Defendants Pennsylvania, Glenn, and Pittsburgh**

**1. Legal Standard for a Motion to Dismiss for Improper Venue**

Federal Rule of Civil Procedure 12(b)(3) states that the court will dismiss or transfer a case if venue is improper or inconvenient in the plaintiff's chosen forum.[FN3] In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor. *2215 Fifth St. Assocs. v. U-Haul Int'l, Inc.,* 148 F.Supp.2d 50, 54 (D.D.C.2001). The court, however, need not accept the plaintiff's legal conclusions as true. *Id.;Kowal,* 16 F.3d at 1276. In addition, the court may examine facts outside of the complaint to determine whether venue is proper. 5A FED. PRAC. & PROC. CIV. 2d § 1352.

> FN3. The federal circuits are split regarding whether the burden in a Rule 12(b)(3) motion is on the defendant or the plaintiff. 5A FED. PRAC. & PROC. CIV. 2d § 1352. The Fourth, Sixth, and Seventh Circuits place the burden on the plaintiff, in keeping with the burden for other jurisdictional issues. *Id.* In contrast, the Third and Eighth Circuits place the burden on the defendant, explaining that venue is a "personal privilege" of the plaintiff. *Id.* The D.C. Circuit has not spoken on this issue. Because the defendant's motion prevails regardless of which party bears the burden, the court need not resolve this is- sue.

**2. Venue in This District Is Improper**

**\*7** Defendants Pennsylvania, Glenn, and Pittsburgh argue that the court should dismiss this action for improper venue pursuant to Federal Rule of Civil

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))

Procedure 12(b)(3). Pa.'s Renewed Mot. to Dismiss at 5; Glenn's Renewed Mot. to Dismiss at 5; Pittsburgh's Renewed Mot. to Dismiss at 7. The plaintiff claims that venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions occurred in this district, the plaintiff resides here and no real property is involved. Compl. at 2; Pl.'s 10/10/02 Opp'n at 10-13, 18-19; Pl.'s Mot. for Hearing at 3. The plaintiff also argues that venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions occurred in this district and the federal defendants reside in this district. Pl.'s Mot. for Hearing at 3.

Because 28 U.S.C. § 1391(e) [FN4] applies only when "a defendant is an officer or employee of the United States or any agency thereof," and because the court has now dismissed all of the claims against the federal defendants, the plaintiff's argument that venue exists here pursuant to 28 U.S.C. § 1391(e) no longer has any basis.[FN5] 28 U.S.C. § 1391(e). The venue statute that applies to the state and private defendants is 28 U.S.C. § 1391(b). This statute states:

> FN4. The text of 28 U.S.C. § 1391(e) provides as follows:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such

action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

> 28 U.S.C. § 1391(e).

> FN5. In fact, the plaintiff's argument would fail even if the United States were still a party because 28 U.S.C. § 1391(e) requires the plaintiff to establish venue for the non-federal defendants as if the federal defendants were not parties to the action. *Id.;Boggs v. U.S. Secret Serv.,* 987 F.Supp. 11, 16 (D.D.C.1997) (stating that for a federal court to hear a case it must have venue over each claim).

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.
28 U.S.C. § 1391(b).

Evaluating the first prong of 28 U.S.C. § 1391(b), the court finds that none of the remaining defendants (the state and private defendants) reside in the District of Columbia. *E.g.* Compl. at 4-5; Pl.'s 8/9/02 Opp'n at 1; Glenn's Renewed Mot. to Dismiss at 2; 28 U.S.C. § 1391(b)(1). As for the second prong, although the complaint includes a statement that a "substantial part of the omissions occurred in DC area," it describes in detail violations of the contracts between the plaintiff and the state and private defendants and litigation in which the defendants allegedly committed fraud, all of which transpired in Pennsylvania. Compl. at 2,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

4-31; 28 U.S.C. § 1391(b)(2). The court determines that the plaintiff's unsubstantiated assertion that most of the omissions occurred in this district is a conclusory statement that incorrectly characterizes the facts of the complaint. Compl. at 2; *2215 Fifth St. Assocs.,* 148 F.Supp.2d at 54;*see also Kowal,* 16 F.3d at 1276. In addition, the complaint demonstrates that a substantial part, if not all, of the events giving rise to the plaintiff's claims occurred in Pennsylvania, not in the District of Columbia, and no relevant property exists in the District of Columbia. *E.g.,* Compl. at 6-25. Finally, because this action could be filed in the Western District of Pennsylvania-indeed that district has already heard and dismissed these same claims the third prong is not applicable. 28 U.S.C. § 1391(b)(3). Accordingly, venue does not exist in the District of Columbia but does exist in the Western District of Pennsylvania, the "district where a substantial part of the events or omissions giving rise to the claims occurred."28 U.S.C. § 1391(b)(2).

*\*8* If venue is improper, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."28 U.S.C. § 1406(a); *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 789 (D.C.Cir.1983). The plaintiff, however, does not ask the court to transfer the case to Pennsylvania. Rather, he insists that venue is improper in the Western District of Pennsylvania "due to the 'situation that exist' there[.]" Compl. at 2. The plaintiff explains that finding an impartial judge in the Western District of Pennsylvania "is not possible until 3rd Cir. changed its unlawful policy on counsel representation."*Id.* at 2. Because the plaintiff does not request a transfer of venue, and because he filed his cases here hoping to find a more sympathetic judge, transferring this action to Pennsylvania would not promote the interest of justice. *Naartex Consulting Corp.,* 722 F.2d at 789;*Prof'l Managers' Ass'n v. United States,* 761 F.2d 740, 744 (D.C.Cir.1985) (discussing Congress' disdain for forum shopping). Accordingly, the court grants the renewed motions to dismiss for improper

venue filed by defendants Pennsylvania, Pittsburgh, and Glenn.[FN6]

> FN6. Because defendant Forest Hills does not challenge venue, the court must evaluate its renewed motion to dismiss even though the court lacks venue over the claims against defendant Forest Hills. *Buchanan v. Manley,* 145 F.3d 386, 388 (D.C.Cir.1998) (stating that a district court may not *sua sponte* dismiss claims for lack of venue).

**D. The Court Grants Defendant Forest Hills's Renewed Motion to Dismiss Because the Statute of Limitations Bars the Claims**

**1. Legal Standard for Statute of Limitations**

A defendant may raise the affirmative defense of statute of limitations via a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint. *Smith-Haynie v. District of Columbia,* 155 F.3d 575, 578 (D.C.Cir .1998). Because statute of limitations issues often depend on contested questions of fact, however, the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint. *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C.Cir.1996). Rather, the court should grant a motion to dismiss only if the complaint on its face is conclusively time-barred and if "no reasonable person could disagree on the date" on which the cause of action accrued. *Id.;Smith v. Brown & Williamson Tobacco Corp.,* 3 F.Supp.2d 1473, 1475 (D.D.C.1998) (citing *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.,* 890 F.2d 456, 463 n. 11 (D.C.Cir.1989)).

Under the District of Columbia statute of limitations, a plaintiff has three years to bring civil rights, contract, conversion and intentional infliction of emotional distress claims. Civil rights claims brought in this court under section 1983 are governed by the District of Columbia's residual statute of limitations, D.C.Code § 12-301(8).*Carney v. Am.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))**

*Univ.,* 151 F.3d 1090, 1096 (D.C.Cir.1998) (citing *Owens v. Okure,* 488 U.S. 235, 243-50 (1989)). Accordingly, a plaintiff must bring a section 1983 claim within three years of its accrual. *Id.* In addition, section 12-301(2) and (7) of the D.C.Code apply three-year statutes of limitations to conversion and contract claims, respectively. *A .I. Trade Finance, Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1456 (D.C.Cir.1995). Because section 12-301 does not specify a statute of limitations for intentional infliction of emotional distress, section 12-301(8) applies to such claims. *See Carney,* 151 F.3d at 1096.

## 2. The Statute of Limitations Bars the Claims Against Defendant Forest Hills

*9 Defendant Forest Hills argues that the three-year statute of limitations, as set forth in D.C.Code § 12-301, bars the plaintiff's civil rights, contract, conversion and emotional infliction of emotional distress claims against it. Forest Hills's Renewed Mot. to Dismiss at 2; Forest Hills's Mot. to Dismiss at 6-7. Defendant Forest Hills argues that all of the plaintiff's allegations against it pertain to actions relating to its 1989 contract with the plaintiff and occurring no later than 1992. Forest Hills's Mot. to Dismiss at 6-7; *see also* Compl. 11-14 (setting forth the alleged violations of defendant Forest Hills). Applying section 12-301 as discussed in Part III.D.1, the court determines that a three-year statute of limitations applies to the plaintiff's civil rights, breach of contract, conversion and intentional infliction of emotional distress claims against defendant Forest Hills. D.C.Code § 12-301(2), (7), (8); Compl. at 1, 25-26. Therefore, to comply with these statutes of limitations, the plaintiff had to bring his claims within three years of their accrual. D.C.Code § 12-301(2), (7), (8).

The plaintiff failed to respond to defendant Forest Hills's renewed motion to dismiss, despite the court's order warning the plaintiff that failure to respond to a motion to dismiss "may result in the court granting the motion and dismissing the

[FN7]Order dated Aug. 2, 2002 (citing *Fox v. Strickland,* 837 F .2d 507, 509 (D.C.Cir.1988)).

> FN7. An opposing party must file a responsive memorandum of points and authorities in opposition to a Rule 12 motion within 11 days of the filing of the motion. LCvR 7.1(b). If the opposing party fails to do so, the court may treat the motion as conceded. *Giraldo v. Dep't of Justice,* 202 U.S.App. LEXIS 13685, at *2 (D.C.Cir. July 8, 2002) (citing *Fed. Deposit Ins. Corp. v. Bender,* 127 F.3d 58, 68 (D.C.Cir.1997)); *Twelve John Does v. District of Columbia,* 117 F.3d 571, 577 (D.C.Cir.1997). Accordingly, even if the court did not grant the motion to dismiss pursuant to the statute of limitations argument, the court could grant the renewed motion to dismiss as conceded.

The plaintiff, however, did respond to defendant Forest Hills's original motion to dismiss. Pl.'s 8/9/02 Opp'n. In that response, the plaintiff did not dispute the defendant's contention that the relevant acts all accrued in or before 1992. *Id.* Indeed, the plaintiff's August 11, 1994 complaint in civil action 94-1349, filed in the Western District of Pennsylvania, describes these same acts and thereby demonstrates that the plaintiff was aware of the acts in 1994, if not in 1992. Forest Hills's Mot. to Dismiss Ex. 1. Consequently, the acts accrued no later than 1994 and the statute of limitations expired in 1997, five years before the plaintiff filed his complaint in this action. D.C.Code § 12-301(2), (7), (8); *Smith,* 3 F.Supp.2d at 1475.

The plaintiff asserts an equitable tolling argument, stating that the court should toll the statute of limitations because he has previously filed identical claims and this action is merely a "follow-on case". A plaintiff, however, may invoke equitable tolling only when a defendant is found to have committed fraudulent concealment, hiding from the plaintiff the basis of a cause of action. *Hohri v. United States,* 782 F.2d 227, 246 (D.C.Cir.1986), *vacated*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 10
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.))

*and remanded on other grounds,* 482 U.S. 64 (1987). In arguing that he previously filed identical claims regarding the actions, he demonstrates that he was aware of the actions in 1994, the year in which he filed his most recent previous action regarding these claims. Compl. at 15; Forest Hills's Mot. to Dismiss Ex. 1. Because the plaintiff neither argues nor demonstrates that the defendant fraudulently concealed the basis of his cause of action, his equitable tolling argument fails. *Hohri,* 782 F.2d at 246.

**\*10** In sum, because "no reasonable person could disagree" that the plaintiff's claims accrued no later than 1994, and the plaintiff filed the instant complaint in 2002, the three-year statute of limitations bars the plaintiff's claims against defendant Forest Hills. *Firestone,* 76 F.3d at 1209. The court therefore grants defendant Forest Hills's motion to dismiss.

## IV. CONCLUSION

For all these reasons, the court denies the federal defendants' motion to strike and grants all of the defendants' renewed motions to dismiss. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this _____ day of August, 2003.

### *ORDER*

### DENYING THE FEDERAL DEFENDANTS' MOTION TO STRIKE; GRANTING THE DEFENDANTS' RENEWED MOTIONS TO DISMISS

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this _____ day of August, 2003, it is

**ORDERED** that the federal defendants' motion [27] to strike is **DENIED**; and it is

**FURTHER ORDERED** that the federal defendants' renewed motion [50] to dismiss is **GRANTED**; and it is

**ORDERED** that the plaintiff's motion [34] for a hearing is **DENIED**; and it is

**FURTHER ORDERED** that defendant Pennsylvania's renewed motion [48] to dismiss is **GRANTED**; and it is

**ORDERED** that defendant Forest Hills's renewed motion [24] to dismiss is **GRANTED**; and it is

**FURTHER ORDERED** that defendant Pittsburgh's renewed motion [28] to dismiss is **GRANTED**; and it is

**ORDERED** that defendant Glenn's renewed motion [33] to dismiss is **GRANTED**.

**SO ORDERED.**

D.D.C.,2003.
Mikkilineni v. Com. of Pennsylvania
Not Reported in F.Supp.2d, 2003 WL 21854754 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TILLOTSON CORPORATION'S BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS FOR IMPROPER VENUE OR IN THE
<u>ALTERNATIVE TO TRANSFER</u>**


**EXHIBIT F**

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2008 WL 1862298 (D.D.C.)
**(Cite as: 2008 WL 1862298 (D.D.C.))**

Greater Yellowstone Coalition v. Kempthorne
D.D.C.,2008.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
GREATER YELLOWSTONE COALITION, et al.,
Plaintiffs,
v.
Dirk KEMPTHORNE, et al., Defendants.
National Parks Conservation Association, Plaintiff,
v.
United States Department of Interior; National Park
Service, Defendants.
**Civil Action Nos. 07-2111(EGS), 07-2112(EGS).**

April 24, 2008.

David S. Baron, Earthjustice, Washington, DC,
Douglas L. Honnold, Sean M. Helle, Earthjustice,
Bozeman, MT, for Plaintiffs.
Barry Alan Weiner, Guillermo A. Montero, Luther
L. Hajek, U.S. Department of Justice, Washington,
DC, for Defendants.
William P. Horn, Birch, Horton, Bittner and
Cherot, Washington, DC, for Movants.

*MEMORANDUM OPINION*

EMMET G. SULLIVAN, District Judge.
*1 Litigation concerning the use of snowmobiles in
Yellowstone and other national parks has been on-
going in this Court in various forms since 1997.
The instant cases represent the latest in a series of
challenges to the regulations promulgated by the
National Park Service ("NPS") concerning winter
activities in the National Parks. The regulations
currently at issue propose new restrictions on recre-
ational snowmobiling in Yellowstone and Grand
Teton National Parks and the John D. Rockefeller
Jr. Memorial Parkway (collectively "the parks").
Specifically, the new Winter Use Plan promulgated
by Defendants allows 540 recreational snowmo-
biles to enter Yellowstone National Park every day.
Plaintiffs allege that this number is so high as to

render the plan arbitrary and capricious in violation
of the Administrative Procedure Act ("APA") and
procedurally flawed in violation of the National En-
vironmental Protection Act ("NEPA").

Pending before the Court is Defendants' Motion to
Transfer this case to the District of Wyoming where
similar litigation has also been filed. Upon consid-
eration of the Motion, the responses and replies
thereto, the applicable law and the entire record of
this long-running litigation, the Court **DENIES** De-
fendants' Motion. Also pending before the Court is
the International Snowmobile Manufacturers Asso-
ciation's Motion to Intervene as Defendants and to
assert cross-claims. For the reasons stated herein,
the Motion to Intervene is **GRANTED IN PART
AND DENIED IN PART.**

**I. BACKGROUND**

**A. History of Snowmobiles Litigation**

This Court's involvement in the ongoing series of
cases regarding Yellowstone's winter management
began in 1997 and has continued nearly without
pause to the present day. *See Fund for Animals v.
Norton,* 323 F.Supp.2d 7 (D.D.C.2004)("*FFA II*");
*Fund for Animals v. Norton,* 294 F.Supp.2d 92
(D.D.C.2003)("*FFA I*"); *Fund for Animals v. Bab-
bitt,* 97-cv-1126 (EGS) (filed May 20, 1997). Over
the years, environmental and recreation groups
have challenged the Park Service's restrictions on
the use of snowmobiles in the parks, with the more
recent controversies growing out of a year 2000 Re-
cord of Decision which found that the use of snow-
mobiles at present levels so harmed the integrity of
the parks' resources and values that it violated the
NPS Organic Act. *See Record of Decision,*Winter
Use Plans for the Yellowstone and Grand Teton
National Parks and John D. Rockefeller Jr., Me-
morial Parkway ("2000 ROD"), 65 Fed.Reg.
80,908, 80,916 (Dec. 22, 2000). In light of this
finding, in 2001, NPS published a Final Rule call-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 2
Slip Copy, 2008 WL 1862298 (D.D.C.)
(Cite as: 2008 WL 1862298 (D.D.C.))

ing for the eventual phaseout of personal snowmobiles in the parks, and instead recommended continued winter access through the use of a snowcoach mass transit system. *FFA I,* 294 F.Supp.2d at 100. The "phase-out rule," promulgated by the Clinton administration, was published the day after President George W. Bush took office, and was immediately stayed pending a review of the Rule by the new administration. *Id.* In response to litigation brought by snowmobiling interest groups, NPS prepared a Supplemental EIS ("SEIS") in 2003. The SEIS proposed a dramatic change of course. In place of the planned phase-out, NPS set a new limit of 950 snowmobiles per day in Yellowstone. *Id.* at 101. Following two lawsuits in this Court and one in the District of Wyoming, NPS put into effect a "Temporary Winter Use Plan" which allowed a daily limit of 720 snowmobiles, subject to "best available technology" standards and some commercial guide requirements. This temporary plan was to be in effect for three winter seasons, from 2004 through 2007, and then replaced with a long-term winter use plan in 2007/2008. It is that long-term plan which is the subject of the instant case.

**B. The Instant Suit**

**\*2** On September 24, 2007, NPS published its Winter Use Plans Final Environmental Impact Statement ("FEIS"). The complete plan was published in a November 20, 2007 Record of Decision ("2007 ROD"). The 2007 ROD claims to address "this Court's various concerns regarding the winter use 2003 Supplemental EIS" and allows 540 recreational snowmobiles per day, subject to "best available technology standards," commercial guiding, and a requirement that all snowmobilers travel in groups of eleven or less. 2007 ROD, p. 3, 8, 13-15. On November 20 and 21, 2007, two lawsuits were filed in this Court challenging the FEIS and ROD. The Greater Yellowstone Coalition Plaintiffs were the first to file suit and consist of conservation organizations that "take an active interest in maintaining the integrity of the National Park System."This group includes the Sierra Club, the Winter Wild-

lands Alliance, the Wilderness Society and the Natural Resources Defense Counsel (collectively "GYC"). GYC Compl. ¶ 7. The second suit was brought by plaintiff National Parks Conservation Association ("NPCA"), the largest national organization in the United States dedicated to the protection and enhancement of the National Park System. NPCA Compl. ¶ 8. Both suits allege that the FEIS and 2007 ROD in this case failed to comply with the National Environmental Protection Act ("NEPA") and the Administrative Procedure Act ("APA"). On December 18, 2007, NCPA amended its complaint to include a challenge to the 2007 Final Rule, which was published on December 13, 2007. In addition to NEPA and the APA, NPCA contends that the 2007 Final Rule violates the National Park Service Organic Act, and governing Executive Orders and NPS Regulations. The GYC plaintiffs likewise amended their compliant on January 11, 2008 to also challenge the Final Rule bringing similar claims. The cases were consolidated by Order of this Court on March 19, 2008.[FN1]

> FN1. The Court's consolidation Order indicated that any later filed Motion to Transfer would be resolved separately for each Plaintiff. The Court has considered the separate responses of each Plaintiff along with the Defendants' separately filed replies. However, as explained herein, the Court finds that Defendants have failed to meet their burden for reasons that apply equally to each Plaintiff. Accordingly, in the interest of judicial economy, and because Defendants' burden is the same in both cases, the Court resolves this motion in a single opinion.

Defendants are the National Park Service, Dirk Kempthorne, in his official capacity as the Secretary of the Interior, Mary Bomar in her official capacity as Director of the National Park Service and Mike Snyder in his official capacity as Director of the Intermountain Region of the U.S. National Park Service (collectively "NPS").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2008 WL 1862298 (D.D.C.)
**(Cite as: 2008 WL 1862298 (D.D.C.))**

## C. The Wyoming Litigation

On December 13, 2007, the State of Wyoming filed a petition for review of agency action challenging the FEIS, 2007 ROD, and 2007 Final Rule, alleging that those actions violate NEPA, the APA, the Organic Act, the Yellowstone National Park Act, and the United States Constitution insofar as they (1) impose daily limits on snowmobile access to Yellowstone National Park ("Yellowstone"); (2) impose a commercial guide requirement; and (3) impose a new management scheme for Sylvan Pass. Defs.' Mot. at 9. On January 2, 2008, the Board of County Commissioners of the County of Park filed a nearly identical petition. *Id.* The two Wyoming Cases were consolidated by Order dated February 19, 2008. *Id.* On February 22, 2008, the International Snowmobile Manufacturers Association, the American Council of Snowmobile Associations, the Blue Ribbon Coalition, and Terri Manning (collectively "ISMA") filed a motion to intervene as plaintiffs in the consolidated Wyoming Cases, challenging the 2007 Final Rule's reduced limit of 540 snowmobiles per day in Yellowstone and the commercial guide requirement. *Id.* ISMA's motion was granted the same day.

## II. DISCUSSION

**\*3** On March 25, 2008, Defendants filed a Motion to Transfer this case to the District of Wyoming. Defendants contend that transfer is warranted because of the risk of inconsistent verdicts between the two Federal Courts presently entertaining challenges to the 2007 Final Rule and supporting documentation. Defendants also argue that the "localized nature" of this controversy and the public interest in judicial economy warrant transfer. Plaintiffs counter that substantial deference is due to their choice of forum in this Court, that this Court's history with this litigation counsels in favor of denying transfer, that this issue is of national significance, and that the principle of comity requires any similar cases to be transferred to this Court because the first challenge relating to the 2007 Final

Rule was filed here.

Under 28 U.S.C. § 1404(a), district courts in their discretion may transfer a case to any other district where it might have been brought "[f]or the convenience of the parties and witnesses, in the interest of justice."28 U.S.C. § 1404(a). Under this statute, the moving party "bears the burden" of establishing that transfer is appropriate. *Flynn v. Veazey Constr. Corp.,* 310 F.Supp.2d 186, 193 (D.D.C.2004).*See Sec. and Exch. Comm. v. Savoy Ind., Inc. .,* 587 F.2d 1149, 1154 (D.C.Cir.1978) (district court's ruling denying motion to transfer "was effectively a ruling that [appellant] had failed to shoulder his burden").

A party dissatisfied with the plaintiffs' chosen forum has the burden of demonstrating the appropriateness of transfer. *FFA II,* 352 F.Supp.2d at 1-2.If venue is proper, as it is here, transfer elsewhere under Section 1404(a) must be justified by particular circumstances that render the transferor forum inappropriate by reference to the considerations specified in that statute.*Savoy Ind.,* 587 F.2d at 1154 (internal quotations omitted). Ultimately, in all but those cases in which the plaintiffs' chosen forum has " 'no meaningful ties to the controversy and no particular interest in the parties or subject matter[,]' " courts "must afford substantial deference to the plaintiffs' choice of forum." *Greater Yellowstone Coalition v. Bosworth,* 180 F.Supp.2d 124, 128 (D.D.C.2001) (quoting *Islamic Republic of Iran v. Boeing Co.,* 477 F.Supp. 142, 144 (D.D.C.1979)); see also *FFA II,* 352 F.Supp.2d at 2;*Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 12 (D.D.C.2000) ("Absent specific facts that would cause a district court to question plaintiffs' choice of forum, plaintiffs' choice is afforded substantial deference."). In exercising their broad discretion, courts are to "balance case-specific factors which include the private interests of the parties and public interests such as efficiency and fairness." *Greater Yellowstone Coalition,* 180 F.Supp.2d at 127.

## A. Private Interest Factors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The private-interest factors include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. *See Greater Yellowstone Coalition,* 180 F.Supp.2d at 127 (citing *Trout Unlimited v. U.S. Dep't of Agric.,* 944 F.Supp. 13, 16 (D.D.C.1996) (citations omitted)).

*\*4* Because this is an action for review of an administrative record and live testimony is unlikely, the Court need not consider the fifth and sixth factors. *Id.* Of the remaining four factors, only the Defendants' choice of forum arguably weighs in favor of transfer. Defendants primarily argue that their choice of forum will avoid the risk of inconsistent verdicts between this Court and the District of Wyoming. However, that result is far from certain. Defendants have informed the Court that they have filed a contingent Motion to Transfer the Wyoming litigation to this Court that will be ripe for adjudication on April 25, 2008. Defendants apparently fear that their Motion will be denied and they will again face the risk of inconsistent judgments should both cases ultimately be decided on the merits in their respective venues. Defendants ask this Court to override Plaintiffs' choice of forum based on mere speculation about the likelihood of an adverse ruling on their Motion to Transfer in the Wyoming Court. This Court will not engage in such speculation about the decisions of another Federal Court. Furthermore, it is speculative at this early stage whether the risk of inconsistent judgments is a legitimate concern. While this case certainly has a history of conflicting orders, the challenges presented in the instant suits are not identical, nor are they guaranteed to produce conflicting outcomes.

The remaining private interest factors counsel in favor of denying transfer. As to the convenience of

the parties, Plaintiff NPCA has its headquarters in Washington, DC and the litigation is being directed by its General Counsel, who is located in the District of Columbia. The NCPA's outside counsel is also located in the District of Columbia. Of the GYC Plaintiffs, the Wilderness Society, the Sierra Club, and the Natural Resources Defense Counsel each have offices here. The Winter Wildlands Alliance is based in Boise, Idaho, and the Greater Yellowstone Coalition is headquartered in Bozeman, Montana, with two staff members based in a Wyoming Field Office and six staff members working out of Idaho Falls, Idaho. Both the Federal Defendants' headquarters and their counsel in the Department of Justice are also based in Washington, DC. Furthermore, proposed intervenors' counsel, the firm of Birch, Horton, Bittner and Cherot, an Alaska-based firm, has its only other office in the District of Columbia.

Defendants argue that the Wyoming District Court is not inconvenient because several of the plaintiffs have field offices in or around Yellowstone. Defendant contends that "none of the plaintiffs could claim prejudice as a result of being made to litigate in Wyoming" because "NCPA has field offices in both Jackson Hole, Wyoming, and Livingston, Montana ... The Wilderness Society also has a field office ... in Bozeman, Montana ... and the Greater Yellowstone Coalition is headquartered in Bozeman."Def.'s Mot. at 17. This argument fails to appreciate the magnitude of the Western landscape. The Wyoming District Court in Cheyenne where the related litigation is pending is approximately 600 miles from both Bozeman and Livingston and 432 miles from Jackson Hole. Defendants cannot reasonably maintain that the presence of field offices an average of 500 miles from the Court is more convenient than a main office approximately 2.5 miles away, as is the case for both the Wilderness Society and the NCPA Plaintiffs. Accordingly, the Court finds that the convenience of the parties clearly weighs in favor of denying transfer. Defendants have failed to articulate any prejudice that will befall them by being forced to litigate in this Dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trict, the home to both Defendants themselves and their counsel.

**\*5** Finally, the Court also finds that the claim did not "arise elsewhere," but rather arose in this District, where the Rule was drafted and published. NPCA Plaintiffs aver significant involvement on the part of high-level Executive Branch officials, up to and including those in the White House. NPCA Opp'n at 6. The Final Rule was signed by the Assistant Secretary of the Interior for Fish and Wildlife and Parks, who is based in Washington, D.C. The voluminous Administrative Record is located in the District of Columbia. While it is undoubtedly the case that NPS officials located in and around Yellowstone provided input into the formulation of the FEIS, the 2007 ROD, and the 2007 Final Rule, this controversy stems from the formulation of national policy on an issue of national significance. *See Wilderness Soc'y,* 104 F.Supp.2d at 14.

**B. Public Interest Factors**

The Court has determined that the private interest factors weigh heavily in favor of denying transfer. However, the Court must also analyze whether the public-interest factors also support denying Defendants' motion. The Court determines that they do.

The public-interest considerations include: (1) the transferee's familiarity with the governing laws and the pendency of related actions in the transferee's forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *See Greater Yellowstone Coalition,* 180 F.Supp.2d. At 128.

First, as detailed above, this Court has a long history with the facts and law surrounding this case and the prior litigation involving winter use at Yellowstone National Park. This Court has rejected previous attempts to transfer this litigation out of this district and finds that Defendants have failed to produce any new or compelling arguments to per-

suade the Court that in spite of this Court's experience with this litigation, transfer is appropriate now.

As for the pendency of related actions, the Court finds it is in the interest of justice that the principle of comity is upheld. Plaintiffs' complaints in this Court were filed on November 20 and 21, 2007. The Wyoming plaintiffs filed their complaint on December 13, 2007. Under the so-called "first-to-file rule," the first court in which jurisdiction attaches has priority to consider the case. This rule has been invoked by both the Tenth and D.C. Circuits. *See Washington Metro. Area Transit Auth. v. Ragarose,* 617 F.2d 828, 830 (D.C.Cir.1980) ("For more than three decades the rule in this circuit has been that '[w]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first...."); *Cessna Aircraft Co. v. Brown,* 348 F.2d 689, 692 (10th Cir.1965) ("The rule is that the first federal district court which obtains jurisdiction of parties and issues should have priority and the second court should decline consideration of the action until the proceedings before the first court are terminated."). Defendants do not object to the consolidation of these related actions before a single Court and accordingly have filed a contingent motion in the District Court in Wyoming to transfer the related litigation to this forum. This Court has no reason to believe that the District of Wyoming would not observe the same principles of comity upheld in both the D.C. and Tenth Circuits and grant Defendants' motion to transfer the related litigation here. Although Defendants' concerns about the prospect of conflicting orders are understandable, it appears to this Court that such a conflict is unlikely.

**\*6** The Court rejects Defendants' argument that Plaintiffs' initial complaints challenging the 2007 ROD and FEIS were somehow deficient such that they should not be accorded first-filing status. Defendants chose not to challenge the sufficiency of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 6
Slip Copy, 2008 WL 1862298 (D.D.C.)
(Cite as: 2008 WL 1862298 (D.D.C.))

Plaintiffs' complaints and therefore the Court considers any such argument waived. Furthermore, as a general matter, Defendants are incorrect as a matter of law. *See Ouachita Watch League v. Jacobs,* 463 F.3d 1163, 1173 (11th Cir.2006)("It is well settled that a final EIS or the record of decision issued thereon constitute final agency action.") (citing *SW Williamson County Cmty Ass'n, Inc. v. Slater,* 173 F.3d 1033, 1036 (6th Cir.1999)). Defendants chose not to argue that the ROD or FEIS in this case might constitute an exception to this rule and therefore the Court will not entertain that argument now.

As for the respective calendars of each court, Defendants have not argued that the District of Wyoming has a less congested docket than this Court. Accordingly, this factor does not weigh in favor of transfer.

Finally, Defendants argue that this case is a "localized controversy" the effects of which will be "more acutely felt in the state of Wyoming" and therefore it should be decided "within their view." Defs.' Mot. at 15. While the Court does not discount the importance of these issues to the people of Wyoming, the Court finds, as it has done previously, that the management of Yellowstone National Park and more broadly, the interpretation of various federal mandates governing the NPS, present questions of national significance. *See Greater Yellowstone Coalition,* 180 F.Supp.2d at 128-29 (noting the "national significance" of a case involving the interpretation of federal statutes, and no state laws, affecting the management of the Yellowstone buffalo); *Wilderness Soc'y,* 104 F.Supp.2d at 13 (concluding that the Department of the Interior's decision to begin oil and gas leasing on Alaska's National Petroleum Reserve was a "national policy decision" concerning a "national resource" not "an isolated, local environmental issue"). Yellowstone National Park is truly a national icon. The first case challenging the winter use plan for the parks was litigated in this District precisely because conserving the scenery, natural objects and wildlife of that park is a matter of great national

importance. *See FFA I,* 294 F.Supp.2d at 102-03. With respect to both the draft EIS and the proposed rule, comments came from every state in the United States and 14 foreign countries. GYC Opp'n at 17. More than 70% of visitors to Yellowstone and Grand Teton National Parks are from states other than Wyoming, Montana and Idaho, the States in which those Parks are located in whole or in part. *See* NPCA Opp'n, Ex. A.

This case is distinguishable from *Trout Unlimited v. U.S. Dep't of Agric.,* 944 F.Supp. 13 (D.D.C.1996). In that case, this Court granted defendant's motion to transfer because no plaintiff resided in the District of Columbia, the challenged decision was inherently local and the controversy involved the potential interpretation of Colorado law. *Id.* at 18-19. *Hawksbill Sea Turtle v. FEMA,* 939 F.Supp. 1 (D.D.C.1996) is also unavailing. There, all the plaintiffs and their witnesses lived in the Virgin Islands and the environmental laws in question were alleged to have been violated there. Moreover, the prior action in the District Court for the Virgin Islands "created three volumes of trial transcript, and a large volume of documents and exhibits." *Id.* at 3. This Court found that "no other court is more familiar with the factual background and legal issues of this case than the District Court for the Virgin Islands, and there is little doubt that transfer of this case will promote significant economy of judicial resources." *Id.* at 4.

*7 As in *Wilderness Society v. Babbitt,* Plaintiffs' ties to the District of Columbia, the involvement of multiple Washington-based officials in the challenged action, and the national scope of the environmental issues at stake defeat Defendants' claim that the connection between Plaintiffs, the controversy and the forum is attenuated. The management of the National Parks and the interpretation of federal environmental statutes are nationwide concerns. Accordingly, Plaintiffs' choice of forum is entitled to substantial deference. *Wilderness Soc'y,* 104 F.Supp.2d at 14. Defendants have failed to meet their burden of demonstrating the appropriate-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ness of transfer in this case, and accordingly the Plaintiffs' choice of forum must be respected.

## III. MOTION TO INTERVENE

Also pending before the Court is ISMA's Motion to Intervene as defendants and to assert cross-claims against the Federal Defendants in this case. Applicant Intervenors are organizations dedicated to the promotion of snowmobiling and the snowmobiling industry and the promotion of snowmobiling as part of responsible conservation and management policies. Furthermore, these organizations' members enjoy snowmobiling in Yellowstone National Park.[FN2] ISMA's Mot. at 3. Applicant Intervenors contend they "have significant interests in this litigation that are not adequately represented by the current parties."*Id.*

> FN2. As previously noted, Applicant Intervenors include the International Snowmobile Manufacturers Association, the American Council of Snowmobile Associations, the Blue Ribbon Coalition, and Terri Manning (collectively "ISMA").

ISMA argues that it is entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a). Alternatively, ISMA moves the Court for permissive intervention under Rule 24(b).

Rule 24(a) provides:

> On timely motion, the court must permit anyone to intervene who:

> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed.R.Civ.P. 24(a).

As a threshold matter, an applicant for intervention

as of right must show that it has standing under Article III of the U.S. Constitution to participate in the litigation as a party. *See Military Toxics Project v. EPA,* 146 F.3d 948, 953 (D.C.Cir.1998). There are three additional prerequisites to intervention as of right: (1) there must be an "adequate interest"; (2) there must be a "possible impairment of that interest"; and (3) there must be a "lack of adequate representation of that interest by existing parties."*Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C.Cir.1986). ISMA's Mot. at 17.

ISMA's Motion to Intervene as a defendant was timely filed and is unopposed. *See* Def.'s Opp'n at 3, n. 2; *see generally* GYC's Opp'n, NCPA's Opp'n. The Court agrees that ISMA has Article III standing, and has substantial interests in the case that are subject to impairment that would not be adequately represented by the parties. Accordingly, ISMA's motion is **GRANTED** insofar as ISMA seeks to intervene as a defendant against Plaintiffs' claims.

**\*8** However, the Court will not allow ISMA's cross-claims against the Federal Defendants to proceed in this case at this time. ISMA has filed identical claims in the District of Wyoming litigation against the same defendants. Under the first-to-file rule discussed above, this Court must yield to the Wyoming Court's jurisdiction over ISMA's claims. Should ISMA decide to voluntarily withdraw its affirmative claims against the Federal Defendants in Wyoming, or if that case is ultimately transferred to this Court, they are free to move the Court to reconsider its decision.

## IV. CONCLUSION

For the reasons stated herein, Defendants have failed to persuade the Court that transfer of this case to the District of Wyoming is in the interests of justice. Accordingly, it is hereby **ORDERED** that Defendants' Motion to Transfer is **DENIED.**It is **FURTHER ORDERED** that ISMA's Motion to Intervene is **GRANTED IN PART AND DENIED IN PART.**ISMA may intervene as a defendant, but

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 8
Slip Copy, 2008 WL 1862298 (D.D.C.)
**(Cite as: 2008 WL 1862298 (D.D.C.))**

may not assert affirmative cross-claims at this time.
An appropriate Order accompanies this Memor-
andum Opinion.

D.D.C.,2008.
Greater Yellowstone Coalition v. Kempthorne
Slip Copy, 2008 WL 1862298 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.