**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ANSELL HEALTHCARE PRODUCTS
LLC, and ANSELL PROTECTIVE
PRODUCTS INC.,**

              **Counterclaimants,**

   **v.**

**TILLOTSON CORPORATION,**

             **Counterclaim
Defendant.**

**C.A. 1:08-CV-585-RMC**

## TILLOTSON CORPORATION'S MOTION TO STAY PROCEEDINGS

Tillotson Corporation ("Tillotson") respectfully moves this Court to stay the Counterclaims filed by Ansell Healthcare Products LLC, and Ansell Protective Products Inc. (collectively, "Ansell" ) pending final resolution of the related International Trade Commission ("ITC") action.

For the reasons set forth in the brief accompanying this Motion, the Court should exercise its discretion and stay this action because a balance of the equities and the doctrine of primary jurisdiction favor a stay while the ITC discharges its statutorily mandated duty of determining whether to enjoin the importation and sale of certain goods that infringe upon the patent at issue in this case.

Counsel conferred on this issue during the Fed. R. Civ. P. 26(f) Rule pre-discovery conference in accordance with LCvR 7(m).  A proposed Order is attached pursuant to LCvRule 7(c).

For the reasons set forth above and in the accompanying brief, Tillotson respectfully requests that the Court stay this action pending the ultimate resolution of the related ITC action or at least until the Court has ruled on Tillotson's Motion to Dismiss or in the Alternative Transfer. [D.E. 6].

Respectfully submitted this 29th day of July, 2008.

/s  Brian Meiners
Brian R. Meiners (D.C. Bar No. 482039)

KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC  20006-2706
Telephone:  (202) 626-2910


 /s/ Asha C. Jennings
M. Russell Wofford
Stephen P. Cummings
Asha C. Jennings

KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 572-4711


Admitted *Pro Hac Vice*
*Counsel for Counterclaim Defendant*
*Tillotson Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANSELL HEALTHCARE PRODUCTS LLC, and ANSELL PROTECTIVE PRODUCTS INC., <br><br> Counterclaimants, <br><br> v. <br><br> TILLOTSON CORPORATION, <br><br> Counterclaim Defendant. | C.A. 1:08-CV-585-RMC |

TILLOTSON CORPORATION'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO STAY

If it declines to dismiss or transfer this case, the Court should at least stay this case pending final resolution of the related International Trade Commission ("ITC") action. The ITC action is substantially further along than this case, will conclude in four months,[1] and involves a federal agency with special expertise in patent law. Its resolution will simplify the issues in this lawsuit, conserve judicial resources, lessen the likelihood of inconsistent rulings, and not harm Ansell.

The Court should therefore stay this case until the ITC concludes its investigation.

### Background

The ITC is investigating the sale and importation into the United States of certain nitrile gloves that Tillotson believes utilize the invention claimed in Tillotson's Patent No. Re. 35,616 ("the '616 patent"). See In the Matter of Certain Nitrile Gloves, U.S. Int'l Trade Comm'n, Inv.

---

[1] At this time, Tillotson seeks only to stay this case until the ITC adopts or rejects the Administrative Law Judge's decision. Tillotson reserves the right to seek an additional stay should a party appeal the ITC's decision.

No. 337-TA-608, 72 Fed. Reg. 37052 (July 6, 2007).  This past May, Tillotson and Ansell

participated in a trial before the ITC regarding the validity, enforceability, and infringement of

the '616 patent -- all issues relevant to this action as well.  <u>See</u> Order No. 28, p. 6 (Exh. A).  The

Administrative Law Judge is expected to issue his ruling on these issues no later than August 25,

2008.  <u>Id.</u>, p. 7.  The ITC then has until November 24, 2008 to adopt or reject the ALJ's decision.

<u>Id.</u>

Almost two years ago, Ansell filed two separate declaratory-judgment actions against

Tillotson in federal court in Delaware raising the same issues addressed in the ITC action.  <u>See</u>

Ansell's Delaware Litigation Complaints (Exh. B).  On Tillotson's motion, that court has stayed

those lawsuits until the ITC action is concluded.  <u>See</u> Delaware Court Order dated Nov. 14, 2007

(Exh. C).[2]

In this case, Tillotson has already filed a Motion to Dismiss for Improper Venue Or in the

Alternative to Transfer.  [D.E. 6]  During the parties' pre-discovery conference under Fed. R.

Civ. P. 26(f), they were unable to agree on whether to stay the current action pending the

outcome of the ITC proceeding.  Joint Rule 26(f) Report [D.E. 17], ¶ 1.  Ansell, in fact, has

already served Tillotson with discovery.[3]  Tillotson thus moves to stay this action as an

alternative to the case's dismissal or transfer.

## ARGUMENT

Courts have broad discretion -- "incidental to the power inherent in every court to control

the disposition of [their] cases" -- in deciding whether to stay an action.  <u>Bacardi & Company</u>

---

[2]   Initially, Ansell opposed Tillotson's Motion to Stay the Delaware Litigation.  <u>See</u> Delaware Court Order dated August 24, 2007 (Exh. D).  Several months later, Tillotson filed another Motion to Stay the Delaware Litigation, which Ansell did not oppose.  (Exh. C).

[3]   On June 27, 2008 and June 30, 2008, Ansell served Tillotson with its first set of requests for production and first set of interrogatories (Exh. E).

Ltd. v. Empresa Cubana Exportadora De Alimentos & Productos Varios, Inc., No. 04-519, 2007
WL 1541386, at *1 (D.D.C. May 24, 2007) (Exh. F) (stay granted while an appeal of a Patent
and Trademark Office ruling was pending).  In determining whether a stay is appropriate, courts
"balance the equities" by comparing the harm that will result from a stay against the benefit of
granting the stay.  See Feld Entm't, Inc. v. A.S.P.C.A., 523 F. Supp. 2d 1, 3 (D.D.C. 2007)
(balance of the equities supports staying case until resolution of a related action).  In cases with a
related action pending before an agency or administrative body, such as the ITC, courts also
consider whether the doctrine of primary jurisdiction recommends a stay as in the parties' best
interest.  See Am. Tel. & Tel. Co. v. MCI Commc'ns Corp., 837 F. Supp. 13, 16-17 (D.D.C.
1993) (action stayed pending resolution of related issue before the FCC).

     Both the equities and the doctrine of primary jurisdiction compel a stay of this case.  The
Court should therefore stay the case pending the ITC's final resolution of that proceeding; or, in
the alternative, stay discovery until ruling on Tillotson's pending motion to dismiss or transfer.

**I.      The Equities Favor a Stay.**

     This Court should consider several factors in weighing the equities of a stay, including
the stay's: (1) impact on the efficient resolution of this case; (2) effect on the use of judicial
resources; (3) ability to help avoid inconsistent judgments; and (4) potential to threaten undue
prejudice or disadvantage to Ansell.  See Fairview Hosp. v. Leavitt, No. 05-1065, 2007 WL
1521233, at *1-3 (D.D.C. May 22, 2007) (Exh. G); IBT/HERE Employee Representatives'
Council v. Gate Gourmet Div. Americas, 402 F. Supp. 2d 289, 292-93 (D.D.C. 2005) (citation
omitted); Novartis Corp. v. Dr. Reddy's Labs. Ltd., No. 04-Civ-0757, 2004 WL 2368007, at *3
(S.D.N.Y. Oct. 21, 2004) (Exh. H) (stay is proper where it may allow an agency action to narrow

the issues, will conserve judicial resources, and there is little prejudice to the parties). Here, all four equity factors justify the stay that Tillotson requests.

A.    A Stay Will Narrow the Issues in this Action.

Courts have recognized that an ITC proceeding can help define or narrow the issues pending in a parallel district court action. See Iljin USA v. NTN Corp., No. 06-10145, 2006 WL 568351, at *2 (E.D. Mich. Mar. 7, 2006) (Exh. I) (granting stay until final determination of ITC action); Flexsys Americas, LP v. Kumho Tire, U.S.A., Inc., No. 5:05CV156, 2005 WL 1126750, at *3-4 (N.D. Ohio Apr. 29, 2005) (Exh. J) (same). During an ITC investigation, for instance, "the ITC will make rulings concerning claim construction [and] invalidity" resulting in fewer issues for the Court to resolve. Flexsys Americas, 2005 WL 1126750, at *3. Regardless of whether the ITC's rulings create res judicata for this case, the Court could "benefit tremendously from narrowing of the complex issues in this case." Id.

Ansell has accused Tillotson of enforcing its '616 patent in bad faith, by knowingly obtaining an invalid and unenforceable patent, filing claims in the ITC and elsewhere, and coercing settlements based on its invalid patent. Amended Counterclaim at ¶¶ 10-16 [D.E. 5]. The ITC action involves many of the same issues: the patent's claim construction and validity, Ansell's infringement, and Tillotson's enforcement of the patent. Ansell, in fact, concedes that rulings in the ITC action could affect this litigation. Joint Rule 26(f) Report [D.E. 17], ¶ 4 (the parties agreed to revisit the use of the Court's alternative dispute resolution process after the determination of the ITC proceeding).

Some issues' resolution in the ITC, in fact, could prove dispositive of Ansell's claims in this action. First, an ITC judgment for Tillotson would rebut any claim that Tillotson had initiated that proceeding in bad faith. See Andrx Pharma. v. Elan Corp., 421 F.3d 1227, 1234

(11th Cir. 2005) (citation omitted) ("a winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham"); USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, 31 F. 3d 800, 810-12 (9th Cir. 1994) (plaintiff cannot objectively prove sham litigation when the defendant had a success rate over 50% in the related suits).[4] The ITC action supposedly forms a "central part" of Tillotson's "campaign" to injure Ansell. See Ansell Parties' Opposition to Tillotson's Motion to Dismiss or in the Alternative to Transfer, p. 8 [D.E. 11]; Amended Counterclaim at ¶ 12 [D.E. 5]. Should the ITC rule for Tillotson, Ansell cannot assert that Tillotson's claims before that agency were objectively baseless, and a "central part" of Ansell's claims disappears. See Baltimore Scrap Corp., 237 F.3d at 399 (citation omitted) ("By definition a winning lawsuit is . . . not a sham.").

Second, the ITC could rule against Tillotson, but also find that Tillotson nevertheless acted in good faith in obtaining and enforcing the '616 patent. An ITC determination that Tillotson acted in good faith would at least inform, if not preclude, this Court's determination of the bad-faith issues necessary to sustain Ansell's Counterclaim. See, e.g., Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999) (tortious-interference claims require "a strong showing of intent to disrupt ongoing business relations .... conduct must be more egregious, for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement.").

The ITC could narrow, and may even eliminate, some or all of Ansell's claims against Tillotson. This first equity factor therefore favors granting the stay that Tillotson has requested.

---

[4] Even if reversed on appeal, a finding by the ITC that the patent was valid and enforceable would create highly probative evidence that Tillotson's effort to enforce the patent was objectively reasonable. See Baltimore Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 399 (4th Cir. 2001) (success before a trial court that is overturned on appeal demonstrates a reasonable basis for the litigation and cannot be the basis of a sham litigation claim).

B.      A Stay Would Conserve the Court's Resources.

A stay that narrows and defines the issues will also conserve the Court's resources.  See

Iljin USA, 2006 WL 568351, at *2 (Exh. I) ("Indisputably, it would conserve judicial resources

to allow the ITC investigation to at least narrow the issues before this case proceeds"); see also

Novartis Corp., 2004 WL 2368007, at *3 (Exh. H) (staying the action pending the completion of

an agency evaluation will conserve judicial resources); Broad. Innovation, L.L.C. v. Charter

Communication, Inc., No. 03-CV-2223-ABJ-BNB, 2006 WL 1897165, at *11-12 (D. Colo. July

11, 2006) (Exh. K) (stay is in the most efficient use of judicial resources by preventing

duplication of effort).  Staying the present action would prevent the waste of judicial time and

money that would result from re-litigating the same issues that the ITC will decide in less than

four months.   The second equity factor also supports a stay.

C.      A Stay Would Lessen the Likelihood of Inconsistent Rulings.

A stay will also reduce the risk of inconsistent rulings on the '616 patent's validity and

enforceability.  See Iljin USA, 2006 WL 568351, at *2 (Exh. I) (granting a stay pending an ITC

decisions will eliminate the possibility of inconsistent rulings); Frontier Tel. of Rochester, Inc. v.

USA Datanet Corp., 386 F. Supp. 2d 144, 150 (W.D.N.Y. 2005) (granting stay pending an

agency action because even if the agency's ruling is not dispositive on the district court there is

still a risk of inconsistent rulings).  With the ITC action still pending, the Court cannot determine

how the ITC will address the '616 patent's validity and enforceability.  A stay would minimize

the risk of inconsistent rulings on these issues.

D.      A Stay Threatens No Real Prejudice to Ansell.

Finally, this Court should consider a stay's potential prejudice to Ansell.  See Clintec

Nutrition Co. v. Abbott Labs., No. 94 C 3152, 1995 WL 228988, at *1 (N.D. Ill. Apr. 14, 1995)

(Exh. L) (citation omitted) ("[i]n deciding a motion to stay, the Court must weigh the competing interests: i.e., the possible damage of granting a stay versus the hardship or inequity of forcing a case onward ...." ).  A four-month stay will not prejudice Ansell.  See <u>Iljin USA</u>, 2006 WL 568351, at *2 (Exh. I) (no prejudice by staying a while an ITC action was pending because the ITC action was filed before the district court complaint and the ITC proceedings were substantially more advanced than the district court action); <u>Novartis Corp.</u>, 2004 WL 2368007, at *3 (Exh. H) (30-month stay pending an agency ruling not prejudicial).  With resolution in the ITC action just four months away, the risk of prejudice to Ansell from a stay -- that witnesses will become unavailable, that their memories fade or that records will be lost in four months -- approaches zero, since most of the evidence has been preserved in the ITC hearing or the related litigations pending in Delaware and Georgia.  <u>See, e.g.</u>, <u>Flexsys Americas</u>, 2005 WL 1126750, at *3-4 (Exh. J) (plaintiff not prejudiced by a stay because much of the discovery in the ITC action overlaps with the discovery to be conducted in the district court action).

Because all four equity factors favor staying this case, the Court should grant Tillotson's motion.

## II.    The Doctrine of Primary Jurisdiction Also Favors a Stay.

The doctrine of primary jurisdiction "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." <u>United States v. W. Pac. R.R</u>, 352 U.S. 59, 64 (1956).  Designed to maintain the proper relationship between the courts and administrative agencies charged with particular regulatory duties, <u>id.</u> at 63, primary jurisdiction requires courts to "stay[] further proceedings so as to give the parties a reasonable opportunity to seek an administrative ruling." <u>Reiter v. Cooper</u>, 507 U.S. 258, 268 (1993); <u>see also</u> <u>Midtech Int'l Co. v.</u>

Minigrip, Inc., 648 F. Supp. 1488, 1496 (N.D. Ill. 1986) (citation omitted) ("the test is not whether some parts of the case are within the exclusive jurisdiction of the courts; the test is whether some parts of the case are within the exclusive jurisdiction of the agency.").

Courts consider four factors in deciding whether to stay an action pursuant to the doctrine of primary jurisdiction: (1) whether the subject matter lies within the court's conventional expertise; (2) whether the subject matter requires agency expertise; (3) the danger of inconsistent rulings; and (4) whether an application to the agency has preceded the lawsuit. See Am. Tel. & Tel. Co., 837 F. Supp. at 16. These four factors further justify a stay pending the ITC's decision.

A.    Patent Law is a Technical Field.

As the Supreme Court has observed, "[p]atent infringement litigation often raises difficult technical issues that are unfamiliar to the average trial judge." Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 651 (1999) (Stevens, J., dissenting). For this reason, trial courts tend to rely especially heavily on experts and technical data. See Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999) ("consultation of extrinsic evidence is particularly appropriate to ensure that [a judge's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art"). Patent law's complexity has prompted Congress to create the specialist Federal Circuit to hear appeals of these cases. See 28 U.S.C. § 1295(a)(1); Holmes Group Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 830-833 (2002).

A stay awaiting the final determination of the ITC action will thus provide this Court with guidance on technical issues that are not normally within the conventional expertise of a judge: the validity and enforceability of the '616 patent.

B.    Congress Vested the ITC with Authority to Determine the Validity
and Infringement of Patents.

Second, Congress specifically vested the ITC with the authority to determine the validity

of certain patents. See 19 U.S.C. § 1337; Tompkins Seals, Inc. v. West Co., No. 85-4929,

1985 WL 4952, at *3 (E.D. Pa. Dec. 17, 1985) (Exh. M) ("[p]ursuant to 19 U.S.C. § 1337,

Congress has expressly given the ITC power and guidelines over claims of unfair competition

and unfair acts in the importation of articles into the United State."). This express statutory

delegation has allowed the ITC to gain greater expertise in deciding patent infringement issues,

such as the ones raised in this action. See ITC Trade Remedy Investigation Resource, available

at ITC website www.usitc.gov/trade_remedy/int_prop/index.htm (Exh. N) ("Section 337

investigations conducted by the [ITC] most often involve claims regarding intellectual property

rights, including allegations of patent infringement and trademark infringement by imported

goods.").

The ITC's greater opportunity to hear these types of disputes has prompted district courts

to defer to the ITC when possible. See Iljin USA, 2006 WL 568351, at *2 (Exh. I) (stay pending

determination of ITC action was proper because the ITC had more experience resolving the

patent infringement claims); Tompkins Seals, Inc., 1985 WL 4952, at *3 (Exh. M) ("[T]he ITC

has undoubtedly had a great more experience than a district court in matters of this kind.").

The second primary-jurisdiction factor thus favors a stay of this case until the ITC

renders its decision.

C.    A Stay Lessens the Risk of Inconsistent Rulings.

As previously mentioned, staying this action avoids the risk of inconsistent rulings. See
p. 6, above.

D.    The ITC Action Preceded this Lawsuit.

Finally, courts consider whether the agency action was filed before the district court case. See Am. Tel. & Tel. Co., 837 F. Supp. at 16 (courts look at whether an application to the agency has been made prior to the filing of the suit). The ITC initiated the investigation into the '616 patent on July 6, 2007, 10 months before Ansell filed and removed its counterclaims. See Notice of Commission Determination, p. 1 (Exh. O). This factor as well favors a stay.

Accordingly, a review of the four primary jurisdiction factors further justifies a stay pending the ITC's decision.

III.    **Alternatively, Discovery Should be Stayed Pending the Outcome of the Motion to Dismiss.**

Even if the Court decides not to stay the case pending final resolution of the ITC action, it should stay the case pending the Court's ruling on Tillotson's Motion to Dismiss. In this Court's view, discovery should generally not commence in the face of a motion that would dispose of the claims in the complaint. See Chavous v. D.C. Fin. Responsibility and Mgmt. Assistance Auth., 201 F.R.D. 1, 3-4 (D.D.C. 2001) (applying a case by case test the court stays discovery while parties' dispositive motion are pending). Based on the specific facts of this case, this Court should "balance the harm produced by a delay in discovery against the possibility that a dispositive motion will be granted and entirely eliminate the need for such discovery." Id. at 3.

Here, a stay threatens no harm to Ansell. Ansell has already filed its opposition to Tillotson's motion to dismiss. Moreover, a stay of discovery while the Tillotson's Motion is pending will prevent wasting the parties' time and resources, and is the most efficient use of judicial resources. Chavous, 201 F.R.D. at 2 ("A stay of discovery . . . 'is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources.'") (citation omitted).

The Court should therefore, at a minimum, stay discovery until it decides Tillotson's Motion to Dismiss.

## CONCLUSION

For the foregoing reasons, Tillotson respectfully submits that the Court grant this Motion and stay this case pending resolution of the ITC action. In the alternative, Tillotson respectfully submits that the Court should stay this case pending a ruling on Tillotson's Motion to Dismiss.

Respectfully submitted this 29th day of July, 2008.

/s   Brian Meiners
Brian R. Meiners (D.C. Bar No. 482039)

KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC 20006-2706
Telephone: (202) 626-2910


/s/ Asha C. Jennings
M. Russell Wofford, Jr.
Stephen P. Cummings
Asha C. Jennings

KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 572-4711


Admitted *Pro Hac Vice*
*Counsel for Counterclaim Defendant*
*Tillotson Corporation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ANSELL HEALTHCARE PRODUCTS
LLC, and ANSELL PROTECTIVE
PRODUCTS INC.,**

                  **Counterclaimants,**

     **v.**

**TILLOTSON CORPORATION,**

                  **Counterclaim Defendant.**

                                **C.A. 1:08-CV-585-RMC**

## ORDER GRANTING MOTION TO STAY

       Upon consideration of the Motion to Stay filed in the above-captioned action, the

applicable law, and the record in this case, it is, by the Court, this __ day of August 2008:

       ORDERED that the Motion to Stay is GRANTED and the case is stayed [pending final

resolution of the ITC action] or [until the Court resolves Tillotson's Motion to Dismiss].

       Dated: _____

                                  _____
                                  Rosemary M. Collyer
                                  United States District Judge

Notice of Order to be provided to:

David Michael Morris
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202)739-3000
Fax: (202)739-3001

Thomas B. Kenworthy
MORGAN, LEWIS & BOCKIUS
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5702
Fax: (215) 963-5001
Admitted *Pro Hac Vice*

*Counsel for Counterclaim Plaintiffs*
*Ansell Healthcare Products LLC, and Ansell*
*Protective Products, Inc.*

Brian R. Meiners (D.C. Bar No. 482039)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC  20006-2706
Telephone:  (202) 626-2910

M. Russell Wofford, Jr.
Stephen P. Cummings
Asha C. Jennings
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 572-4711
Admitted *Pro Hac Vice*

*Counsel for Counterclaim Defendant*
*Tillotson Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ANSELL HEALTHCARE PRODUCTS
LLC, and ANSELL PROTECTIVE
PRODUCTS INC.,**

               **Counterclaimants,**

     **v.**

**TILLOTSON CORPORATION,**

             **Counterclaim Defendant.**

**C.A. 1:08-CV-585-RMC**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion to Stay and Memorandum in Support were served on counsel of record, via the Court's CM/ECF electronic file and serve, this 29th day of July.

/s  Asha C. Jennings
Asha C. Jennings

KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 572-2758
Admitted *Pro Hac Vice*

Attorney for Tillotson Corporation

# EXHIBIT A

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| | |
|---|---|
| In the Matter of **CERTAIN NITRILE GLOVES** | Inv. No. 337-TA-608 |

AND

| | |
|---|---|
| In the Matter of **CERTAIN NITRILE RUBBER GLOVES** | Inv. No. 337-TA-612 |

**ORDER NO. 28: SETTING THE PROCEDURAL SCHEDULE**

(October 5, 2007)

Investigation 337-TA-608 was instituted by the Commission on June 29, 2007 and the notice of investigation was published in the Federal Register on July 6, 2007.[1]  The Administrative Law Judge set a fourteen-month target date of September 8, 2008 for completion of this investigation by the Commission in Order No. 2.  Order No. 2 also requested discovery statements from the parties by August 10, 2007.

Investigation 337-TA-612 was instituted by the Commission on August 16, 2007 and the notice of investigation was published in the Federal Register on August 22, 2007.[2]  On September 19, 2007, the Administrative Law Judge issued an initial determination, Order No. 19, which consolidated investigation 337-TA-608 and 337-TA-612.  In that initial determination, the Administrative Law Judge set a fifteen-month target date of November 22, 2008 for Inv. No. 337-

---

[1] *See* 72 Fed. Reg. 37,052 (July 6, 2007).
[2] *See* 72 Fed. Reg. 47,072 (August 22, 2007).

TA-612 and extended the target date in Inv. No. 337-TA-608 to sixteen-and-a-half months, or November 22, 2008.[3] Order No. 19 also requested discovery statements from the parties by October 1, 2007. On September 28, 2007, Complainant Tillotson Corporation ("Tillotson") filed a motion for extension of time to file the requested discovery statement, which was granted by Order No. 24, extending the time to file discovery statements to October 3, 2007.

On October 1, 2007, separate discovery statements were received from the following Respondents: Cardinal Health, Inc.; Cardinal Health 200, Inc.; and Cardinal Health Malaysia 211 Sdn. Bhd. (collectively "Cardinal Health"), and Henry Schein, Inc. and HSI Gloves, Inc. (collectively "HSI"). On October 3, 2007, Complainant and Respondents Ansell, Ltd.; Darby Group Companies, Inc.; Dynarex Corporation; Liberty Glove and Safety Co.; Protective Industrial Products Inc.; Tronex International Inc.; Top Glove Corporation Bhd.; Laglove (M) Sdn. Bhd.; Smart Glove Holdings Sdn. Bhd.; YTY Holdings Sdn. Bhd.; Kossan Rubber Industries Bhd., Ltd.; Riverstone Resources Sdn. Bhd.; PT Shamrock Manufacturing Corporation; JDA (Tianjin) Plastic Rubber Co.; Hartalega Holdings Bhd.; PT Medisafe Technologies and Latexx Partners Berhad filed a joint proposed procedural schedule. On October 3, 2007, separate discovery statements were received from the Commission Investigative Staff ("Staff") and Respondents Seal Polymer Industries Bhd. ("Seal Polymer"), Supermax Corporation Bhd. ("Supermax"), and Latexx Partners Berhad ("Latexx") agreeing with the joint proposed procedural schedule filed by Complainant.

Although the undersigned strongly encouraged the parties to "make intensive good faith efforts to agree to a procedural schedule" in Order No. 19, the parties were unable to agree on a

---

[3] Note that November 22, 2008 falls on a Saturday. Therefore, the target date is actually set for November 24, 2008.

procedural schedule. The dispute between the parties is the proposed scope and date of the *Markman* hearing. In Order No. 19, the undersigned proposed a *Markman* hearing for December 13-14, 2007. Cardinal Health and HSI oppose a December *Markman* hearing and propose that the *Markman* hearing take place in late February. In the alternative, Cardinal Health and HSI propose that the *Markman* hearing that is in December be limited to the issues raised in the current pending motions for summary judgment. Cardinal Health and HSI assert that it is unreasonable to have a *Markman* hearing just four months after the investigation is instituted, and note that in Inv. No. 337-TA-600, the *Markman* hearing was scheduled for seven months after the investigation was instituted.

The undersigned does not find Cardinal Health and HSI's arguments to be persuasive. The target date in Inv. No. 337-TA-600 is 19 months. Therefore, the longer than usual target date allowed the undersigned to schedule the *Markman* hearing in Inv. No. 337-TA-600 at a later time. In these two investigations the target date is only 16 1/2 and 15 months. The undersigned notes that in previous cases where the target date was set at 15 months, a *Markman* hearing was held five months after the investigation was instituted.[4]  In Inv. No. 337-TA-547, there were five patents at issue involving more complex technology than the technology involved in the one patent-at-issue in this investigation. Accordingly, the undersigned finds that a December *Markman* hearing is reasonable.

In addition, the undersigned has no intention of limiting the December *Markman* hearing to only the claim terms at issue in the pending motions for summary judgement. As noted in the Ground Rules, the purpose of the *Markman* hearing is for "construing any disputed claim terms of the patents at issue in the investigation" and that after the order construing the disputed claims is issued, "discovery and briefing . . . shall be limited to that claim construction." The parties are expected to

---

[4] *See* Inv. No. 337-TA-547, Order No. 3, September 19, 2005.

-3-

brief all disputed claim terms during the December *Markman* hearing . All other claim terms shall

be deemed as undisputed.[5]

Based on a review of the proposed procedural schedules, the undersigned hereby adopts the

following procedural schedule:

| Event | Deadline Date |
|---|---|
| Exchange list of terms each party contends requires construction | October 29, 2007 |
| First settlement conference | By October 31, 2007 |
| File identification of claim construction expert witnesses, including their expertise and curriculum vitae for claim construction hearing | November 2, 2007 |
| Submission of first settlement conference joint report | November 5, 2007 |
| Exchange interpretations by the private parties for each term the parties contend require construction, along with preliminary identification of supporting intrinsic and extrinsic evidence (including claim construction expert reports, if any) | November 9, 2007 |
| Exchange of rebuttal claim construction expert reports | November 16, 2007 |
| Meet and confer in effort to narrow the list of terms that each party contends require construction. Submission of final list of terms that each party contends require construction. | November 16, 2007 |
| File tentative list of witnesses a party will call to testify at the *Markman* hearing, with an identification of each witness' relationship to the party | November 16, 2007 |
| File opening claim construction briefs - private parties | November 21, 2007 |
| File opening claim construction brief - Staff | November 29, 2007 |

---

[5] *See the* undersigned previous statements in previous issued Orders construing the terms of the asserted claims of the patents at issue that "All other claim terms shall be deemed as undisputed and shall be interpreted by the undersigned in accordance with 'their ordinary meaning as viewed by one of ordinary skill in the art.'" *Certain Personal Computers, Server Computers, and Components Thereof,* Order No. 15 (February 8, 2005) at 23; *Certain Personal Computers, Monitors and Components Thereof,* Order No. 22 (March 10, 2005) at 20 (citations omitted).

| Event | Deadline Date |
|---|---|
| File rebuttal claim construction briefs - private parties | December 5, 2007 |
| File rebuttal claim construction brief - Staff | December 11, 2007 |
| Tutorial (if necessary) and *Markman* hearing | December 13-14, 2007 at 9:00 a.m. in Courtroom A |
| File notice of prior art | December 19, 2007 |
| Submission of *Markman* joint proposed claim construction chart | December 21, 2007 |
| File identification of expert witnesses on issues other than claim construction, including their expertise and curriculum vitae | January 4, 2008 |
| Second settlement conference | By January 18, 2008 |
| Exchange of initial expert reports on issues other than claim construction | January 25, 2008 |
| File tentative list of witnesses a party will call to testify at the hearing, with an identification of each witness' relationship to the party | January 25, 2008 |
| Submission of second settlement conference joint report | January 25, 2008 |
| Fact discovery cutoff and completion | February 19, 2008 |
| Exchange of rebuttal expert reports on issues other than claim construction | February 22, 2008 |
| Expert discovery cutoff and completion | March 21, 2008 |
| Deadline for filing summary determination motion | March 27, 2008 |
| Deadline for motions to compel | March 28, 2008 |
| Exchange of exhibit lists among the parties | April 7, 2008 |
| Third settlement conference | By April 11, 2008 |
| Submit and serve direct exhibits (including witness statements), with physical and demonstrative exhibits available — Complainant(s) and Respondent(s) | April 14, 2008 |
| Submit and serve direct exhibits (including witness statements), with physical and demonstrative exhibits available -- Staff | April 17, 2008 |

| Event | Deadline Date |
|---|---|
| Submission of third settlement conference joint report | April 18, 2008 |
| File objections to direct exhibits (including witness statements) | April 21, 2008 |
| Submit and serve rebuttal exhibits (including witness statements), with rebuttal physical and demonstrative exhibits available -- all parties | April 28, 2008 |
| File responses to objections to direct exhibits (including witness statements) | April 28, 2008 |
| File pre-trial statements and briefs -- Complainant(s) and Respondent(s) | April 30, 2008 |
| File requests for receipt of evidence without a witness | May 5, 2008 |
| File objections to rebuttal exhibits (including witness statements) | May 5, 2008 |
| Deadline for motions *in limine* | May 6, 2008 |
| File pre-trial statement and brief -- Staff | May 7, 2008 |
| File high priority objections statement | May 9, 2008 |
| File responses to objections to rebuttal exhibits (including witness statements) | May 12, 2008 |
| File responses to high priority objections statement | May 13, 2008 |
| File responses to motions *in limine* | May 13, 2008 |
| Pre-trial conference | May 16, 2008 at 10:00 a.m. in Courtroom B |
| Opening Statements | May 16, 2008 following pre-trial conference |
| Trial | May 19-23, 2008 and May 27-30, 2008 at 9:00 a.m. in Courtroom B[6] |

---

[6] In the undersigned's view, 9 days of trial time is excessive when considering that there is only one patent-at-issue, that there no live direct testimony, and that claim construction issues will already have been decided. The parties should reevaluate their approximation of time needed to present their case closer to the trial date.

-6-

| Event | Deadline Date |
|---|---|
| File initial post-trial briefs, proposed findings of fact and conclusions of law, and final exhibit lists | June 13, 2008 |
| File reply post-trial briefs, objections and rebuttals to proposed findings of fact | June 27, 2008 |
| Initial Determination due | August 25, 2008[7] |
| Target date for completion of investigation | November 24, 2008 |

For the dates set forth above that require a submission or filing, the date set forth is the date that the submission or filing must be at or filed at the Commission (by the close of business) and is not the date that such submission or filing is merely served.

SO ORDERED.

Charles E. Bullock
Administrative Law Judge

---

[7] August 24, 2008 falls on a Sunday.

**IN THE MATTER OF CERTAIN NITRILE GLOVES**        **337-TA-608 & 337-TA-612**

## CERTIFICATE OF SERVICE

I, Marilyn R. Abbott, hereby certify that the attached **ORDER** was served upon, **Vu Q. Bui, Esq.,** Commission Investigative Attorney, and the following parties via first class mail and air mail where necessary on <u>October 5</u>, 2007.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112A
Washington, DC 20436

**FOR COMPLAINANT TILLOTSON CORPORATION:**
    Gilbert B. Kaplan, Esq.
    Jeffrey M. Telep, Esq.
    Taryn L. Koball, Esq.
    **KING & SPALDING LLP**
    1700 Pennsylvania Avenue, N.W.
    Washington, DC 20006-4706

    Anthony B. Askew, Esq.
    Katrina M. Quicker, Esq.
    Jason M. Pass, Esq.
    **KING & SPALDING LLP**
    1180 Peachtree Street
    Atlanta, GA 30309

    Gregory C. Dorris, Esq.
    Charles H. Carpenter, Esq.
    Sean P. Bamford, Esq.
    **PEPPER HAMILTON, LLP**
    600 Fourteenth Street, N.W.
    Washington, DC 20005-2004

    William D. Belanger, Esq.
    Aaron J. Levangie, Esq.
    **PEPPER HAMILTON, LLP**
    101 Federal Street, Suite 1010
    Boston, MA 02110-1817

**IN THE MATTER OF CERTAIN NITRILE GLOVES**          **337-TA-608 & 337-TA-612**

**FOR RESPONDENT ANSELL LTD.:**
    Thomas B. Kenworthy, Esq.
    David W. Marston Jr., Esq.
    Rebecca J. Hillyer, Esq.
    **MORGAN, LEWIS & BOCKIUS LLP**
    1701 Market Street
    Philadelphia, PA 19103-2921

**FOR RESPONDENTS CARDINAL HEALTH, INC., CARDINAL HEALTH 200, INC. & CARDINAL HEALTH MALAYSIA 211 Sdn. Bhd.:**
    Paul F. Brinkman, Esq.
    Jeffrey Schwartz, Esq.
    **ALSTON & BIRD LLP**
    950 F Street, N.W.
    Washington, DC 20004-1404

**FOR RESPONDENT DARBY GROUP COMPANIES, INC.:**
    Michael S. French, Esq.
    Shanon J. McGinnis, Esq.
    Sarah-Nell H. Walsh, Esq.
    Joseph D. Wargo, Esq.
    **WARGO & FRENCH, LLP**
    1170 Peachtree Street NE, Suite 2020
    Atlanta, GA 30309

**FOR RESPONDENT DYNAREX CORPORATION:**
    Merritt R. Blakeslee, Esq.
    Donald E. DeKieffer, Esq.
    J. Kevin Horgan, Esq.
    Gregory S. Menegaz, Esq.
    **DEKIEFFER & HORGAN**
    729 Fifteenth Street, N.W., Suite 800
    Washington, DC 20005

**IN THE MATTER OF CERTAIN NITRILE GLOVES**      **337-TA-608 & 337-TA-612**

**FOR RESPONDENTS**
   **HARTALEGA HOLDINGS Bhd.**
   **JDA (TIANJIN) PLASTIC RUBBER CO. LTD**
   **KOSSAN RUBBER INDUSTRIES Bhd. Ltd.**
   **LAGLOVE (M) Sdn. Bhd.**
   **LATEXX PARTNERS BERHAD**
   **PT MEDISAFE TECHNOLOGIES**
   **PT SHAMROCK MANUFACTURING CORPORATION**
   **RIVERSTONE RESOURCES Sdn. Bhd.**
   **SMART GLOVE HOLDINGS Sdn. Bhd.**
   **YTY HOLDINGS Sdn. Bhd.**
   **TOP GLOVE CORPORATION Bhd.:**
      Perry R. Clark, Esq.
      Jenny Lee, Esq.
      Michael T. Pieja, Esq.
      Kenny Nguyen, Esq.
      **KIRKLAND & ELLIS LLP**
      555 California Street
      San Francisco, CA 94104-1501

   **FOR RESPONDENT SMART GLOVE HOLDINGS, Sdn.Bhd.**
      Scott M. Daniels, Esq.
      Ken-Ichi Hattori, Esq.
      Ryan B. Chirnomas, Esq.
      Kumiko Ide, Esq.
      Shuji Yoshizaki, Esq.
      **WESTERMAN, HATTORI, DANIELS & ADRIAN, LLP**
      1250 Connecticut Avenue, N.W.
      Suite 700
      Washington, DC   20036

**FOR RESPONDENTS HENRY SCHEIN, INC. & HSI GLOVES INC.:**
   Lawrence K. Nodine, Esq.
   Robin L. Gentry, Esq.
   J. Scott Anderson, Esq.
   **NEEDLE & ROSENBERG, P.C.**
   999 Peachtree Street, Suite 1000
   Atlanta, GA 30309-3915

**IN THE MATTER OF CERTAIN NITRILE GLOVES**      **337-TA-608 & 337-TA-612**

**FOR RESPONDENT LIBERTY GLOVE, INC.:**
 Rosa S. Jeong, Esq.
 Philippe M. Bruno, Esq.
 Mark L. Hogge, Esq.
 Shailendra K. Maheshwari, Esq.
 Kate A. Jefcoat, Esq.
 **GREENBERG TRAURIG, LLP**
 800 Connecticut Avenue, N.W., Suite 500
 Washington, D.C. 20006

**FOR RESPONDENT PROTECTIVE INDUSTRIAL PRODUCTS, INC.:**
 J. Rodgers Lunsford III, Esq.
 Elizabeth Borland, Esq.
 **SMITH, GAMBRELL, AND RUSSELL LLP**
 Promenade II, Suite 3100
 Atlanta, GA 30309

**FOR RESPONDENT TRONEX INTERNATIONAL, INC.:**
 Maureen F. Browne, Esq.
 Jenny L. Workman, Esq.
 **HELLER EHRMAN, LLP**
 1717 Rhode Island Avenue, N.W.
 Washington, DC 20036-3001

**FOR RESPONDENT QRP INC. d/b/a QRP GLOVES:**
 Daniel J. Quigley, Esq.
 **QUIGLEY & WHITEHILL P.L.C.**
 2730 E. Broadway Blvd., Suite 160
 Tucson, AZ 85716-5384

**FOR RESPONDENTS SEAL POLYMER INDUSTRIES Bhd & SUPERMAX CORPORATION Bhd:**
 Todd L. Juneau, Esq.
 **JUNEAU PARTNERS, PLLC**
 2121 Eisenhower Avenue #200
 Alexandria, VA 22314

**IN THE MATTER OF CERTAIN NITRILE GLOVES**          **337-TA-608 & 337-TA-612**

**FOR RESPONDENT YEE LEE CORPORATION Bhd.:**
    Keith R. Marino, Esq.
    Ralph A. Mittelberger, Esq.
    **ARENT FOX LLP**
    1050 Connecticut Avenue NW
    Washington, DC 20036-5339

**RESPONDENTS:**
    **ADENNA, INC.**
    12216 McCann Drive
    Santa Fe Springs, CA 90670

    **DASH MEDICAL GLOVES, INC.**
    c/o Robert J. Sullivan
    1018 South 54th Street
    Franklin, WI 53132

    **DENTEXX/FIRST MEDICA INFECTION CONTROL ASSOCIATE**
    3704C Boren Drive
    Greensboro, NC 27407

    **MEDTEXX PARTNERS INC.**
    102 Engle St. FL2
    Englewood, NJ 07631

    **Ansell (Thailand) Ltd.**
    110 Moo 4
    Chalongkrung Road
    Bangkok, Thailand 10520

    **Ansell Healthcare Products LLC**
    200 Schulz Drive
    Red Bank, NJ 07701

    **Ansell Protective Products Inc.**
    200 Schulz Drive
    Red Bank, NJ 07701

    **Top Glove Sdn. Bhd.**
    Lot 4968
    Jalan Teratai
    Batu 6

**IN THE MATTER OF CERTAIN NITRILE GLOVES**        **337-TA-608 & 337-TA-612**

Off Jalan Meru
41050 Klang
Selangor D.E.
Malaysia

**TG Medical (USA) Inc.**
165 North Aspen Ave.
Azusa, CA 91702

**Hartalega Sdn. Bhd.**
Lot 9
Jalan Kuang Bulan
Taman Kepong Industrial Estate
52100 Kuala Lumpur
Malaysia

**Pharmatex USA Inc.**
77530 Enfield Lane Bldg. 1
Suite 203
Palm Desert, CA 92211

**Perusahaan Getah Asas Sdn. Bhd.**
Lot 754
Jalan Haji Sirat
Off Jalan Kapur
42100 Klang
Selangor D.E.
Malaysia

**Kossan Gloves Inc. d/b/a Sintex**
16810 Baker Springs #219
Houston, TX 77084

**PT Haloni Jane**
JL. Raya Serang KM 13.8 Cikupa Tangerang
Indonesia

**Shamrock Manufacutring Company Inc.**
5445 Daniels Street
Chino, CA 91710

**IN THE MATTER OF CERTAIN NITRILE GLOVES**     **337-TA-608 & 337-TA-612**

**Smart Glove Corporation Sdn. Bhd.**
Lot 6487
Batu 5 3/4
Sementajln Kapar
42100 Klang
Selangor D.E.
Malaysia

**YTY Industry (Manjung) Sdn. Bhd.**
Lot 1422-1424
Batu 10 Lekir
32020 Sitiawan
Perak Darul Ridzuan
Malaysia

## PUBLIC MAILING LIST

Sherry Robinson
LEXIS - NEXIS
8891 Gander Creek Drive
Miamisburg, OH  45342

Ronnita Green
Thomson West
1100 – 13th Street NW
Suite 200
Washington, DC   20005

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANSELL HEALTHCARE
PRODUCTS LLC,

                    Plaintiff,

    v.                                          Civil Action No. _____

TILLOTSON CORPORATION,

                    Defendant.

## COMPLAINT

### The Parties

1.    Plaintiff Ansell Healthcare Products LLC ("Ansell") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business in Red Bank, New Jersey.

2.    On information and belief, defendant Tillotson Corporation ("Tillotson") is a Massachusetts corporation with a principal place of business in Massachusetts located at One Cranberry Hill, Suite 105, Lexington, Massachusetts.

### Jurisdiction and Venue

3.    This action arises under the patent laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**Count I**
**(Claim For Declaratory Judgment)**

5.      On information and belief, Tillotson is the assignee and present owner of United States Reissue Patent No. Re 35,616 ("the '616 patent"). A true and correct copy of the '616 patent is attached hereto as Exhibit A.

6.      Ansell sells and offers for sale within the United States, including this District, elastomeric hand gloves, including Micro-Touch® Nitrile medical examination gloves.

7.      Tillotson has sued Ansell's customer Darby Dental Supply Co., Inc. ("Darby Dental") in the United States District Court for the Northern District of Georgia, alleging that Darby Dental has sold and/or offered for sale gloves made from elastomeric materials that infringe one or more claims of the '616 patent.

8.      In June 2006, Tillotson's counsel advised Darby Dental's counsel that one line of gloves sold by Darby Dental that Tillotson contended infringed the '616 patent was Ansell's Micro-Touch® Nitrile medical examination gloves. That information was communicated to Ansell on July 27, 2006.

9.      Ansell has asked Tillotson's counsel on several occasions whether Tillotson intends to assert a claim against Ansell in the Georgia action and has received ambiguous responses. Tillotson has also declined Ansell's request to dismiss without prejudice the claim against Darby Dental for infringement of the '616 patent based on Ansell gloves.

10.      Tillotson has over a number of years filed more than 15 separate actions alleging infringement of the '616 patent by manufacturers and sellers of nitrile gloves.

11.      Tillotson's statements, allegations and actions have created a reasonable apprehension and belief on the part of Ansell that it will soon be faced with a patent infringement

- 2 -

lawsuit as a result of the sale and offer for sale in the United States of its Micro-Touch® Nitrile medical examination gloves which Tillotson contends infringe the '616 patent.

12.    Ansell has not infringed, and is not now infringing, any valid and enforceable claim of the '616 patent.

13.    Tillotson's "customer suit" against Darby Dental places a cloud over Ansell's ability to market its Micro-Touch® Nitrile medical examination gloves in the United States and in this District.

14.    A justiciable controversy exists between Ansell and Tillotson with respect to the '616 patent.

WHEREFORE, Ansell prays for judgment as follows:

(a)    For a judicial determination and declaration that Ansell has not infringed, induced others to infringe, or contributed to the infringement of any valid claim of the '616 patent;

(b)    For an injunction prohibiting Tillotson, its officers, agents, servants and employees, and all persons in active concert or participation with any of them, from alleging infringement of, or instituting or pursuing any action for alleged infringement of, the '616 patent against Ansell or its customers with respect to any glove sold or offered for sale by Ansell; and

(c)    For such other and further relief as the Court deems just and equitable.

DATE:  August 25, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
1201 N. Market Street
P. O. Box 1347
Wilmington, Delaware  19899
(302) 658-9200

OF COUNSEL:
Thomas B. Kenworthy
David W. Marston Jr. (#3972)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5000

*Attorneys for Plaintiff*
*Ansell Healthcare Products LLC*

EXHIBIT A



US00RE35616E

# United States Patent [19]

## Tillotson et al.

[11] E    Patent Number:    Re. 35,616

[45] Reissued    Date of Patent:    Sep. 30, 1997

[54] **ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH**

[75] Inventors: Neil E. Tillotson, Dixville Notch, N.H.; Luc G. DeBecker, Vancleave, Miss.

[73] Assignee: Tillotson Corporation, Boston, Mass.

[21] Appl. No.: 556,080

[22] Filed: Nov. 13, 1995

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.: 5,014,362
    Issued: May 14, 1991
    Appl. No.: 522,390
    Filed: May 11, 1990

[51] Int. Cl.$^6$ ............................................ A41D 19/00
[52] U.S. Cl. .................................... 2/168; 2/167
[58] Field of Search ........................ 2/168, 161.7, 167, 2/169, 161.6, 159, 163, 164; 524/430, 432, 433, 434, 436; 526/338

[56]    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,577,345 | 12/1951 | McEwan | 128/294 |
| 2,880,189 | 3/1959 | Miller | 260/29.7 |
| 3,759,254 | 9/1973 | Clark | 128/79 |
| 4,096,135 | 6/1978 | Ohishi et al. | 260/79.5 B |
| 4,115,873 | 9/1978 | Stansbury | 2/163 |
| 4,508,867 | 4/1985 | Sato | 524/434 |
| 4,590,123 | 5/1986 | Hashimoto et al. | 428/316.6 |
| 4,684,490 | 8/1987 | Taller et al. | 264/296 |
| 4,834,114 | 5/1989 | Boarman | 128/830 |
| 4,855,169 | 8/1989 | McGlothlin et al. | 428/35.2 |
| 4,945,923 | 8/1990 | Evans et al. | 128/842 |
| 4,963,623 | 10/1990 | Miller et al. | 525/604 |
| 4,971,071 | 11/1990 | Johnson | 128/842 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 59-124831 | 7/1984 | Japan . | |

*Primary Examiner*—Amy B. Vanatta
*Attorney, Agent, or Firm*—Jones & Askew

[57]    **ABSTRACT**

An elastomeric material and gloves made therewith are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and have a relatively low resilience. The gloves conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced. The gloves are particularly useful in medical applications and most particularly useful as surgical gloves.

**21 Claims, 1 Drawing Sheet**



U.S. Patent                Sep. 30, 1997                Re. 35,616



FIG 1



FIG 2

Re. 35,616

1

## ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

### TECHNICAL FIELD

The present invention generally relates to elastomeric materials, and more particularly relates to flexible latex gloves useful in medical applications.

### BACKGROUND OF THE INVENTION

Coverings made with elastomeric materials are well known and find many useful applications. One such application is known as the "latex glove." Latex gloves are made from a variety of elastomers and during the glove-making process the elastomers are normally in their latex form. Latex gloves are often desirable because they can be made light, thin, flexible, tightly-fitting and substantially impermeable to some liquids and gases such as liquid water and water vapor.

The characteristics of latex make latex gloves useful in medical applications, and particularly useful as surgical gloves. Surgeons are required to perform delicate operations with their hands while wearing latex gloves. Surgical operations often last for hours. To maintain accurate control over instruments with their hands, surgeons must wear relatively thin latex gloves which fit closely to their skin so that they can grip and feel the instruments in their hand almost as if they were not wearing gloves at all. Thus, conventional latex surgical gloves are thin and undersized so as to fit tightly onto the surgeons' hands. However, conventional latex surgical gloves, which are often made of natural rubber, are very resilient and, when stretched to fit about the wearer's hand, apply pressure to the wearer's hand. With conventional latex surgical gloves, this pressure is not appreciably released until the wearer removes the gloves. The pressure applied by conventional latex surgical gloves restricts the blood vessels in the hands of the wearer and restricts the movement of the wearer's fingers. Thus, when worn for an extended period of time, the pressure applied by conventional latex surgical gloves tends to numb and fatigue the wearer's hands and causes general discomfort for the wearer. During a long surgical operation, this can cause surgeons some difficulty in controlling instruments with their hands.

Accordingly, there is a need for an elastomeric material which is suitable as a covering, but which relaxes after being stretched about an object. More particularly, there is a need for a latex surgical glove that, when stretched to fit the wearer's hand, conforms to fit closely about the wearer's hand and then relaxes to relieve the pressure applied by the glove to the wearer's hands and give the wearer greater comfort and greater sensitivity in performing delicate tasks.

### SUMMARY OF THE INVENTION

Accordingly, an object of the present invention *is* to provide an improved latex glove.

Another object of the present invention *is* to provide a latex glove which does not numb or fatigue the hand of the wearer when worn for an extended period of time.

Another object of the present invention *is* to provide a latex glove which conforms to the wearer's hand, but does not exert pressure on the wearer's hand for an extended period of time.

2

A further object of the present invention is to provide an elastomeric material useful in forming a covering or glove than when stretched to cover an object conforms to the shape of the object and then relaxes to reduce the pressure exerted upon the object.

This invention fulfills these and other objects by providing an elastomeric material characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low level of resilience. More specifically, the elastomeric material of the present invention is characterized by having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness of about 4.0 to about 4.5 mils, and having elastic properties such that when the elastomeric material is stretched from an initial configuration to fit about an object, the elastomeric material conforms to the configuration of the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% of the predetermined pressure.

Preferably, the material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in the amount effective to impart sufficient tensile strength without significantly stiffening the elastomeric material and altering the elastomeric properties. More preferably, the material of the present invention comprises carboxylated nitrile butadiene rubber.

The metallic compound preferably comprises a metal selected from the group consisting of lead, magnesium and zinc. More preferably, the metallic compound is a metallic oxide. Preferred metallic oxides include lead oxide, magnesium oxide and zinc oxide. Zinc oxide is the most preferred metallic compound. Zinc oxide is preferably present in the material in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

According to another aspect, the present invention comprehends a glove comprising a layer of the elastomeric material of the present invention. The glove of the present invention has an initial configuration adapted to receive a hand. Because the glove of the present invention comprises a layer of the elastomeric material of the present invention, the glove of the present invention has elastic properties such that when stretched from the initial configuration to fit about a hand, the glove conforms to the configuration of the hand initially exerting a predetermined pressure on the hand and thereafter relaxing to exert on the hand a reduced pressure which is substantially less than about 80% of the predetermined pressure. In addition, the glove of the present invention has a relatively high tensile strength and is substantially impermeable to water vapor and liquid water. Accordingly, the glove of the present invention is particularly useful as a surgical glove. After being donned by the wearer, the glove of the present invention relaxes so that the pressure on the wearer's hand is substantially reduced, but remains closely fitted about the wearer's hand. Thus, the glove of the present invention may be worn for an extended period of time without diminishing the sensitivity of the wearer's hand or becoming uncomfortable.

Other features, objects, and advantages of the present invention will become apparent from the following detailed description, drawings, and claims.

### BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a graph comparing the percent of initial stress required to maintain the stretch of a latex glove made

Re. 35,616

3

according to a preferred embodiment of the present invention to that required by a conventional latex glove.

FIG. 2 is a graph comparing the stress required to maintain the stretch of a latex glove mile according to a preferred embodiment of the present invention to that required by a conventional latex glove.

## DETAILED DESCRIPTION

Generally described, the elastomeric material of the present invention is characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low resilience. These properties make the elastomeric material of the present invention particularly useful as a covering, and even more particularly useful as a glove.

The elastomeric material of the present invention has the following properties as measured according to ASTM D-412 on a sample having a thickness from about 4.0 to about 4.5 mils: a tensile strength greater than about 1500 psi and preferably greater than about 2000 psi, and a elongation greater than about 700% and preferably greater than about 800%, and a 500% modulus less than about 350 psi and preferably between about 250 and about 300 psi. The tensile strength is the energy required to stretch the sample to the breaking point and the elongation is the percent stretch of the sample at the breaking point. The 500% modulus is a measure of the energy it takes to stretch the sample 500% of a predetermined length. The elastomeric material of the present invention and gloves made therewith also have a high level of puncture resistance. The elastomeric material of the present invention has a puncture resistance as measured according to ASTM D-120 on a sample having a thickness between about 4.0 and 4.5 mils of greater than about 800 pounds per inch.

The high level of strength as illustrated by the foregoing properties, enables the elastomeric material of the present invention and gloves made therewith to be pulled and stretched a considerable amount before breaking. Thus, a glove made with the elastomeric material of the present invention can be made to fit closely to the wearer's skin because it can be pulled with a considerable amount of force when being donned by the wearer. This is particularly important for surgical gloves which must be thin and fit closely.

The relatively low resilicace, allows the elastomeric material of the present invention and gloves made therewith to relax after being stretched while the stretch is maintained. In other words, the elastomeric material of the present invention has elastic properties such than when the elastomeric material is stretched from an initial configuration to fit about an object such as a hand, the elastomeric material conforms to the configuration or the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% or the predetermined pressure. Preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastic properties such that the significantly reduced pressure is reached within six minutes after the material is stretched to fit about the object or hand. More preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than about 50% of said predetermined pressure within about one minute after the material is stretched to fit about the object or hand. Most preferably, the elastomeric

4

material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than [bout 90%] *about 10%* of said predetermined pressure within about six minutes after the material is stretched to fit about the object or hand.

Accordingly, gloves made with the elastomeric material of the present invention are particularly useful as surgical gloves because they relax on the hands of the wearer after being donned so that there is little resistance to movement by the wearer's fingers and there is little restriction of blood vessels in the wearer's hands. Thus, gloves made with the elastomeric material of the present invention can be worn for extended periods of time without tiring or numbing the hands of the wearer, thereby giving the wearer greater comfort and greater sensitivity in performing delicate tasks. The elastic properties of the gloves of the present invention are illustrated in FIGS. 1 and 2 discussed hereinbelow.

Preferably, the elastomeric material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in an amount effective to impart sufficient tensile strength to the elastomeric material without significantly stiffening elastomeric material and altering the elastic properties of the elastomeric material. The nitrile butadiene rubber is preferably carboxylated nitrile butadiene rubber which when cured possesses a higher tensile strength than noncarboxylated nitrile butadiene rubber.

The metallic compound preferably comprises lead, magnesium or zinc. Representative compounds are metallic oxides, such as lead oxide, magnesium oxide or zinc oxide. Zinc oxide is preferred. In addition, zinc oxide is preferably present in the elastomeric material in an amount from about 0.1 to about 0.5 parts per hundred parts nitrile butadiene rubber. If the zinc oxide is not present or is present in an amount below this range, the tensile strength of the elastomeric material is reduced and gloves made therewith tear easily. If the zinc oxide is present in an amount above this range, the elastomeric material and gloves made therewith become more stiff and their resilience is reduced. At the higher resilience, gloves made with the elastomeric material maintain undesirable pressure on the hands of the wearer.

The gloves of the present invention are preferably made by dipping a glove form into a latex mixture, curing the latex mixture on the glove form at elevated temperatures, and then stripping the cured latex glove from the glove form. The resulting gloves preferably have a thickness from about 4.0 to about 4.5 mils.

The latex mixture preferably comprises carboxylated nitrile butadiene rubber latex having about a 40% dry rubber content and zinc oxide in the amount from about 0.1 to about 0.5 parts per hundred parts rubber. The latex mixture may also include additives commonly used to make cured latex products such as processing agents, pH control agents, accelerating agents, curing agents, coagulants, and colorants. As will be appreciated by those skilled in the art, the amounts of these additives may be varied considerably. This preferred latex mixture is preferably cured in an oven for 30 to 40 minutes at 270 to 300 degrees Fahrenheit.

The present invention is further illustrated by the following example which is designed to teach those of ordinary skill in the art how to practice this invention and represent the best mode contemplated for carrying out this invention.

## EXAMPLE 1

Latex gloves were made as follows. A latex material having the formula set forth in Table 1 was thoroughly

Re. 35,616

5

mixed in a container. The amount of each component of the material is set forth in parts per hundred dry rubber (PHR). Table I shows the amount of dry carboxylated nitrile butadiene rubber present in the latex composition; however, the carboxylated nitrile butadiene rubber was added to the latex composition as a latex comprising 40% by weight of carboxylated nitrile butadiene rubber with the remainder water and surfactants. The sodium dodecylbenzene sulfonate is a processing agent, the potassium hydroxide is present as a pH control agent, the sulfur is a curing agent, the zinc dibutyl dithiocarbamate is an accelerating agent, the titanium dioxide is present as a pigment, the MICHEMLUBE 135 is a paraffin wax emulsion available from Michelman, Inc., Cincinnati, Ohio, and the COAGULANT WS is a polyether-polysiloxane coagulant available from Bayer, Inc.

Glove forms were prepared by washing with a detergent and rinsing. The glove forms were then dipped in a coagulant mixture comprising calcium nitrate, water and a non-ionic soap to promote congealing of the latex around the glove forms. After being dipped in the coagulant mixture, the glove forms were dipped in the latex material. The latex coated glove form was then dipped in a leach consisting of warm water and then into a powder slurry consisting of powdered starch. The latex coated glove forms were then placed in an oven for 30 minutes at 285 degrees Fahrenheit to cure the latex. After removal from the oven, the cured latex coated glove forms were dipped in a post curing leach consisting of warm water. The cured latex gloves were then stripped from the glove forms and tumbled.

TABLE 1

EXAMPLE 1 LATEX FORMULATION

| | PHR |
|---|---|
| Carboxylated nitrile butadiene rubber (dry) | 100.0 |
| Sodium dodecylbenzene sulfonate | 0.25 |
| Potassium hydroxide | 0.7 |
| Sulfur | 1.0 |
| Zinc dibutyl dithiocarbamate | 1.0 |
| Zinc oxide | 0.5 |
| Titanium dioxide | 4.0 |
| MICHEMLUBE 135 | 3.0 |
| COAGULANT WS | 2.0 |
| STAN-TONE WD 2467 pigment | 0.1 |
| CHERRY FLAVOR #30767 pigment | 0.7 |

The gloves from Example 1 were subjected to a series of tests, the results of which are shown in Tables 2 and 3 and FIGS. 1 and 2. The tensile strength, elongation, and 500% modulus of the gloves made according to Example 1 were each measured according to ASTM D-412 and are shown in Table 2.

TABLE 2

Physical Properties-ASTM D-412

| Thickness | 4.5 mils |
|---|---|
| Tensile Strength | 2200 psi |
| Elongation | >800% |
| 500% modulus | 350 psi |

The puncture resistances of the gloves from Example 1, of a conventional natural rubber latex examination glove, and of a conventional natural rubber latex surgical glove were measured according to ASTM D-120 and the results are shown in Table 3. Table 3 illustrates the superior puncture resistance of the gloves made according to Example 1.

6

TABLE 3

PUNCTURE RESISTANCE-ASTM D-120

| Glove | lbs. | gauge | lbs./inch |
|---|---|---|---|
| NR examination | 1.9 | 6.7 | 281 |
| NR surgical | 2.9 | 7.5 | 396 |
| Example 1 | 3.9 | 4.7 | 842 |

The resilience of the gloves made according to Example 1 and a conventional natural rubber latex glove was tested as follows. A sample was cut from each glove and stretched 100% of its length to determine the initial 100% modulus according to ASTM D-412. The amount of stress required to maintain this 100% stretch was then recorded every minute for 30 minutes. The resulting data is shown in FIGS. 1 and 2. FIG. 1 is a plot of percent of initial stress versus time for the sample from the Example 1 glove and the sample from the conventional natural rubber glove. FIG. 2 is a plot of stress in psi versus time for the same samples. As can be seen from FIGS. 1 and 2, the stress required to maintain the 100% stretch of the Example 1 glove sample was substantially zero within six minutes after the initial stretch, while the stress required to maintain the 100% stretch of the conventional glove sample dropped to only about 80% of the initial stress over the 30 minute period.

The foregoing description relates only to preferred embodiments of the present invention, and numerous changes and modifications may be made therein without departing from the spirit and scope of the invention as defined in the following claims.

What is claimed is:

1. A *closely fitting* glove comprising a layer of elastomeric material (a) *comprising nitrile butadiene rubber,* (b) having an initial configuration adapted to receive *and fit closely about* a hand, and (c) characterized by (i) being substantially impermeable to water vapor and liquid water, (ii) having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness from about 4.0 to about 4.5 mils, and (iii) having a *thickness and* elastic properties such that *the glove is capable of being stretched to fit closely about the hand and* when stretched from the initial configuration to fit *closely* about the hand, the elastomeric material conforms to the configuration of the hand, initially exerting [a predetermined] *an initial* pressure on the hand and thereafter *still fitting closely about the hand, but relaxing, within about 6 minutes after the glove is stretched to fit about said hand,* to exert on the hand a reduced pressure which is [substantially] less than about [80%] *50%* of the [predetermined] *initial* pressure.

2. A glove as in claim 1, wherein the layer of elastomeric material *further* comprises [nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening the elastomeric material and altering said elastic properties.

3. A glove as in claim 2 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

4. A glove as in claim 2 wherein the metallic compound comprises metallic oxide.

5. A glove as in claim 4 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

6. A glove as in claim 2 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

Re. 35,616

7

8

7. A glove as in claim 1, wherein the *nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber and the* layer of elastomeric material *further* comprises [carboxylated nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening said elastomeric material and said elastic properties.

8. A glove as in claim 7 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

9. A glove as in claim 7 wherein the metallic compound comprises metallic oxide.

10. A glove as in claim 9 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

11. A glove as in claim 7 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

[12. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is reached within 6 minutes after the glove is stretched to fit about said hand.]

[13. A glove as in claim 1, further characterized by having elastomeric properties such that the reduced pressure is less than about 50% of said predetermined pressure.]

14. A glove as in claim [13] *1* further characterized by having elastic properties such that said reduced pressure is reached within about one minute after the glove is stretched to fit about said hand.

15. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is less than about [90%] *10%* of said [predetermined] *initial* pressure.

[16. A glove as in claim 15, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is reached within about 6 minutes after the material is stretched to fit about said hand.]

*17. A glove as in claim 1, wherein the layer of elastomeric material has a thickness up to about 4.5 mils.*

*18. A glove as in claim 1, wherein the layer of elastomeric material has a thickness from about 4 to about 4.5 mils.*

*19. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a puncture resistance of greater than about 800 lbs/in.*

*20. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having an elongation of greater than about 800%.*

*21. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus up to about 350 psi.*

*22. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus in the range from about 250 to about 350 psi.*

*23. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a elastomeric properties such that said reduced pressure is about zero.*

*24. A glove as in claim 1, wherein the nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber.*

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANSELL PROTECTIVE
PRODUCTS INC.,

                        Plaintiff,

        v.                                          Civil Action No.  0 7 - 9 3  _____

TILLOTSON CORPORATION,

                        Defendant.

2007 FEB 20  PH 12: 24
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE  FILED

## COMPLAINT

### The Parties

1.      Plaintiff Ansell Protective Products Inc. ("Ansell Protective Products") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Red Bank, New Jersey.

2.      On information and belief, defendant Tillotson Corporation ("Tillotson") is a Massachusetts corporation with a principal place of business in Massachusetts, located at One Cranberry Hill, Suite 105, Lexington, Massachusetts.

### Jurisdiction and Venue

3.      This action arises under the patent laws of the United States.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## Count I
### (Claim For Declaratory Judgment)

5.    On information and belief, Tillotson is the assignee and present owner of United States Reissue Patent No. Re 35,616 ("the '616 patent"). A true and correct copy of the '616 patent is attached hereto as Exhibit A.

6.    Ansell Protective Products sells and offers for sale within the United States, including this District, elastomeric hand gloves, including Touch N Tuff and TNT gloves.

7.    Tillotson has over a number of years filed more than 15 separate actions alleging infringement of the '616 patent by manufacturers and sellers of nitrile gloves.

8.    In an action pending in this Court, Tillotson has accused Ansell Protective Products' sister company, Ansell Healthcare Products LLC ("Ansell Healthcare"), of infringing the '616 patent with respect to Touch N Tuff and TNT gloves. It is Ansell Protective Products rather than Ansell Healthcare, however, that sells these gloves.

9.    Tillotson's statements, allegations and actions have created a reasonable apprehension and belief on the part of Ansell Protective Products that it will soon be faced with a patent infringement lawsuit as a result of the sale and offer for sale in the United States of its Touch N Tuff and TNT gloves, which Tillotson contends infringe the '616 patent.

10.    Ansell Protective Products has not infringed, and is not now infringing, any valid and enforceable claim of the '616 patent.

11.    A justiciable controversy exists between Ansell Protective Products and Tillotson with respect to the '616 patent.

2

WHEREFORE, Ansell Protective Products prays for judgment as follows:

(a)    For a judicial determination and declaration that Ansell Protective Products has not infringed, induced others to infringe, or contributed to the infringement of any valid claim of the '616 patent;

(b)    For an injunction prohibiting Tillotson, its officers, agents, servants and employees, and all persons in active concert or participation with any of them, from alleging infringement of, or instituting or pursuing any action for alleged infringement of, the '616 patent against Ansell Protective Products or its customers with respect to any glove sold or offered for sale by Ansell Protective Products; and

(c)    For such other and further relief as the Court deems just and equitable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Date:  February 20, 2007

_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P. O. Box 1347
Wilmington, Delaware  19899
jblumenfeld@mnat.com
(302) 658-9200

*Of Counsel:*

Thomas B. Kenworthy
David W. Marston Jr.
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5000

741890.1

*Attorneys for Plaintiff*
*Ansell Protective Products Inc.*

3

# EXHIBIT A



US00RE35616E

# United States Patent [19]

## Tillotson et al.

| | |
|---|---|
| [11] E | Patent Number: Re. 35,616 |
| [45] Reissued | Date of Patent: Sep. 30, 1997 |

[54] **ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH**

[75] Inventors: **Neil E. Tillotson**, Dixville Notch, N.H.; **Luc G. DeBecker**, Vancleave, Miss.

[73] Assignee: **Tillotson Corporation**, Boston, Mass.

[21] Appl. No.: **556,080**

[22] Filed: **Nov. 13, 1995**

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.: 5,014,362
    Issued: May 14, 1991
    Appl. No.: 522,390
    Filed: May 11, 1990

[51] Int. Cl.⁶ ................................ A41D 19/00
[52] U.S. Cl. ........................... 2/168; 2/167
[58] Field of Search .................. 2/168, 161.7, 167, 2/169, 161.6, 159, 163, 164; 524/430, 432, 433, 434, 436; 526/338

[56]           **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,577,345 | 12/1951 | McEwen | 128/294 |
| 2,880,189 | 3/1959 | Miller | 260/29.7 |
| 3,759,254 | 9/1973 | Clark | 128/79 |
| 4,096,135 | 6/1978 | Ohishi et al. | 260/79.5 B |
| 4,115,873 | 9/1978 | Stansbury | 2/163 |
| 4,508,867 | 4/1985 | Sato | 524/434 |
| 4,590,123 | 5/1986 | Hashimoto et al. | 428/316.6 |
| 4,684,490 | 8/1987 | Taller et al. | 264/296 |
| 4,834,114 | 5/1989 | Boarman | 128/830 |
| 4,855,169 | 8/1989 | McGlothlin et al. | 428/35.2 |
| 4,945,923 | 8/1990 | Evans et al. | 128/842 |
| 4,963,623 | 10/1990 | Miller et al. | 525/604 |
| 4,971,071 | 11/1990 | Johnson | 128/842 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 59-124831 | 7/1984 | Japan . |

*Primary Examiner*—Amy B. Vanatta
*Attorney, Agent, or Firm*—Jones & Askew

[57]            **ABSTRACT**

An elastomeric material and gloves made therewith are substantially impermeable to water vapor and liquid water, have a relatively high tensile strength, and have a relatively low resilience. The gloves conform to the shape of a hand when stretched to fit about the hand and then relax so that the pressure exerted on the hand is substantially reduced. The gloves are particularly useful in medical applications and most particularly useful as surgical gloves.

**21 Claims, 1 Drawing Sheet**





**FIG  1**



**FIG  2**

Re. 35,616

1

# ELASTOMERIC COVERING MATERIAL AND HAND GLOVE MADE THEREWITH

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## TECHNICAL FIELD

The present invention generally relates to elastomeric materials, and more particularly relates to flexible latex gloves useful in medical applications.

## BACKGROUND OF THE INVENTION

Coverings made with elastomeric materials are well known and find many useful applications. One such application is known as the "latex glove." Latex gloves are made from a variety of elastomers and during the glove-making process the elastomers are normally in their latex form. Latex gloves are often desirable because they can be made light, thin, flexible, tightly-fitting and substantially impermeable to some liquids and gases such as liquid water and water vapor.

The characteristics of latex make latex gloves useful in medical applications, and particularly useful as surgical gloves. Surgeons are required to perform delicate operations with their hands while wearing latex gloves. Surgical operations often last for hours. To maintain accurate control over instruments with their hands, surgeons must wear relatively thin latex gloves which fit closely to their skin so that they can grip and feel the instruments in their hand almost as if they were not wearing gloves at all. Thus, conventional latex surgical gloves are thin and undersized so as to fit tightly onto the surgeons' hands. However, conventional latex surgical gloves, which are often made of natural rubber, are very resilient and, when stretched to fit about the wearer's hand, apply pressure to the wearer's hand. With conventional latex surgical gloves, this pressure is not appreciably released until the wearer removes the gloves. The pressure applied by conventional latex surgical gloves restricts the blood vessels in the hands of the wearer and restricts the movement of the layer's fingers. Thus, when worn for an extended period of time, the pressure applied by conventional latex surgical gloves tends to numb and fatigue the wearer's hands and causes general discomfort for the wearer. During a long surgical operation, this can cause surgeons some difficulty in controlling instruments with their hands.

Accordingly, there is a need for an elastomeric material which is suitable as a covering, but which relaxes after being stretched about an object. More particularly, there is a need for a latex surgical glove that, when stretched to fit the wearer's hand, conforms to fit closely about the wearer's hand and then relaxes to relieve the pressure applied by the glove to the wearer's hands and give the wearer greater comfort and greater sensitivity in performing delicate tasks.

## SUMMARY OF THE INVENTION

Accordingly, an object of the present invention is to provide an improved latex glove.

Another object of the present invention is to provide a latex glove which does not numb or fatigue the hand of the wearer when worn for an extended period of time.

Another object of the present invention is to provide a latex glove which conforms to the wearer's hand, but does not exert pressure on the wearer's hand for an extended period of time.

2

A further object of the present invention is to provide an elastomeric material useful in forming a covering or glove than when stretched to cover an object conforms to the shape of the object and then relaxes to reduce the pressure exerted upon the object.

This invention fulfills these and other objects by providing an elastomeric material characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low level of resilience. More specifically, the elastomeric material of the present invention is characterized by having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness from about 4.0 to about 4.5 mils, and having elastic properties such that when the elastomeric material is stretched from an initial configuration to fit about an object, the elastomeric material conforms to the configuration of the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% of the predetermined pressure.

Preferably, the material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in the amount effective to impart sufficient tensile strength without significantly stiffening the elastomeric material and altering the elastomeric properties. More preferably, the material of the present invention comprises carboxylated nitrile butadiene rubber.

The metallic compound preferably comprises a metal selected from the group consisting of lead, magnesium and zinc. More preferably, the metallic compound is a metallic oxide. Preferred metallic oxides include lead oxide, magnesium oxide and zinc oxide. Zinc oxide is the most preferred metallic compound. Zinc oxide is preferably present in the material in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

According to another aspect, the present invention comprehends a glove comprising a layer of the elastomeric material of the present invention. The glove of the present invention has an initial configuration adapted to receive a hand. Because the glove of the present invention comprises a layer of the elastomeric material of the present invention, the glove of the present invention has elastic properties such that when stretched from the initial configuration to fit about a hand, the glove conforms to the configuration of the hand initially exerting a predetermined pressure on the hand and thereafter relaxing to exert on the hand a reduced pressure which is substantially less than about 80% of the predetermined pressure. In addition, the glove of the present invention has a relatively high tensile strength and is substantially impermeable to water vapor and liquid water. Accordingly, the glove of the present invention is particularly useful as a surgical glove. After being donned by the wearer, the glove of the present invention relaxes so that the pressure on the wearer's hand is substantially reduced, but remains closely fitted about the wearer's hand. Thus, the glove of the present invention may be worn for an extended period of time without diminishing the sensitivity of the wearer's hand or becoming uncomfortable.

Other features, objects, and advantages of the present invention will become apparent from the following detailed description, drawings, and claims.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a graph comparing the percent of initial stress required to maintain the stretch of a latex glove made

Re. 35,616

3

according to a preferred embodiment of the present invention to that required by a conventional latex glove.

FIG. 2 is a graph comparing the stress required to maintain the stretch of a latex glove mile according to a preferred embodiment of the present invention to that required by a conventional latex glove.

## DETAILED DESCRIPTION

Generally described, the elastomeric material of the present invention is characterized by being substantially impermeable to water vapor and liquid water, having a relatively high tensile strength, and having a relatively low resilience. These properties make the elastomeric material of the present invention particularly useful as a covering, and even more particularly useful as a glove.

The elastomeric material of the present invention has the following properties as measured according to ASTM D-412 on a sample having a thickness from about 4.0 to about 4.5 mils: a tensile strength greater than about 1500 psi and preferably greater than about 2000 psi, an elongation greater than about 700% and preferably greater than about 800%, and a 500% modulus less than about 350 psi and preferably between about 250 and about 300 psi. The tensile strength is the energy required to stretch the sample to the breaking point and the elongation is the percent stretch of the sample at the breaking point. The 500% modulus is a measure of the energy it takes to stretch the sample 500% of a predetermined length. The elastomeric material of the present invention and gloves made therewith also have a high level of puncture resistance. The elastomeric material of the present invention has a puncture resistance as measured according to ASTM D-120 on a sample having a thickness between 4.0 and 4.5 mils of greater than about 800 pounds per inch.

The high level of strength as illustrated by the foregoing properties, enables the elastomeric material of the present invention and gloves made therewith to be pulled and stretched a considerable amount before breaking. Thus, a glove made with the elastomeric material of the present invention can be made to fit closely to the wearer's skin because it can be pulled with a considerable amount of force when being donned by the wearer. This is particularly important for surgical gloves which must be thin and fit closely.

The relatively low resilience, allows the elastomeric material of the present invention and gloves made therewith to relax after being stretched while the stretch is maintained. In other words, the elastomeric material of the present invention has elastic properties such than when the elastomeric material is stretched from an initial configuration to fit about an object such as a hand, the elastomeric material conforms to the configuration of the object, initially exerting a predetermined pressure on the object and thereafter relaxing to exert on the object a reduced pressure which is substantially less than about 80% or the predetermined pressure. Preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastic properties such that the significantly reduced pressure is reached within six minutes after the material is stretched to fit about the object or hand. More preferably, the elastomeric material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than about 50% of said predetermined pressure within about one minute after the material is stretched to fit about the object or hand. Most preferably, the elastomeric

4

material of the present invention and gloves made therewith are further characterized by having elastomeric properties such that the reduced pressure becomes less than [bout 90%] *about 10%* of said predetermined pressure within about six minutes after the material is stretched to fit about the object or hand.

Accordingly, gloves made with the elastomeric material of the present invention are particularly useful as surgical gloves because they relax on the hands of the wearer after being donned so that there is little resistance to movement by the wearer's fingers and there is little restriction of blood vessels in the wearer's hands. Thus, gloves made with the elastomeric material of the present invention can be worn for extended periods of time without tiring or numbing the hands of the wearer, thereby giving the wearer greater comfort and greater sensitivity in performing delicate tasks. The elastic properties of the gloves of the present invention are illustrated in FIGS. 1 and 2 discussed hereinbelow.

Preferably, the elastomeric material of the present invention comprises nitrile butadiene rubber and a metallic compound which is substantially insoluble in water and is present in an amount effective to impart sufficient tensile strength to the elastomeric material without significantly stiffening elastomeric material and altering the elastic properties of the elastomeric material. The nitrile butadiene rubber is preferably carboxylated nitrile butadiene rubber which when cured possesses a higher tensile strength than noncarboxylated nitrile butadiene rubber.

The metallic compound preferably comprises lead, magnesium or zinc. Representative compounds are metallic oxides, such as lead oxide, magnesium oxide or zinc oxide. Zinc oxide is preferred. In addition, zinc oxide is preferably present in the elastomeric material in an amount from about 0.1 to about 0.5 parts per hundred parts nitrile butadiene rubber. If the zinc oxide is not present or is present in an amount below this range, the tensile strength of the elastomeric material is reduced and gloves made therewith tear easily. If the zinc oxide is present in an amount above this range, the elastomeric material and gloves made therewith become more stiff and their resilience is reduced. At the higher resilience, gloves made with the elastomeric material maintain undesirable pressure on the hands of the wearer.

The gloves of the present invention are preferably made by dipping a glove form into a latex mixture, curing the latex mixture on the glove form at elevated temperatures, and then stripping the cured latex glove from the glove form. The resulting gloves preferably have a thickness from about 4.0 to about 4.5 mils.

The latex mixture preferably comprises carboxylated nitrile butadiene rubber latex having about a 40% dry rubber content and zinc oxide in the amount from about 0.1 to about 0.5 parts per hundred parts rubber. The latex mixture may also include additives commonly used to make cured latex products such as processing agents, pH control agents, accelerating agents, curing agents, coagulants, and colorants. As will be appreciated by those skilled in the art, the amounts of these additives may be varied considerably. This preferred latex mixture is preferably cured in an oven for 30 to 40 minutes at 270 to 300 degrees Fahrenheit.

The present invention is further illustrated by the following example which is designed to teach those of ordinary skill in the art how to practice this invention and represent the best mode contemplated for carrying out this invention.

## EXAMPLE 1

Latex gloves were made as follows. A latex material having the formula set forth in Table 1 was thoroughly

Re. 35,616

**5**

mixed in a container. The amount of each component of the material is set forth in parts per hundred dry rubber (PHR). Table 1 shows the amount of dry carboxylated nitrile butadiene rubber present in the latex composition; however, the carboxylated nitrile butadiene rubber was added to the latex composition as a latex comprising 40% by weight of carboxylated nitrile butadiene rubber with the remainder water and surfactants. The sodium dodecylbenzene sulfonate is a processing agent, the potassium hydroxide is present as a pH control agent, the sulfur is a curing agent, the zinc dibutyl dithiocarbamate is an accelerating agent, the titanium dioxide is present as a pigment, the MICHEMLUBE 135 is a paraffin wax emulsion available from Michelman, Inc., Cincinnati, Ohio, and the COAGULANT WS is a polyether-polysiloxane coagulant available from Bayer, Inc.

Glove forms were prepared by washing with a detergent and rinsing. The glove forms were then dipped in a coagulant mixture comprising calcium nitrate, water and a non-ionic soap to promote congealing of the latex around the glove forms. After being dipped in the coagulant mixture, the glove forms were then dipped in the latex material. The latex coated glove forms were then dipped in a leach consisting of warm water and then into a powder slurry consisting of powdered starch. The latex coated glove forms were then placed in an oven for 30 minutes at 285 degrees Fahrenheit to cure the latex. After removal from the oven, the cured latex coated glove forms were dipped in a post curing leach consisting of warm water. The cured latex gloves were then stripped from the glove forms and tumbled.

**TABLE 1**

EXAMPLE 1 LATEX FORMULATION

| | PHR |
|---|---|
| Carboxylated nitrile butadiene rubber (dry) | 100.0 |
| Sodium dodecylbenzene sulfonate | 0.25 |
| Potassium hydroxide | 0.7 |
| Sulfur | 1.0 |
| Zinc dibutyl dithiocarbamate | 1.0 |
| Zinc oxide | 0.5 |
| Titanium dioxide | 4.0 |
| MICHEMLUBE 135 | 3.0 |
| COAGULANT WS | 2.0 |
| STAN-TONE WD 2467 pigment | 0.1 |
| CHERRY FLAVOR #50767 pigment | 0.7 |

The gloves from Example 1 were subjected to a series of tests, the results of which are shown in Tables 2 and 3 and FIGS. 1 and 2. The tensile strength, elongation, and 500% modulus of the gloves made according to Example 1 were each measured according to ASTM D-412 and are shown in Table 2.

**TABLE 2**

Physical Properties-ASTM D-412

| Thickness | 4.5 mils |
|---|---|
| Tensile Strength | 2200 psi |
| Elongation | >800% |
| 500% modulus | 350 psi |

The puncture resistances of the gloves from Example 1, of a conventional natural rubber latex examination glove, and of a conventional natural rubber latex surgical glove were measured according to ASTM D-120 and the results are shown in Table 3. Table 3 illustrates the superior puncture resistance of the gloves made according to Example 1.

**6**

**TABLE 3**

PUNCTURE RESISTANCE-ASTM D-120

| Glove | lbs. | gauge | lbs./inch |
|---|---|---|---|
| NR examination | 1.9 | 6.7 | 281 |
| NR surgical | 2.9 | 7.5 | 396 |
| Example 1 | 3.9 | 4.7 | 842 |

The resilience of the gloves made according to Example 1 and a conventional natural rubber latex glove was tested as follows. A sample was cut from each glove and stretched 100% of its length to determine the initial 100% modulus according to ASTM D-412. The amount of stress required to maintain this 100% stretch was then recorded every minute for 30 minutes. The resulting data is shown in FIGS. 1 and 2. FIG. 1 is a plot of percent of initial stress versus time for the sample from the Example 1 glove and the sample from the conventional natural rubber glove. FIG. 2 is a plot of stress in psi versus time for the same samples. As can be seen from FIGS. 1 and 2, the stress required to maintain the 100% stretch of the Example 1 glove sample was substantially zero within six minutes after the initial stretch, while the stress required to maintain the 100% stretch of the conventional glove sample dropped to only about 80% of the initial stress over the 30 minute period.

The foregoing description relates only to preferred embodiments of the present invention, and numerous changes and modifications may be made therein without departing from the spirit and scope of the invention as defined in the following claims.

What is claimed is:

1. A *closely fitting* glove comprising a layer of elastomeric material (a) comprising nitrile butadiene rubber, (b) having an initial configuration adapted to receive *and fit closely about* a hand, and (c) characterized by (i) being substantially impermeable to water vapor and liquid water, (ii) having a tensile strength of at least about 1500 psi as measured according to ASTM D-412 on a sample of the elastomeric material having a thickness from about 4.0 to about 4.5 mils, and (iii) having a *thickness and* elastic properties such that *the glove is capable of being stretched to fit closely about the hand and* when stretched from the initial configuration to fit *closely* about the hand, the elastomeric material conforms to the configuration of the hand, initially exerting [a predetermined] *an initial* pressure on the hand and thereafter *still fitting closely about the hand, but relaxing, within about 6 minutes after the glove is stretched to fit about said hand,* to exert on the hand a reduced pressure which is [substantially] less than about [80%] *50% of the* [predetermined] *initial* pressure.

2. A glove as in claim 1, wherein the layer of elastomeric material *further comprises* [nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening the elastomeric material and altering said elastic properties.

3. A glove as in claim 2 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

4. A glove as in claim 2 wherein the metallic compound comprises metallic oxide.

5. A glove as in claim 4 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

6. A glove as in claim 2 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

Re. 35,616

7

7. A glove as in claim 1, wherein the *nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber and the layer of elastomeric material further comprises* [carboxylated nitrile butadiene rubber and] a metallic compound which is substantially insoluble in water and is present in an amount effective to impart said tensile strength without significantly stiffening said elastomeric material and said elastic properties.

8. A glove as in claim 7 wherein the metallic compound comprises a metal selected from the group consisting of lead, magnesium and zinc.

9. A glove as in claim 7 wherein the metallic compound comprises metallic oxide.

10. A glove as in claim 9 wherein the metallic oxide is selected from the group consisting of lead oxide, magnesium oxide and zinc oxide.

11. A glove as in claim 7 wherein the metallic compound comprises zinc oxide present in an amount from about 0.1 to about 0.5 parts per 100 parts nitrile butadiene rubber.

[12. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is reached within 6 minutes after the glove is stretched to fit about said hand.]

[13. A glove as in claim 1, further characterized by having elastomeric properties such that the reduced pressure is less than about 50% of said predetermined pressure.]

14. A glove as in claim [13] *1* further characterized by having elastic properties such that said reduced pressure is reached within about one minute after the glove is stretched to fit about said hand.

15. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastic properties

8

such that said reduced pressure is less than about [90%] *10%* of said [predetermined] *initial* pressure.

[16. A glove as in claim 15, wherein the layer of elastomeric material is further characterized by having elastic properties such that said reduced pressure is reached within about 6 minutes after the material is stretched to fit about said hand.]

17. A glove as in claim 1, wherein the layer of elastomeric material has a thickness up to about 4.5 mils.

18. A glove as in claim 1, wherein the layer of elastomeric material has a thickness from about 4 to about 4.5 mils.

19. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a puncture resistance of greater than about 800 lbs/in.

20. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having an elongation of greater than about 800%.

21. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus up to about 350 psi.

22. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having a 500% modulus in the range from about 250 to about 350 psi.

23. A glove as in claim 1, wherein the layer of elastomeric material is further characterized by having elastomeric properties such that said reduced pressure is about zero.

24. A glove as in claim 1, wherein the nitrile butadiene rubber comprises carboxylated nitrile butadiene rubber.

* * * * *

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANSELL HEALTHCARE PRODUCTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-527 (JJF) |
| | ) | |
| TILLOTSON CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ANSELL PROTECTIVE PRODUCTS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-93 (JJF) |
| | ) | |
| TILLOTSON CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] ORDER

AND NOW, this __14__ day of November, 2007, upon consideration of

Plaintiffs' Unopposed Motion For Stay Pursuant To 28 U.S.C. § 1659(a), it is hereby ORDERED

that said motion is GRANTED.  The above-captioned actions are hereby STAYED until the

determination of the United States International Trade Commission in Inv. No. 337-TA-608

becomes final or further order of this Court.

_Joseph J. Farnan Jr._
J.

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANSELL HEALTHCARE PRODUCTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 06-527-JJF |
| TILLOTSON CORPORATION, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant | ) | |
| | ) | |
| ANSELL PROTECTIVE PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 07-93-JJF |
| TILLOTSON CORPORATION, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

AUG 2 1 2007

## <u>ORDER</u>

WHEREAS, on July 12, 2007, Defendant Tillotson Corporation ("Tillotson") filed Motions To Stay Proceedings Pending The Outcome Of The International Trade Commission's Investigation [C.A. No. 06-527-JJF D.I. 90; C.A. No. 07-93-JJF D.I. 22]; and

WHEREAS, on July 26, 2007, Plaintiff Ansell Healthcare Products LLC and Plaintiff Ansell Protective Products Inc. requested leave to file a motion for summary judgment as to the validity of the '616 Patent at this stage of the proceedings [C.A. No. 06-527-JJF D.I. 96; C.A. No. 07-93-JJF D.I. 27];

IT IS HEREBY ORDERED as follows:

      1.    Tillotson's Motions To Stay Proceedings Pending The Outcome Of The International Trade Commission's Investigation are DENIED.  The Court will permit double captioning of discovery for use in both the International Trade Commission Investigation No. 337-TA-608 and the instant case before this Court.

2.      Plaintiff Ansell Healthcare Products LLC and Plaintiff Ansell Protective Products Inc.'s request for leave to file a motion for summary judgment at this stage of the proceedings is DENIED.

IT IS SO ORDERED this ___24___ day of ___August___ 2007.

_____
United States District Judge

813969/30675

2

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANSELL HEALTHCARE PRODUCTS LLC, and ANSELL PROTECTIVE PRODUCTS INC.,**<br><br>**Counterclaimants,**<br><br>v.<br><br>**TILLOTSON CORPORATION,**<br><br>**Counterclaim Defendant.** | **C.A. 1:08-CV-585-RMC** |

**COUNTERCLAIMANTS' FIRST SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS AND THINGS DIRECTED TO TILLOTSON CORPORATION**

Pursuant to Rule 34, Counterclaimants Ansell Healthcare Products LLC and Ansell Protective Products Inc. request that on or before July 28, 2008, Counterclaim Defendant Tillotson Corporation (hereafter "Tillotson"), at the offices of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, N.W., Washington, DC 20004, or at such other location and time as the parties may agree, produce or permit the inspection and copying of the following documents[1] that are in Tillotson's possession, custody, or control.

---

[1] As used herein the term "document" includes all writings, drawings, graphs, charts, photographs, phonorecords, E-mails, electronically transmitted communications, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form.

## CERTIFICATE OF SERVICE

I, DAVID M. MORRIS, do hereby certify that on this date, I caused copies of the foregoing Counterclaimants' First Set Of Requests For Production Of Documents And Things Directed To Tillotson Corporation to be served upon the following individuals as indicated below:

### VIA HAND DELIVERY

Brian Meiners, Esquire
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC  20006-2706

### VIA ELECTRONIC MAIL

Stephen Paul Cummings, Esquire
Asha Camille Jennings, Esquire
Milton Russell Wofford, Esquire
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309

*Counsel for Counterclaim Defendant*
*Tillotson Corporation*

DATED:   June 27, 2008

David M. Morris
D.C. Bar No. 432593
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 739-3000
Facsimile:  (202) 739-3001
dmorris@morganlewis.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANSELL HEALTHCARE PRODUCTS LLC, and ANSELL PROTECTIVE PRODUCTS INC.,**

                **Counterclaimants,**

    v.

**TILLOTSON CORPORATION,**

                **Counterclaim Defendant.**

**C.A. 1:08-CV-585-RMC**

## COUNTERCLAIMANTS' FIRST SET OF
## INTERROGATORIES DIRECTED TO TILLOTSON CORPORATION

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Counterclaimants Ansell Healthcare Products LLC and Ansell Protective Products Inc. propound the following interrogatories to Counterclaim Defendant Tillotson Corporation (hereinafter "Tillotson") to be answered under oath within 30 days hereof:

## INTERROGATORY NO. 1:

Identify by name and address all entities against whom Tillotson has filed suit in a United States District Court for infringement of U.S. Patent No. Re. 35,616 ("the '616 patent"), but did not serve with the complaint and summons.

## CERTIFICATE OF SERVICE

I, DAVID M. MORRIS, do hereby certify that on this date, I caused copies of the foregoing Counterclaimants' First Set Of Interrogatories Directed To Tillotson Corporation to be served upon the following individuals as indicated below:

### VIA HAND DELIVERY

Brian Meiners, Esquire
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC  20006-2706

### VIA ELECTRONIC MAIL

Stephen Paul Cummings, Esquire
Asha Camille Jennings, Esquire
Milton Russell Wofford, Esquire
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309

*Counsel for Counterclaim Defendant
Tillotson Corporation*

DATED:    June 30, 2008

David M. Morris
D.C. Bar No. 432593
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 739-3000
Facsimile:  (202) 739-3001
dmorris@morganlewis.com

# EXHIBIT F



Slip Copy                                                                                                                          Page 1
Slip Copy, 2007 WL 1541386 (D.D.C.)
**2007 WL 1541386 (D.D.C.)**

Barcardi & Co. Ltd. v. Empresa Cubana Exportadora De Alimentos y Productos Varios, Inc.
D.D.C.,2007.
Only the Westlaw citation is currently available.BARCARDI & COMPANY LIMITED, et al., Plaintiffs,
v.
EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS, INC., et al., Defendants.
**Civil Action No. 04-519 (EGS).**

May 24, 2007.

Emily Johnson Henn, Eugene D. Gulland, Oscar M. Garibaldi, Covington & Burling, Washington, DC, Michelle Marie Graham, William R. Golden, Jr., Kelley Drye & Warren LLP, New York, NY, for Plaintiffs.

Mark J. Biros, Robert M. Bernstein, Proskauer Rose LLP, Peter M. Brody, Ropes & Gray, Washington, DC, Herbert F. Schwartz, Michele M. Winneker, Pablo D. Hendler, Vincent N. Palladino, Ropes & Gray LLP, New York, NY, for Defendants.

### MEMORANDUM OPINION

EMMET G. SULLIVAN, United States District Judge.

**\*1** Plaintiffs Bacardi & Co., Ltd. and Bacardi U.S.A., Inc. (collectively "Bacardi") filed this suit in 2004 to contest the "Havana Club" trademark owned by defendants Empresa Cubana Exportadora ("Cubaexport") and Havana Club Holding S.A. ("HCH"). Counts I and V of the complaint seek the cancellation of defendants' Havana Club trademark. Counts II, III, and IV seek declaratory relief, specifically that the Court declare that (1) plaintiffs have a common law trademark for Havana Club, (2) plaintiffs' use of the Havana Club mark will not violate federal trademark laws, and (3) plaintiffs' use of the Havana Club mark will not violate any state laws.

On August 3, 2006, the Patent and Trademark Office ("PTO") issued an order cancelling defendants' trademark. The parties agree that this decision has

been or will be appealed. In addition, Pernod Richard, majority shareholder of HCH, is contesting the PTO decision in a suit in federal court in Delaware. On September 15, 2006, plaintiffs filed a motion to stay the case pending final resolution of any appeal from the PTO decision. Defendants consent to the stay with regard to Counts I and V because those claims seek cancellation of the trademark. Defendants oppose a stay with regard to Counts II, III, and IV because they believe those claims should be dismissed for lack of jurisdiction or on the merits. Thus, in addition to their oppositions to the motion to stay, defendants each filed motions to dismiss Counts II, III, and IV. Plaintiffs did not respond to the motions to dismiss, but instead filed a motion for extension of time to respond, arguing that an extension should be granted because the case should be stayed.

### ANALYSIS

"A trial court has broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere."*Hisler v. Gallaudet Univ.,* 344 F.Supp.2d 29, 35 (D.D.C.2004) (citing *Landis v. North Am. Co.,* 299 U.S. 248, 254 (1936))."The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."*Air Line Pilots Ass'n v. Miller,* 523 U.S. 866, 879 n. 6 (1998) (quoting *Landis,* 299 U.S. at 254-55)."Indeed, 'a trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case.' " *Hisler,* 344 F.Supp.2d at 35 (quoting *Levya v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 863-64 (9th Cir.1979)).

Plaintiffs have stated that if they prevail on appeal, they will have obtained the relief sought in this suit and further pursuit of their claims here would be unnecessary. Therefore, they argue that staying the case will conserve judicial resources, and save time and effort for the Court and the parties. For instance, plaintiffs point out that staying the case will obviate

Slip Copy                                                                                          Page 2
Slip Copy, 2007 WL 1541386 (D.D.C.)
**2007 WL 1541386 (D.D.C.)**

the need to decide defendants' pending motions to dismiss.

**\*2** Defendants' argument against the stay is that the Court must address its jurisdiction over the declaratory judgment claims before it can stay those claims. There is some support for that proposition. *See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 95 (1998)* (holding that the "requirement that jurisdiction be established [is] a threshold matter"). More convincing, however, is the approach employed by Judge Urbina when recently faced with similar circumstances. In *IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Americas, 402 F.Supp.2d 289 (D.D.C.2005),* the plaintiff had moved to stay the case pending resolution of a related arbitration proceeding, and defendants had moved to dismiss for lack of jurisdiction. *Id.* at 292-93. The court observed that the arbitration outcome may moot the defendants' motion to dismiss and resolve the issues in the case in their entirety. *Id.* at 293. Thus, in the interest of judicial economy, the court granted the motion to stay. *Id.* The same reasoning applies here with equal force because resolution of the PTO action may moot this entire case. In addition, this Court retains jurisdiction over the suit as a whole because of Counts I and V.

Moreover, the resolution of defendants' jurisdictional arguments will not be straightforward because a recent Supreme Court decision, *MedImmune, Inc. v. Genentech, Inc., 127 S.Ct. 764 (2007),* has substantially altered the standard for declaratory judgment jurisdiction. *See Sandisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1380 (Fed.Cir.2007)* ("The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test."); *id.* at 1380 n. 2 (declining to address whether *MedImmune* affects the second prong of the Federal Circuit's two-prong test); Def. Cubaexport's Mot. to Dismiss at 5 (relying on the Federal Circuit's test for jurisdiction). Finally, defendants will not be unduly prejudiced if the Court grants the stay. Defendants claim that doing so will deny them finality in this action. This is argument is misplaced though, because all parties agree that Counts I and V should be stayed, and thus the case will continue even if the declaratory judgment claims are dismissed.

**CONCLUSION**

Plaintiffs' motion to stay the case is **GRANTED** in the interest of judicial economy and because defendants will not be unduly prejudiced. Due to the recent change in declaratory judgment law, defendants' motions to dismiss are **DENIED without prejudice** to reconsideration if and when the stay is lifted and proceedings continue. Therefore, plaintiffs' motion for an extension of time to respond to the motions to dismiss is **DENIED** as moot. Finally, the parties are directed to file a joint status report regarding the PTO appeal proceedings and recommendation for future proceedings in this case by no later than July 24, 2007. An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2007.
Barcardi & Co. Ltd. v. Empresa Cubana Exportadora De Alimentos & Productos Varios, Inc.
Slip Copy, 2007 WL 1541386 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Westlaw.

Slip Copy                                                                                                          Page 1
Slip Copy, 2007 WL 1521233 (D.D.C.), Med & Med GD (CCH) P 302,092
**2007 WL 1521233 (D.D.C.)**

CFairview Hosp. v. Leavitt
D.D.C.,2007.

United States District Court,District of Columbia.
FAIRVIEW HOSPITAL, et al., Plaintiff,
v.
Michael O. LEAVITT, Defendant.
**Civil Action No. 05-1065 (RWR).**

May 22, 2007.

Jacqueline Elizabeth Bennett, Reed Smith LLP, Washington, DC, for Plaintiff.
Peter Robbins, U.S. Department of Justice, Washington, DC, for Defendant.

### MEMORANDUM OPINION AND ORDER

RICHARD W. ROBERTS, United States District Judge.
**\*1** Plaintiffs, three Massachusetts hospitals,[FN1] seek an order requiring the defendant, Secretary of the United States Department of Health and Human Services, to reopen cost reports from prior years and provide Medicare reimbursements for a state assessment under Medicare regulation 42 C.F.R. § 405.1885(d). Plaintiffs move for a **stay** of the proceedings pending the final resolution of *Bradley Memorial Hospital v. Leavitt*, Civil Action No. 04-416(EGS) (D.D.C. filed Mar. 17, 2004). Because a **stay** of these proceedings would promote judicial economy and **efficiency** for the parties, plaintiffs' **motion** for a **stay** will be granted.

> FN1. Fairview Hospital, Tufts-New England Medical Center, and Mount Auburn Hospital.

### BACKGROUND

Plaintiffs seek reimbursement for costs incurred as a result of the Massachusetts Uncompensated Care Pool ("UCP") assessment. (Am.Compl.¶ 39.) UCP "reimburse[s] hospitals and community centers for care provided to low-income, uninsured and underinsured residence of the commonwealth."Mass. Gen. Laws Ann. Ch. 118G, § 18(a)."The UCP is

funded, in part, through [an assessment] against each hospital's private sector charges."(Am.Compl.¶ 21.)

Plaintiffs claim that certain of defendant's intermediaries that processed plaintiffs' cost reports for Medicare reimbursement s[FN2]maintained a policy that the UCP was not reimbursable for the plaintiffs and misled plaintiffs into believing that the UCP was not reimbursable while simultaneously reimbursing the UCP for other Massachusetts hospitals. Plaintiffs argue that this "dual policy" constitutes "similar fault" under § 405.1885(d), requiring that their cost reports be reopened under the regulation. Plaintiffs filed a motion for a stay of proceedings until *Bradley* has been fully resolved, including any appeal. Defendant's oppose plaintiffs' motion.

> FN2. Associated Hospital Services ("Associated") processed claims for Tufts and Mount Auburn, and Mutual of Omaha Insurance Company ("Mutual of Omaha") processed claims for Fairview. (Pls.' Reply at 1.)

### DISCUSSION

"A trial court has broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere."*Marsh v. Johnson*, 263 F.Supp.2d 49, 52 (D.D.C.2003) (citing *Landis v. N. Am. Co.*, 229 U.S. 248, 254 (1936)); *see McSurely v. McClellan*, 426 F.2d 664, 671 (D.C.Cir.1970) ("[T]he District Court has a broad discretion in granting or denying stays so as to coordinate the business of the court efficiently and sensibly."(internal quotations omitted)). The court "must weigh competing interests and maintain an even balance," when determining whether to stay a proceeding. *Landis*, 299 U.S. at 254. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."*Id.* A party may be required "to submit to delay not immoderate in extent and not oppressive in its consequences if ... convenience will thereby be promoted."*Id.* at 256."Indeed, '[a] trial court may, with propriety, find it is **efficient** for its own docket and the fairest course

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1521233 (D.D.C.), Med & Med GD (CCH) P 302,092
**2007 WL 1521233 (D.D.C.)**

for the parties to enter a **stay** of an action before it, pending resolution of independent proceedings which bear upon the case."*IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Ams., 402 F.Supp.2d 289, 292 (D.D.C.2005).*

*\*2* Plaintiffs argue that a **stay** of proceedings in the instant case pending final resolution of *Bradley* is warranted because it would "promote **efficiency** and conserve party and judicial **resources** ."(Pls.' Mem. in Support of **Mot.** for **Stay** of Proceedings ("Pls.' **Stay Mot.**") at 11.) Given that the legal defenses are nearly identical in both cases and mostly involve pure **issues** of law, plaintiffs contend that "success on [these defenses] before the Court of Appeals for this Circuit would likely obviate the need for further proceedings...."(*Id.*)Plaintiffs point out that three previously filed Massachusetts lawsuits [FN3] have been stayed pending the outcome in *Bradley* for the same reasons argued by plaintiffs here. Further, plaintiffs claim that the parties' joint requests for stays in those cases are instructive in this case because, with the exception of the fiscal years at issue, the complaints in all four are identical. (Pls.' Reply Mem. in Support of Mot. for Stay of Proceedings ("Pls.' Reply") at 3.)

> FN3.*Milton Hospital v. Thompson,* Civil Action No. 04-1497(RWR) (D.D.C. filed Aug. 30, 2004); *Dana-Farber Cancer Inst. v.Thompson,*Civil Action No. 04-1537(RWR) (D.D.C. filed Sept. 3, 2004); *Berkshire Medical Ctr. v. Thompson,* Civil Action No. 04-1562(RWR) (D.D.C. filed Sept. 9, 2004).

In *Milton, Dana-Farber,* and *Berkshire,* the parties jointly moved to **stay** the proceedings until final resolution, including any appeal, of *Bradley.*The parties represented that the **stays** were justified because the cases "raise [d] **issues** similar to those in *Bradley Memorial Hospital v. Thompson,* D.D.C. No. 04-416(EGS) (filed March 15, 2004)." (Joint **Mot.** for a **Stay** of Proceedings, *Milton,* at 1.)[FN4] In addition, the parties believed that the **stays**"would promote **efficiency** and conserve party and judicial **resources**."(*Id.*) Despite factual differences between the cases, the parties urged **stays** arguing that the claims raised in all three cases were "virtually identical to those raised in *Bradley,* and the defenses [were] likely to be the same."(Supplemental Mem. in Supp. of Joint **Mot.** for a **Stay** of Proceedings

("Supplemental Mem."), *Milton,* at 5.) Moreover, the parties postulated that "[e]ven if some **issues** remain for resolution after disposition in *Bradley,* they are likely to be reduced to discrete factual questions Such a **narrowing** of the case[s] would facilitate more economical proceedings and/or possible settlement discussions in the future."(*Id.*)

> FN4. Identical motions and supplemental filings were filed in *Dana-Farber* and *Berkshire.*

When faced with the complaint filed in the instant case, instead of joining in the plaintiffs' motion for a stay as he had done in the prior three Massachusetts lawsuits, the defendant responded by filing a dispositive motion. (*See* Def.'s Mot. to Dismiss or, In the Alternative, for Summ. J.) Defendant argues that his prior positions in *Milton, Dana-Farber,* and *Berkshire* have no bearing on whether a **stay** should be granted in this case. (Def.'s Opp'n to Pls.' **Mot.** for **Stay** of Proceedings ("Def.'s Opp'n") at 15 .) However, given the similar nature of the cases and defendant's previous representations that **staying** those cases pending resolution of *Bradley* would promote convenience and **efficiency**, a **stay** in this case appears equally worthwhile. While defendant argues that the plaintiffs have not demonstrated any hardship or inequity would result if the case is not **stayed** (Def.'s Opp'n at 4), these considerations are not limitations upon a court's power to **stay** proceedings. *See Landis,* 299 U.S. at 255. This is especially so where simultaneous litigation may settle questions of law and simplify the proceedings. *See id.* at 256.

*\*3* Defendant also claims that the *Bradley* plaintiffs' amended complaint has now changed the factual allegations of that case such that they "differ dramatically from those pled here."(Def.'s Opp'n at 8.) However, the defendant concedes that there are identical legal issues and defenses raised by the cases.[FN5](Def.'s Opp'n at 12.) The amended complaint in *Bradley* contains the same legal theories as those contained in the initial complaint. (*Compare* Pls.' Stay Mot., Ex. 3, *with* Pls.' Stay Mot., Ex. 7.) Additionally, the amended complaints in *Bradley* and this case are strikingly similar *(compare* Pls.' Stay Mot., Ex. 7, *with* Pls.' First Am. Compl.), and the defenses raised in the dispositive motions filed in both cases are nearly identical.[FN6] Further, that the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1521233 (D.D.C.), Med & Med GD (CCH) P 302,092
**2007 WL 1521233 (D.D.C.)**

facts in *Bradley* and this case may be different is a particularly unpersuasive basis for denying a stay. The defendant has been aware for some time that the facts in *Bradley*, a case involving Connecticut hospitals seeking reimbursement for a state tax, were different from those of the Massachusetts lawsuits (*see* Supplemental Mem., *Milton*, at 4), where hospitals are seeking reimbursement of a state assessment. Knowing of these differences, the defendant still urged that stays be ordered in the three previous Massachusetts lawsuits. Given the indistinguishable nature of the legal issues and defenses raised by *Bradley* and the case at hand, efficiency requires that this case be stayed.[FN7]

> FN5. The defendant argues that both here and in *Bradley*, the court should: (1) "dismiss the claims for failure to exhaust administrative remedies;" (2) "conclude that plaintiffs have no right to a reopening under 42 C.F.R. § 405.1885(d)... because the regulation, by its express terms, does not apply to the actions on intermediaries in issuing their own payment determinations;" (3) "conclude that an opinion of law is not a statement of material fact about which a fraudulent or negligent misrepresentation can be made;" (4) "conclude that the Secretary and his agents have no legal duty to provide hospitals with unsolicited opinions on specific Medicare questions;" and (5) "conclude that the alleged reliance on the putative legal opinions of Medicare fiscal agents is unjustifiable as a matter of law."(Def.'s Opp'n at 12.)

> FN6. The parties' counsel in *Bradley*, *Fairview*, *Milton*, *Dana-Farber*, and *Berkshire* are also the same.

> FN7. The defendant also argues that a stay is not warranted because indefinite stays are disfavored and a stay would not foreclose the necessity of litigation in this case. Defendant's arguments are flawed in two ways. (Def.'s Opp'n at 6, 12.) First, any stay issued here would not be indefinite because briefing in the *Bradley* case is complete and dispositive motions are currently pending before the court. Second, it is well established that a stay of the proceedings in

one case is permitted even where proceedings in the other court "may not settle every question of fact and law ..., but in all likelihood ... will settle many and simplify them all ."*Landis*, 299 U.S. at 256.

### CONCLUSION AND ORDER

Because the case at hand raises nearly identical **issues** as those currently briefed and pending on cross-motions for summary **judgment** in *Bradley Memorial Hospital v. Leavitt*, Civil Action No. 04-416(EGS) (D.D.C.), and because holding this case in abeyance pending the final resolution of that matter will foster **efficiency** and conservation of **resources** for both the parties and the court, the plaintiffs' **motion** for a **stay** will be granted. Accordingly, it is hereby

ORDERED that plaintiffs' motion [14] for a **stay** of the proceedings be, and hereby is, GRANTED. This case is **STAYED** and ADMINISTRATIVELY CLOSED pending final resolution of *Bradley*.It is further

ORDERED that the defendant's motion [12] to dismiss, or for summary **judgment**, be and hereby is, DENIED without **prejudice**. It is further

ORDERED that plaintiff's cross-motion [20] for summary **judgment** be, and hereby is, DENIED without **prejudice**. It is further

ORDERED that defendant's motion [24] to strike be, and hereby is, DENIED without **prejudice**. It is further

ORDERED that within 60 days after final resolution of *Bradley*, the parties shall submit either a motion to re-open the case addressing the need for any further proceedings in this action, or a stipulation of dismissal. Failure to comply timely will result in the dismissal of the case.

D.D.C.,2007.
Fairview Hosp. v. Leavitt
Slip Copy, 2007 WL 1521233 (D.D.C.), Med & Med GD (CCH) P 302,092

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**2004 WL 2368007 (S.D.N.Y.)**

CNovartis Corp. v. Dr. Reddy's Laboratories, Ltd.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
NOVARTIS CORPORATION, Novartis
Pharmaceuticals Corporation, and Novartis
International AG, Plaintiffs,
v.
DR. REDDY'S LABORATORIES, LTD. and Dr.
Reddy's Laboratories, Inc., Defendants.
**No. 04 Civ.0757 SAS.**

Oct. 21, 2004.

Dimitrios T. Drivas, Jeffrey J. Oelke, Catherine
Lacavera, White & Case LLP, New York, New York,
for Plaintiffs.
Frank D. Rodriguez, Vijayant Pawar, Budd Larner,
P.C., Short Hills, New Jersey, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

I. INTRODUCTION

**\*1** Novartis Corporation, Novartis Pharmaceuticals
Corporation and Novartis International AG
(collectively, "Novartis") bring this patent
infringement suit against Dr. Reddy's Laboratories,
Ltd. and Dr. Reddy's Laboratories, Inc. (collectively,
"DRL").[FN1] Novartis claims that DRL's New Drug
Application ("NDA") to the United States Food and
Drug Administration ("FDA") seeking approval to
market amlodipine maleate and benazepril
hydrochloride combination capsules ("DRL's
Combination Capsules") infringes on a patent owned
by Novartis.[FN2]DRL now moves for an order staying
these proceedings pending the decision by the FDA
on its Administrative Stay of Action (the "FDA
Stay") concerning DRL's New Drug Application for
its amlodipine maleate product (AmVaz®), which
may moot this action.[FN3]Novartis opposes DRL's
motion to stay the litigation.[FN4]For the reasons set
forth below, DRL's motion to stay these proceedings
is granted.

FN1.*See* Complaint ¶ 20.

FN2.*See id.*

FN3.*See* Memorandum of Law in Support of
DRL's Motion for Stay ("DRL Mem.") at 1.
*See also* 2/4/04 Food and Drug
Administration Administrative Stay of
Action ("FDA Stay"), Ex. A to Pawar Decl.

FN4.*See* Novartis' Opposition to DRL's
Motion to Stay the Case ("Novartis Opp.")
at 9.

II. BACKGROUND

A. New Drug Applications Under 21 U.S.C. §
355(b)(2)

Section 355 of Title 21 of the United States Code
authorizes abbreviated new drug applications which
shorten the time and effort needed to obtain
marketing approval from the FDA.[FN5]An abbreviated
application may be filed for a generic drug that is the
same as a drug previously approved (referred to as a
"pioneer drug") or that differs from the pioneer drug
in specified ways.[FN6]The abbreviated application
allows an applicant to substitute bioequivalence data
for the extensive animal and human studies of safety
and effectiveness that must accompany a full new
drug application.[FN7]

FN5.*See Eli Lilly & Co. v. Medtronic, Inc.,*
496 U.S. 661, 676 (1990).

FN6.*See id.*

FN7.*See id.*

In order to protect against patent infringement,
applicants must file with the FDA the patent number
and expiration date of any patent which claims the
drug that is the subject of the application or which
claims a method of using such drug with respect to
which a claim of patent infringement could
reasonably be asserted.[FN8]Upon approval of a NDA

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**2004 WL 2368007 (S.D.N.Y.)**

or receipt of supplemental patent information, the FDA publishes this information in a listing called "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book") pursuant to 21 U.S.C. § 355(b)(1).[FN9]

> FN8.*See id.; see also*21 U.S.C. § 355(b)(1).

> FN9.*See Del Greco v. CVS Corp.,* No. 03 Civ. 1262, 2004 WL 2211600 at *15 (S.D.N.Y. Sept. 22, 2004).

[Abbreviated applications] are required to contain one of four certifications with respect to each patent named in the pioneer drug application: (i) that such patent information has not been filed, (ii) that such patent has expired, (iii) the date on which such patent will expire, or (iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted."[FN10]

> FN10.*Medtronic, 496 U.S. at 677* (quotation marks omitted).*See also*21 U.S.C. §§ 355(b)(2)(A)(i)-(iv).

This certification determines the date on which approval of the new drug application can take effect.[FN11]An applicant who makes the fourth certification (a "Paragraph (iv) Certification") is required to give notice to the holder of the patent alleged to be invalid or not infringed, stating that an application has been filed seeking approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent and including a detailed statement of the factual and legal basis for the applicant's opinion that the patent is not valid or will not be infringed.[FN12] If the patent owner brings a lawsuit for infringement within forty-five days of receiving notice of the certification, then approval of the NDA may only be made "upon the expiration of the thirty-month period beginning on the date of the receipt of the notice" unless there is a court determination that "the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity)."[FN13] If the patent owner does not initiate a lawsuit within forty-five days, approval of the NDA may become effective immediately.[FN14]

> FN11.*See Medtronic, 496 U.S. at 677*. "If the applicant makes either the first or the second certification, approval can be made effective immediately. If the applicant makes the third certification, approval of the application can be made effective as of the date the patent expires."*Id.*

> FN12.*See*21 U.S.C. § 355(b)(3).

> FN13.21 U.S.C. § 355(c)(3)(C).*See also Medtronic, 496 U.S. at 678* (stating that section 271(e)(2) of Title 35 of the United States Code creates "a highly artificial act of infringement" consisting solely of submitting a NDA containing a Paragraph (iv) Certification that is in error as to whether the new drug violates the relevant patent).

> FN14.*See*21 U.S.C. § 355(c)(3)(C).

**B. Novartis' '802 Patent**

**\*2** The United States Patent and Trademark Office issued U.S. Patent No. 6,162,802 (the "'802 Patent") on December 19, 2000.[FN15]The '802 Patent, entitled "Synergistic Combination Therapy Using Benazepril and Amlodipine for the Treatment of Cardiovascular Disorders and Compositions Therefor," covers a range of ratios of specified amounts of benazepril and amlodipine (or pharmaceutically acceptable salts of either or both), used for treating hypertension in humans.[FN16]The '802 Patent has been assigned to Novartis Corporation, the current owner of the patent.[FN17]Novartis Corporation exclusively licensed the '802 Patent to Novartis International AG, which in turn exclusively licensed the '802 Patent to Novartis Pharmaceuticals Corporation.[FN18]The '802 Patent is listed in the Orange Book.[FN19]

> FN15.*See* Complaint ¶ 10.

> FN16.*See id.* ¶¶ 10, 12.

> FN17.*See id.* ¶ 11.

> FN18.*See id.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**2004 WL 2368007 (S.D.N.Y.)**

FN19.*See id.* ¶ 14.

C. DRL's New Drug Application for Amlodipine Maleate

In December 2001, DRL filed a NDA under 21 U.S.C. § 355(b)(2) seeking approval to market AmVaz®, a heart medicine, whose active ingredient is a chemical commonly known as amlodipine maleate.[FN20]Pfizer, Inc. ("Pfizer") sued DRL on June 12, 2002 in the District of New Jersey alleging that AmVaz® infringed U.S. Patent No. 4,572,909, which covers Pfizer's amlodipine besylate product.[FN21]The FDA initially approved DRL's amlodipine maleate product.[FN22]Then Pfizer sued the FDA in the District of Columbia to overturn the approval.[FN23]DRL intervened in that action.[FN24]

FN20.*See* 7/23/04 Declaration of Vijayant Pawar in Support of DRL's Motion for a Stay of Proceedings ("Pawar Decl.") ¶ 2; DRL Mem. at 2.

FN21.*See* Pawar Decl. ¶ 3.

FN22.*See id.* ¶ 10.

FN23.*See id.*

FN24.*See id.*

On February 4, 2004, in light of questions raised about the data used in DRL's NDA for the amolodipine maleate product, the FDA issued the FDA Stay. The FDA action stays the effective date of the FDA's approval of the amlodipine maleate product, and prohibits DRL from marketing any such product until the FDA has reevaluated the application and determined that the drug has been shown to be safe and effective.[FN25]Both Pfizer's suit against DRL in the District of New Jersey and Pfizer's suit against the FDA in District of Columbia have been stayed pending the lifting of the FDA Stay.[FN26]

FN25.*See id.* ¶ 11.*See also* FDA Stay.

FN26.*See* Pawar Decl. ¶¶ 12-14; 5/25/04 Order of the United States District Court for the District of New Jersey, Ex. C. to Pawar Decl.; 4/6/04 Order of the United States

District Court for the District of Columbia, Ex. B. to Pawar Decl.

D. Novartis' Dispute with DRL

On December 23, 2003, Novartis received notice that DRL had filed a NDA with the FDA seeking approval to market DRL's Combination Capsules.[FN27]On February 2, 2004, Novartis brought the present suit against DRL alleging that DRL's Combination Capsules (containing amlodipine maleate and benazepril hydrochloride) infringe on Novartis' Lotrel® (a combination of amlodipine besylate and benazepril hydrochloride), which is covered by the '802 patent.[FN28] Novartis' suit triggered the thirty-month stay of approval by the FDA of the NDA for DRL's Combination Capsules.[FN29]DRL counterclaimed seeking a declaration that DRL's filing of a NDA seeking FDA approval of DRL's Combination Capsules does not infringe any valid and enforceable claim of Novartis"802 patent.[FN30]DRL now moves to stay these proceedings pending the completion of the FDA's reevaluation of the safety and efficacy of DRL's amlodipine maleate product.

FN27.*See* Complaint ¶ 17.

FN28.*See id.* ¶ 20.

FN29.*See* 21 U.S.C. § 355(c)(3)(C).

FN30.*See* Answer of DRL to Novartis' Complaint and Counterclaims ¶ 65.

III. LEGAL STANDARD

*3 "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."[FN31]When faced with a motion to stay patent infringement litigation pending an administrative decision, courts have considered (1) whether a stay will simplify the issues in question and promote judicial economy; (2) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party;

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**2004 WL 2368007 (S.D.N.Y.)**

Page 4

and (3) how far the litigation has already progressed.[FN32]

> FN31.*Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).

> FN32.*See Aerotel, Ltd. v. IDT Corp.*, No. 03 Civ. 6496, 2003 WL 23100263 (S.D.N.Y. Dec. 30, 2003).

## IV. DISCUSSION

### A. A Stay Will Simplify the Issues and Promote Judicial Economy

A stay of these proceedings pending the completion of the FDA's reevaluation will simplify the issues before this Court and promote judicial economy. If the FDA Stay remains in effect or if the FDA withdraws its approval of DRL's amlodipine maleate product, DRL would not be permitted to market its Combination Capsules, which contain amlodipine maleate. Thus, the FDA's decision may moot the case before this Court.[FN33]DRL is requesting this stay relatively early in the litigation, as discovery has just begun.[FN34]A stay of this case will therefore conserve judicial and party resources by avoiding potentially needless and expensive discovery.[FN35]

> FN33.*See Alberta Gas Chems., Ltd. v. Celanese Chem. Co.*, 650 F.2d 9, 14 (2d Cir.1981) (remanding case to the trial court with a direction for a stay pending an administrative agency's decision) ("We believe that the Commission's decision ... will materially affect, or perhaps definitively conclude, the federal action now before us.").

> FN34.*See Aerotel*, 2003 WL 23100263 at *2 (finding that a stay of litigation is warranted where "litigation has just begun"); *ASCII Corp. v. STD Entertainment USA, Inc.*, 844 F.Supp. 1378, 1381 (N.D.Cal.1994) (granting a stay of litigation pending the outcome of the U.S. Patent and Trademark Office's reexamination or reissuance proceedings where the parties were in "the initial stages of the lawsuit").

> FN35.*See SmithKline Beecham Corp. v. Apotex Corp.*, No. Civ.A. 99-CV-4304 et. al., 2004 WL 1615307 at *8 (E.D.Pa. July 16, 2004) ("If we decline to stay these proceedings, there is substantial risk that the parties will engage in costly, time-consuming discovery that might ultimately be unnecessary.").

### B. A Stay Will Not Unduly Prejudice Novartis If Novartis Is Granted a Commensurate Extension of the Thirty-Month Stay of Approval

Novartis contends that a stay of these proceedings will be prejudicial to its right to seek a court determination of its patent rights within the thirty-month period provided for by section 355(c)(3)(C), unless Novartis is given a commensurate extension of that period. Novartis argues that it would be an abuse of the statutory scheme to allow a new drug applicant making a Paragraph (iv) Certification to benefit from a stay of litigation by letting the clock run on the thirty-month stay of FDA approval of the NDA.

DRL does not object to tolling the thirty-month stay of approval of DRL's Combination Capsules during the pendency of a stay of these proceedings.[FN36] Further, the Court has the discretion to extend the thirty-month period if "either party to the action failed to reasonably cooperate in expediting the action."[FN37]DRL cannot feasibly argue that it is reasonably cooperating in expediting the action when it has asked the court to stay the proceedings. Therefore, the thirty-month period will be tolled during the stay of these proceedings.

> FN36.*See* DRL's Reply to Novartis' Opposition to Motion for Stay ("DRL Reply") at 2.

> FN37.21 U.S.C. § 355(c)(3)(C).*See also Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, No. IP99-0038-C-H/G, 2001 WL 238090 (S.D.Ind. March 8, 2001) (granting extension of thirty-month stay until the entry of final judgment where drug applicant that made a Paragraph (iv) Certification failed to meet the case management deadline for serving its expert witness reports).

With an extension of the thirty-month period,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 5
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**2004 WL 2368007 (S.D.N.Y.)**

Novartis will not be disadvantaged by a stay of these proceedings. Novartis argues that there is no evidence concerning when the FDA is likely to take action and that DRL's Paragraph (iv) Certification challenge to the '802 Patent "cast[s] a cloud over [the] patent that Novartis is anxious to clear."[FN38] However, DRL is prohibited from marketing any product containing amlodipine maleate during the FDA Stay, thereby protecting Novartis from suffering economic harm during the pendency of a stay of these proceedings. Also, it is in DRL's interest to obtain quick approval to market its product. Consequently, there is no justification for requiring the parties to move forward with discovery when the FDA's decision regarding its reevaluation of the drug may moot these proceedings.

>    FN38. Novartis Mem. at 10, 13.

## V. CONCLUSION

**\*4** For the foregoing reasons, DRL's motion for a stay pending the completion of the FDA's reevaluation of DRL's amlodipine maleate product is granted. The parties are to immediately advise the Court of any action taken by the FDA regarding the NDA for DRL's amlodipine maleate product. Further, the thirty-month limitation on FDA approval of DRL's Combination Capsules is tolled during the pendency of this stay. The Clerk of the Court is directed to close this motion [# 14 on the docket sheet] and transfer this action to the suspense docket pending further order of the Court.

SO ORDERED:

S.D.N.Y.,2004.
Novartis Corp. v. Dr. Reddy's Laboratories, Ltd.
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 568351 (E.D.Mich.)
**2006 WL 568351 (E.D.Mich.)**

Page 1

CIljin USA v. NTN Corp.
E.D.Mich.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Michigan, Southern
Division.
ILJIN USA, Plaintiff,
v.
NTN CORPORATION, Defendant.
**No. 06-10145.**

March 7, 2006.

Jerold I. Schneider, Akerman Senterfitt, West Palm
Beach, FL, for Plaintiff.
Harold D. Pope, III, Jaffe, Raitt, Southfield, MI, for
Defendant.

*ORDER GRANTING STAY*

ROBERTS, J.

I. INTRODUCTION

*1 This matter is before the Court on Defendant's
Motion to stay all proceedings. For the following
reasons, the Court GRANTS the Motion.

II. BACKGROUND

This case arises out of alleged patent infringement.
On January 10, 2006, Plaintiff, ILJIN USA
("ILJIN"), filed a Complaint seeking a declaratory
judgment that: (1) ILJIN has not infringed on
Defendant NTN Corporation's ("NTN") patent; (2)
NTN's patent is invalid; and (3) NTN's patent is
unenforceable.

ILJIN and NTN manufacture axle bearing
assemblies. On October 24, 2005, NTN filed a
complaint with the International Trade Commission
("ITC"). NTN alleged ILJIN is infringing on its U.S.
Patent No. 5,620,263 ('263 patent). The ITC's
investigation began on November 18, 2005. A
hearing is scheduled for June 26, 2006. The
Administrative Law Judge is to issue an initial
determination no later than September 28, 2006. A
final determination is due by December 28, 2006.

NTN seeks a stay of these proceedings at least until
December 28, 2006, the ITC'S deadline for a final
determination. ILJIN opposes the stay, arguing that
NTN has not demonstrated the necessary grounds.

III. APPLICABLE LAW AND ANALYSIS

The parties dispute the standard the Court is to apply
in deciding whether to issue a stay of proceedings
pending the outcome of an ITC investigation.

NTN argues the Court should apply the standard in
*Ralph Gonnocci Revocable Living Trust v. 3M Tool
& Machine, Inc.,* 68 U.S .P.Q.2d 1755
(E.D.Mich.2003). In *Gonnocci,* the court ruled on
whether to grant a stay of district court proceedings
pending the U.S. Patent and Trademark Office's
("PTO") reexamination of a patent. The court cited
three factors to be considered: (1) whether a stay
would unduly prejudice or present a clear tactical
disadvantage to the non-moving party; (2) whether a
stay will simplify the issues in question and trial of
the case; and, (3) whether discovery is complete and
whether a trial date has been set. *Id.* at 1757.In its
discussion the court found that although there were
factors supporting both parties, "on, balance ... the
interests of the parties and the court weigh in favor of
a stay."*Id.* at 1758.

The *Gonnocci* court considered the resources that
would be spent by the parties and the court in
litigating the case. The court also considered that a
determination from the PTO would simplify the
action. The court did not address prejudice to the
plaintiff if the stay was granted or hardship to the
defendant if denied.

ILJIN claims *Gonnocci* is inapplicable because it
involved a request to stay because of a pending patent
reexamination by the PTO, not an investigation by
the ITC. ILJIN correctly points out that the factors
relied on by the *Gonnocci* court were cited in another
case that dealt with patent reexamination as well.

NTN also relies on *Tompkins Seals, Inc. v. The West
Co.,* 229 U.S.P.Q. 469 (E.D.Penn.1985). In

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 568351 (E.D.Mich.)
**2006 WL 568351 (E.D.Mich.)**

*Tompkins,* the court granted a stay pending resolution of the defendant's complaint for unfair competition and unfair acts of importation and sale with the ITC. The plaintiff had sought a declaratory judgment that it was not infringing upon the defendant's trademark.

**\*2** In granting the stay, the *Tompkins* court held that a stay would: (1) allow the plaintiff to devote its full attention to the ITC investigation; (2) eliminate the possibility of waste of judicial time and money from simultaneous proceedings; and (3) eliminate the possibility of conflicting rulings. *Id.* at 470.The court also stated that the ITC possesses special competence regarding such claims. *Id.* at 471.The court did not assess the prejudice to the non-movant or hardship to the movant.

ILJIN claims the proper standard to be applied in this case was set forth in *Landis v. North American Co., 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936),* and the *Tompkins* court erred in not applying it. In *Landis,* the Court considered a stay while a decision was pending in another. The issue in both cases was the validity of the Public Utility Holding Company Act. The Court held "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."*Id.* at 255.The Court stated that in determining whether to grant a stay the court should weigh the competing interests. *Id.* The Court held that a movant for a stay must demonstrate hardship or inequity if it is required to go forward.*Id.* However, the Court also stated that only in rare circumstances would a litigant in one cause, be compelled to stand aside while a litigant in another cause, settles a rule of law that would define the rights of both. *Id.*

*Landis* may be less applicable inasmuch as it did involve different parties to different cases, and different issues. But, while the parties do not agree on the standard which applies when a district court considers a stay pending resolution of an investigation by the ITC involving a patent, it is unassailable that issues of judicial economy and balancing the interests of the parties and the Court are to be taken into account.

Here, the ITC claim was filed before the district court Complaint. The proceedings are more advanced in the ITC case than in the district court. There has not been substantial discovery in this case. Indisputably, it would conserve judicial resources to allow the ITC investigation to at least narrow the issues before this case procedes, with the added benefit of potentially avoiding conflicting decisions. Additionally, as the *Tompkins* court noted, the ITC is more experienced in deciding patent disputes than the district court. Lastly, ILJIN does not present any persuasive reason why a stay should not issue.

Accordingly, a stay will issue and be in effect until December 28, 2006-the deadline for a final determination from the ITC.

IV. CONCLUSION

For the foregoing reasons, the Court GRANTS NTN's Motion to stay proceedings until December 28, 2006. The hearing on this Motion, set for March 13, 2006, is cancelled.

IT IS SO ORDERED.

E.D.Mich.,2006.
Iljin USA v. NTN Corp.
Not Reported in F.Supp.2d, 2006 WL 568351 (E.D.Mich.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1126750 (N.D.Ohio)
**2005 WL 1126750 (N.D.Ohio)**

**H**Flexsys Americas, LP v. Kumho Tire, U.S.A., Inc.
N.D.Ohio,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Ohio, Eastern
Division.
FLEXSYS AMERICAS, LP Plaintiff,
v.
KUMHO TIRE, U.S.A., INC., et al., Defendants.
**No. 5:05CV156.**

April 29, 2005.

Amanda M. Leffler, John C. Fairweather, Lisa S.
Delgrosso, David C. Minc, Akron, OH, Carolyn E.
Miller, Neil A. Benchell, Eric C. Cohen, Chicago, IL,
for Plaintiff.
Alisa L. Wright, Ronald S. Kopp, Philip R. Wiese,
Akron, OH, Darin J. Glasser, Newport Beach, CA,
Diane K. Wong, John C. Kappos, Irvine, CA, Mark
A. Samuels, Ryan K. Yagura, Vision L. Winter, Los
Angeles, CA, Robert B. Casarona, Deborah A.
Coleman, Cleveland, OH, for Defendants.

*Memorandum of Opinion and Order*

GAUGHAN, J.

*INTRODUCTION*

*1 This matter is before the Court upon Kumho Tire
U.S.A., Inc., Kumho Tire Co., Inc. and Korea Kumho
Petrochemical Co., Ltd.'s Motion to Stay (Doc. 18).
Sovereign Chemical Company filed notice of Joinder
in Kumho Defendants' Motion to Stay. Also before
the Court is Sinorgchem's Motion to Stay (Doc. 20).
This is an action for patent infringement. For the
reasons that follow, the motions are GRANTED.

*FACTS*

Plaintiff, Flexsys Americas LP, filed this patent
infringement action against defendants, Kumho Tire,
U.S.A, Inc. (hereafter "Kumho USA"), Kumho Tire
Co., Inc. (hereafter "Kumho Korea"), Korea Kumho
Petrochemical Co., Ltd. (hereafter "KKPC"),
Sovereign Chemical Company (hereafter
"Sovereign") and Sinorgchem Co. (hereafter

"Sinorgchem").

According to the complaint, plaintiff is the beneficial
owner of U.S. Patent No. 5,117,063 ('063 Patent),
U.S. Patent No. 5,608,111 ('111 Patent), U.S. Patent
No. 5,453,541 ('541 Patent) and 6,140,538 ('538
Patent). These patents cover certain processes for
making the chemical compound 4-ADPA and its
alkylated derivatives, including 6PPD. (Compl.¶ 1).
These compounds are contained in nearly every tire
sold in the United States. (Comp.¶ 2).

Plaintiff alleges that each defendant infringes its
patents, albeit in different contexts. According to
plaintiff, Sinorgchem actually manufactures 4-ADPA
and 6PPD by utilizing the processes covered by
plaintiff's patents. (Compl.¶ 9). Plaintiff further
alleges that, in concert with Sinorgchem, defendant
KKPC purchases 4-ADPA from Sinorgchem and
alkylates the compound into 6PPD. (Compl.¶ 23).
Kumho Korea and Kumho USA do not manufacture
either compound but, instead, import tires into the
United States that contain 6PPD. (Compl.¶¶ 32, 39).
Sovereign Chemical is alleged to have infringed
plaintiff's patents by importing 6PPD made by a
process covered by one or more of the patents at
issue.

Shortly after plaintiff filed this lawsuit, it filed a
complaint with the United States International Trade
Commission (hereafter "ITC") against, among others,
Sinorgchem, KKPC and Sovereign Chemical.
Plaintiff, however, did not name Kumho USA or
Kumho Korea as defendants in the ITC action. The
ITC complaint asserts patent infringement claims
with respect to three of the four patents at issue in
this lawsuit. The only patent not subject to the ITC
action is the '541 patent. On March 23, 2005, the ITC
instituted a formal investigation into plaintiff's
allegations. All defendants now seek a stay of this
action pending the conclusion of the ITC
proceedings. Plaintiff opposes defendants' motions.

*ANALYSIS*

As an initial matter, Sinorgchem, Sovereign
Chemical and KKPC argue that they are entitled to a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1126750 (N.D.Ohio)
**2005 WL 1126750 (N.D.Ohio)**

mandatory stay pursuant to 28 U.S.C. § 1659(a) with respect to the '063 Patent, the '111 Patent and the '538 Patent, which are the three patents at issue in the ITC investigation. Section 1659(a) provides, in relevant part,

In a civil action involving parties that are also parties to a proceeding before the United States International Trade Commission ... at the request of a party that is also a respondent in the proceeding before the Commission, the district court *shall* stay, until the determination of the Commission becomes final, proceedings in the civil action with respect to any claim that involves the same issues involved in the proceeding before the Commission....

**\*2** 28 U.S.C. § 1659(a) (emphasis added).

Plaintiff does not dispute that these defendants are entitled to a stay. Based on the mandatory nature of the stay provision, the Court hereby stays this action as to Sinorgchem, Sovereign Chemical and KKPC with regard to the '063 Patent, the '111 Patent and the '538 Patent.

Sinorgchem, Sovereign Chemical and KKPC also ask this Court to invoke its discretionary power to stay plaintiff's claim of infringement vis à vis the '541 Patent. According to these defendants, adjudication of this patent will involve the same facts and issues facing the ITC with respect to two of the three patents before it. According to defendants, the '541 Patent is a member of the same patent family as the '063 and '111 patents. Defendants argue that nearly all of the important claim terms found in the '541 Patent will necessarily be construed by the ITC because those terms also appear in either the '063 Patent of the '111 Patent. As a result, defendants claim that resolution of plaintiff's claims with respect to the '541 Patent will involve the same claim construction, validity, infringement and inventorship issues. In addition, the witnesses and discovery necessary to analyze this patent will overlap extensively with the discovery that will be conducted before the ITC.

According to plaintiff, a stay of this case is not warranted with respect to the '541 Patent. Plaintiff points out that it does not intend to duplicate any discovery that will be conducted before the ITC and further indicates that the discovery taken in the ITC

action will be fully available for use in this case. In addition, plaintiff argues that this Court's resources will not be wasted because the Court will not be required to make any substantive rulings until after the ITC's decision is issued. Moreover, any claims construction or other rulings made by the ITC are not res judicata and, as such, this Court will be required to engage in its own analysis on these issues. According to plaintiff, by permitting discovery into the '541 Patent to proceed simultaneously with the ITC action, this case can be resolved shortly after the ITC concludes its investigation. As such, this case will be concluded within the 24-month period set for complex cases. Plaintiff further points out that the scope of the two proceedings is different in that the ITC cannot award damages or issue an injunction to the same extent as an Article III court.

Upon review of the parties arguments, as well as the relevant law, the Court finds defendants' argument to be well taken. It is well settled that this Court possesses the power to grant a discretionary stay if the circumstances warrant. *Landis v. North American Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936)."... [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."*Id.* at 254."A district court has discretion to determine whether a stay is necessary to avoid piecemeal, duplicative litigation and potentially conflicting results."*International Brotherhood of Electrical Workers, Local Unio No.2020 v. AT & T Network Systs.,* unreported, 879 F.2d 864 (6th Cir. July 17, 1989)."[T]he burden is on the party seeking the stay to show ... [a] pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order."*Ohio Envtl. Council v. United States Dist. Ct., Southern Dist. of Ohio,* 565 F.2d 393, 396 (6th Cir.1977).

**\*3** Although no court in the Sixth Circuit has addressed the precise issues presented by defendants' motion, the Court finds *Alloc, Inc. v. Unilin Decor N.V.,* 2003 WL 21640372 (D.Del. July 11, 2003) instructive. In *Alloc,* plaintiff filed a patent infringement action with respect to one patent, which was the latest in a series of continuation patents. The earlier patents were the subject of an ITC investigation. Plaintiff argued that a stay was inappropriate because the specific patent at issue in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 1126750 (N.D.Ohio)
**2005 WL 1126750 (N.D.Ohio)**

the lawsuit was not before the ITC. The court rejected plaintiff's argument, noting that, by nature, continuation patents overlap considerably with each other. Specifically, the court noted,

... [P]laintiffs cannot credibly argue that the patents are not alike in subject matter, as well as in many of their claims. This is so because, in general, 'a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application.' Therefore, even though the [patent at issue in the lawsuit] does not contain precisely the claims of the other patents that are under review or reexamination, there is a sufficient correlation among all of the patents for the court to conclude that a stay is appropriate.

*Id.* at *2 (citations omitted).

The court further noted that it would benefit greatly from the narrowing of complex issues related to the claims. In addition, the court relied on the fact that the parties had not yet incurred substantial litigation expenses.[FN1]

> FN1. Plaintiff attempts to distinguish *Alloc* on the basis that one of the patents at issue was subject to a reexamination proceeding before the Patent Office and the ITC ruling was pending before the Federal Circuit Court of Appeals. In addition, unlike the instant action, the lawsuit in *Alloc* was filed after the ITC proceeding was instituted. The Court does not believe that these minor differences affect the persuasiveness of *Alloc.* Nor is this Court compelled to follow *Mircon Tech., Inc. v. Mosel Vitelic Corp.,* 1999 WL 458168 (D.Idaho March 31, 1999), the case primarily relied on by plaintiff.

Like the Court in *Alloc,* this Court finds that Sinorgchem, Sovereign Chemical and KKPC are entitled to a stay of the proceedings with regard to the '541 Patent. The '541 Patent is part of a series of continuation patents, which includes both the '063 Patent and the '111 Patent. As defendants point out, many of the claims contained in the '541 Patent that will require construction in this case are present in either the '063 or '011 patent. As part of its investigation, the ITC will make rulings concerning claims construction, invalidity and relevant prior art. This Court recognizes that it is not bound by the rulings made by the ITC. As in *Alloc,* however, the Court finds that it would benefit tremendously from a narrowing of the complex issues in this case. It is more than likely that after the ITC ruling, the parties in this case will have fewer issues for this Court to resolve.

Moreover, the Court finds that plaintiff will not be prejudiced by a stay of this case. It is entirely unclear to this Court why plaintiff would opt to pursue only two of the three continuation patents before the ITC, other than in an attempt to avoid the mandatory stay requirements of 28 U.S.C. § 1659(a). Plaintiff indicates in its brief in opposition that it will be harmed by a stay of this action because the damages portion of the trial will be delayed while defendants continue to infringe the patents and because "delay always results in increased costs."The Court is not convinced of the gravity of plaintiff's alleged prejudice. On the other hand, the Court finds that requiring defendants to litigate both this case and the ITC action at the same time will result in prejudice. As set forth above, the majority of this case against these defendants is subject to a statutory stay. In the event this Court were to allow the case to proceed only with respect to the '541 Patent, this case would essentially be relitigated after the lifting of the mandatory stay. Much of the discovery related to this patent will overlap with that required to litigate the other patents at issue. Thus, two rounds of discovery would ensue absent a stay.[FN2] Although plaintiff indicates that it will not seek additional discovery, the same cannot be said of all of the parties in this case. Certainly, as set forth more fully below, Kumho USA and Kumho Korea will seek discovery as to the patents at issue before the ITC. Because plaintiff did not name them as defendants in the ITC proceeding, they will be unable to participate in discovery until after this Court lifts the automatic stay. In addition to compounding the written discovery, this would result in redeposing many witnesses [FN3] and requiring the parties to appear for at least twice as many hearings and conferences. Given that two of these defendants are located in Asia, the Court finds that requiring this case to proceed only with respect to the '541 Patent would create an undue burden on defendants.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN2. Even accepting as true plaintiff's statement that no discovery will be duplicated, the Court finds that imposition of a discretionary stay will not cause plaintiff undue hardship. The '541 Patent is a member of the same patent family as the '063 and the '111 patents and the Court cannot imagine that a great deal of additional discovery will be necessary to analyze the '541 Patent after the ITC ruling is issued. Thus, if plaintiff is correct, and no party seeks discovery in regards to the patents at issue before the ITC, only a minimal delay will occur in this action.

FN3. For example, in a continuation patent there is at least one inventor in common with the prior application. Because of the statutory stay, this individual could not be questioned with regard to either the '063 Patent or the '111 Patent until after the stay is lifted. If this Court allowed the case to proceed only as to the '541 Patent, this individual would be required to appear at least twice for depositions. The Court presumes other witnesses would face a similar fate.

*4 In addition, the Court finds that a temporary stay will result in a tremendous savings of judicial time and resources. Absent a stay, the Court will hold status conferences and hearings and address discovery disputes only to be faced with many of these same issues after the stay is lifted. In all, the Court finds that the balance of interests weighs in favor of granting a stay with regard to the '541 Patent.

For these same reasons, the Court finds that a stay with regard to Kumho USA and Kumho Korea is also warranted. Although these defendants are not parties to the ITC action, the Court finds that allowing this case to proceed against only these defendants makes little sense. As these defendants point out, they are not primary infringers. Rather, plaintiff alleges that Kumho USA and Kumho Korea import tires containing products that were manufactured by other defendants who used an infringing process. Having concluded that a stay of this matter is appropriate as to the primary infringer(s), the Court finds that requiring Kumho USA and Kumho Korea to defend this action absent the primary infringer(s) would result in unfair prejudice to defendants. Once the stay is lifted, all of the issues will be relitigated. Perhaps even more important, it would be impossible for this Court to resolve the patent infringement claims filed against these defendants absent the primary infringer(s) because the patents at issue are process patents. Kumho USA and Kumho Korea are not alleged to infringe the patent by employing the covered processes themselves. Rather, they import tires allegedly containing materials other defendants manufacture in violation of the patents. As such, in order to determine whether Kumho USA and Kumho Korea are liable in this case, it is necessary to discover the process employed by the primary infringer(s) in creating the 6PPD contained in the tires they import. It will be impossible, however, for these defendants to obtain the discovery necessary to defend themselves against the majority of the claims asserted by plaintiff until after the mandatory stay is lifted.[FN4] For this reason, and those stated above, the Court finds that a stay is warranted as to Kumho USA and Kumho Korea.

FN4. The Court rejects plaintiff's suggestion that these parties would not require additional discovery because they have the same attorneys as KKPC. For obvious reasons, this Court could not preclude Kumho USA and Kumho Korea from seeking additional discovery upon the lifting of the mandatory stay.

*CONCLUSION*

For the foregoing reasons, Kumho Tire U.S.A., Inc., Kumho Tire Co., Inc. and Korea Kumho Petrochemical Co., Ltd.'s Motion to Stay are GRANTED. In addition, Sinorgchem's Motion to Stay is GRANTED. This case is hereby perpetually stayed. Upon the conclusion of the ITC proceeding, any party may move to reopen this case.

IT IS SO ORDERED.

N.D.Ohio,2005.
Flexsys Americas, LP v. Kumho Tire, U.S.A., Inc.
Not Reported in F.Supp.2d, 2005 WL 1126750 (N.D.Ohio)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

▷Broadcast Innovation, L.L.C. v. Charter
Communication, Inc.
D.Colo.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
BROADCAST INNOVATION, L.L.C., and IO
Research Pty, Ltd., Plaintiffs and Counter-
Defendants,
v.
CHARTER COMMUNICATIONS, INC., Defendant
and Counter-Plaintiff.
**Civil Action No. 03-CV-2223-ABJ-BNB.**

July 11, 2006.

Barry Alan Schwartz, Kamlet, Shepherd, & Reichert,
LLP, Denver, CO, Corby R. Vowell, Edward W.
Goldstein, Goldstein & Faucett, LLP, Houston, TX,
Edward R. Nelson, III, Jonathan Tad Suder,
Friedman, Suder & Cooke, Fort Worth, TX, for
Plaintiffs and Counter-Defendants.
David C. Doyle, Jose L. Patino, Morrison & Foerster,
LLP, San Diego, CA, J. Eric Elliff, Morrison &
Foerster, LLP, Denver, CO, Robert M. Harkins,
Morrison & Foerster, San Francisco, CA, for
Defendant and Counter-Plaintiff.

**ORDER GRANTING DEFENDANT'S MOTION
FOR STAY PENDING REEXAMINATION OF
U.S. PATENT 6,076,094 BY UNITED STATES
PATENT AND TRADEMARK OFFICE**

ALAN B. JOHNSON, District Judge.
***1** The above-captioned matter comes before the
Court on Defendant Charter Communications, Inc.'s
Motion to Stay Pending Reexamination of the U.S.
Patent 6,076,094 By United States Patent and
Trademark Office. Plaintiffs Broadcast Innovation,
LLC and IO Research Pty, Ltd. have resisted this
motion, timely filing a response on June 29, 2006.
After careful consideration of the motion, briefs and
governing authorities, and being otherwise fully
advised in the premises, the Court **FINDS** and
**ORDERS** as follows:

**Background**

**I. Procedural History**

In this patent infringement and validity action,
Plaintiffs Broadcast Innovation, LLC and IO
Research Pty, Ltd. (hereinafter "Plaintiffs") allege
that Charter Communications, Inc. (hereinafter
"Charter") infringed directly or indirectly claims 8,
15, 22, 29 of United States Patent No. 6,076,094
(hereinafter "'094 patent"), a patent Charter claims is
invalid for numerous reasons, not the least of which
being anticipation and obviousness based on prior
art.[FN1] The '094 patent claims a complex distributed
database system with applicability to data
broadcasting and data casting communications
media.[FN2]

> FN1. The Court also notes that Charter has
> joined in and adopted a host of pleadings
> filed both in the present action and in the
> case of *Broadcast Innovation, L.L. C. v.
> Echostar Communication Corp.,* 01-cv-
> 2201-ABJ-BNB (D.Colo), a case also
> involving the '094 patent which has been
> stayed pending final resolution of the
> present case.

> FN2. The Court eschews an exhaustive
> recitation of the adjudicative facts
> surrounding the merits of this case, focusing
> instead on the posture of the present motion
> and response.

On June 8, 2006, Charter requested that the United
States Patent and Trademark Office (PTO) reexamine
the '094 patent to determine whether the four asserted
claims in the present case-claims 8, 15, 22 and 29-are
invalid. The information provided to the PTO as a
basis for reexamination includes, among other
materials, three prior art references that form the
basis of Charter's summary judgment motion before
this Court: (1) the 1989 World System Teletext and
Data Broadcasting Technical Specification; (2) a
1986 article entitled *"BBC Datacast-A New
Generation of Data Transmission Networks Using
Broadcast Video";* and (3) a 1988 article authored by
John Lilley entitled *"Can Data Broadcasting
Actually Sell Itself?"* It is undisputed that this art was
not before the PTO during its original examination of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

the application that eventually issued the '094 patent. Unsurprisingly, Charter asks this Court to stay the case awaiting the fully-informed, expert view of the PTO.

## II. Patent Reexamination

### A. Overview

Reexamination is a procedure by which any person can request that the PTO reexamine or reevaluate the patentability of an unexpired U.S. patent. 35 U.S.C. § 302. A request for patent reexamination must be based upon prior art patents or publications which raise "a substantial new question of patentability."*Id.* § 303(a). Typically, the cited prior art patents or printed publications upon which a request is based were not considered by the patent examiner during the processing of the patent application that resulted in the patent-in-suit. Once a reexamination request is granted, a patent examiner who is familiar with the technology involved with the patent conducts the reexamination. The examiner is obligated to do so "with special dispatch." 35 U.S.C. § 305; 37 C.F.R. § 1.550(a).

*2 Within approximately three months of the filing of the reexamination petition, the PTO will determine whether the request raises a "substantial new question of patentability" affecting any claim or claims of the patent.*Kaufman Co. v. Lantech Inc.*, 807 F.2d 970, 976 (Fed.Cir.1986). The examiner, utilizing his expertise, determines if such a "new question" exists by comparing the prior art of record in the original patent application with the prior art cited in the request for reexamination (although the examiner is not limited to that information).35 U.S.C. § 303(a). If the prior art patents and/or printed publications are "material" to the reexamination of at least one claim of the patent, a substantial new question of patentability exists.[FN3] Thereafter, the parties are given the opportunity to provide position statements to the PTO, and the PTO reexamines the patent claims in *ex parte* fashion. If the Commissioner decides *not* to institute a reexamination proceeding, the decision is final and nonappealable.

> FN3. The materiality standard is fairly deferential to the PTO. Prior art is "material" to the examination of a claim of the patent if "there is a substantial likelihood

that a reasonable examiner would consider the prior art patent or printed publication *important* in deciding whether or not the claim is patentable."UNITED STATES PATENT AND TRADEMARK OFFICE,*Manual of Patent Examination Procedure* § 2294 (8th ed., rev.1, October 2005) (emphasis added).

Importantly, a decision by the Patent Office that the reexamined claims of an issued patent are canceled as unpatentable renders the claims unenforceable in the pending litigation and in any future disputes. 35 U.S.C. § 307(a). Cancellation through reexamination, however, is available only when the claims at issue are unpatentable over prior art patents and publications. 35 U.S.C. §§ 301-02. Although not binding, a decision by the PTO upholding the validity of reexamined patent claims is strong evidence that a district court must consider in assessing whether the party asserting invalidity has met its burden of clear and convincing evidence. *Custom Accessories, Inc. v. Jeffery-Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed.Cir.1986). After a decision sustaining the validity of the claims, this burden becomes more difficult to satisfy. *Id.*[FN4]

> FN4. Relevant are the Federal Circuit's comments in *American Hoist v. Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed.Cir.1984):
>
> [I]t is clearly appropriate that the jury be instructed that because the PTO has now held the claims in suit patentable in light of the additional art discovered by Sowa, its burden of proof of unpatentability has become *more difficult* to sustain-a fact likewise to be taken into account by the trial judge.
>
> *Id.* at 1354.

During the course of a stay, the court retains jurisdiction to respond to changing factual circumstances with appropriate orders. Thus, if a stay is granted prior to the decision from the Patent Office as to whether a substantial new question of patentability exists, the court can issue an order lifting the stay upon a negative determination, thereafter deciding all pending motions and, if

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

necessary, proceeding to trial. *See, e.g., Grayling Indus. v. GPAC Inc.,* 19 U.S.P.Q.2d 1872, 1874 (N.D.Ga.1991); *Brown v. Shimano American Corp.,* 18 U.S.P.Q.2d 1496, 1496 (C.D.Cal.1991). Similarly, the court may dissolve the stay when preliminary reports from the Patent Office reveal that some of the claims at issue will survive reexamination. The court would then await the PTO's decision for guidance on pending motions and, if necessary, trial. *See, e.g ., Purolite Int'l, Ltd. v. Rohm and Haas Co.,* 24 U.S.P.Q.2d 1857, 1860 (E.D.Pa.1992); *Rohm and Haas Co. v. Brotech Corp.,* 24 U.S.P .Q.2d 1369, 1372 (D.Del.1992). If no claims survive, neither does the court's work.

**B. Scope and Purpose: Expertise**

**\*3** "Congress instituted the reexamination process to shift the burden or reexamination of patent validity from the courts to the PTO. Patent validity is a commonly asserted defense in litigation and courts are cognizant of Congress's intention of utilizing the PTO's specialized expertise to reduce costly and timely litigation."*Canady v. Erbe Elektromedizin GmbH,* 271 F.Supp.2d 64, 78 (D.D.C.2002) (citing H.R. REP. No. 1307, 96th Cong., 2d Sess., pt. 7 at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460)); *see also* Wayne O. Stacy, *Reexamination Reality: How Courts Should Approach A Motion to Stay Litigation Pending the Outcome of Reexamination,* 66 GEO. WASH. L.REV. 172, 172 (1997) ("Congress decided that the often-asserted validity issue, which can involve intricate technological questions, deserved special treatment. Thus, Congress established a patent reexamination procedure that allows the Patent and Trademark Office, instead of a district court, to consider validity issues that the PTO overlooked during the initial examination.").

Shifting the patent validity issue to the PTO has many advantages, including:

1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

4. The outcome of the reexamination many encourage a settlement without the further use of the Court.

5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.

6. Issues, defenses, and evidence will be more easily limited in final pretrial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

*Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987).

Early drafts of the reexamination statute expressly provided for a stay of court proceedings during all reexamination proceedings. *See*S. REP. 1679, 96th Cong., 1st Sess. § 310 (1979); H.R. REP. 5075, 96th Cong., 1 st Sess. § 310 (1979); S. REP. 2446, 96th Cong., 2 Sess. § 310 (1980). However, an express provision was ultimately deemed unnecessary because courts already had the power to stay civil actions "to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure."*Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.), *cert. denied,*464 U.S. 935 (1983).[FN5]"When a district court stays patent validity proceedings before it until completion of a reexamination proceeding, that stay must be accepted if the purpose of the reexamination statute is to be preserved."*Id.* To no surprise, courts frequently note that "[t]he legislative history surrounding the establishment of the reexamination proceeding evinces congressional approval of district courts liberally granting stays."*Robert H. Harris Co. v. Metal Mfg. Co.,* 19 U.S.P.Q.2d 1786, 1788 (E.D.Ark.1991).

> FN5. The pertinent House report explained as follows:
>
> The bill [35 U.S.C. §§ 301-07] does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)

**2006 WL 1897165 (D.Colo.)**

power already resides with the Court to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner.

H.R. REP. No. 1307 Part I, 96th Cong., 2d Sess. 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460-6463).

**C. Relevant Factors Weighing For Or Against A Stay**

*4 "A motion to stay an action pending the resolution of a reexamination proceeding in the United States Patent and Trademark Office is directed to the sound discretion of the court."*Braintree Laboratories, Inc. v. Nephro-Tech, Inc., 1997 WL 94237 (D.Kan.1997); see also Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed.Cir.1988)* ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). As mentioned above, there exists a "liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination proceedings."*Whatley v. Nike, 54 U.S .P.Q.2d 1124, 1125 (D.Or.2000); see also In re Laughlin Products, Inc., 265 F.Supp.2d 525, 530 (E.D.Pa.2003)* (same).

"In deciding whether to grant a stay, the court must weight the benefits of the stay against the costs."*Motson v. Franklin Covey Co., 2005 WL 3465664, *1 (D.N.J.2005).* Courts consider a number of factors in determining whether to stay litigation pending PTO reexamination, including: (1) whether a stay will simplify the issues in question and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and (4) "whether a stay will reduce the burden of litigation on the parties and on the court ."*Tap Pharm. Prods. Inc. v. Atrix Labs., Inc., 70 U.S.P.Q.2d 1319, 1320 (N.D.Ill.2004); Nexmed Holdings, Inc. v. Block Inv., Inc., 2006 WL*

149044, *1 (D.Utah Jan. 19, 2006)* (citing *In re Laughlin Prods., 265 F.Supp.2d at 530);Brown, 18 U.S.P.Q.2d at 1496* (detailing the expertise factor).[FN6] No one factor is controlling-the totality of the circumstances governs.

> FN6. While the *Tap Pharmaceuticals* court created a fourth category examining the "burden of litigation on the parties and on the court," see *70 U.S.P.Q.2d at 1320,* most courts merge this inquiry with the "simplification of issues" factor. *Accord Xerox Corp. v. 3Com Corp., 69 F.Supp.2d 404, 406 (W.D.N.Y.1999)* (collecting cases); *Versa Corp. v. Ag-Bag Intern. Ltd., 2001 WL 34046241, *1 (D.Or.2001)* (describing this factor as "the orderly course of justice measured in terms of the *simplifying or complicating of issues,* proof, and questions of law which could be expected to result from a stay") (emphasis added).

**Analysis**

**I. Will A Stay Simplify the Issues Before the Court?**

Courts routinely consider the expertise of the Patent Office, under which claim validity will be rigorously reevaluated, as an important factor in determining whether to stay its proceedings. *Accord Gould,* 705 F.3d at 1342;*Middleton, Inc. v. Minn. Mining & Mfg. Co., 2004 WL 198669, at *3 (S.D.Iowa 2004); GPAC Inc. v. D. W.W.Enter. Inc., 23 U.S.P.Q.2d 1129, 1134 (D.N.J.1992); see also Bausch & Lomb Inc. v. Alcon Labs., Inc., 914 F.Supp. 951, 953 (W.D.N.Y.1996)* ("Because the PTO is considered to have expertise in deciding issues of patentability[,] many courts have preferred to postpone making final decisions on infringement until the PTO rules on issues before it."). The technical nature of the patent claims in question increases the utility of PTO expertise, which is further amplified by the need to examine prior art and publications not before the PTO during its original patent examination. *See Brown, 18 U.S.P.Q.2d at 1496* ("[R]eexamination by the PTO when issues relevant to prior art are involved is especially helpful given the PTO's expertise."). In turn, patent cases *not* hinging upon the consequences of prior art references have less of a need for the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

PTO's expertise. *See Emhart Indus., Inc., 3 U.S.P.Q.2d at 1892 n. 3* (distinguishing the matter before it on such grounds, explaining that if "the issue of prior art was involved, the PTO's opinion [would] be invaluable.") (quotation omitted).

**\*5** Confronted with a motion to stay pending PTO reexamination after significant discovery, pretrial conference and trial dates set, a neighboring district court concluded as follows:

The technical expertise provided by the reexamination proceeding ... will be extremely helpful to this Court should further consideration of this matter be necessary. Indeed, the Court invites a final determination by the PTO as to the validity of plaintiff's patent claims. The reexamination procedure has the potential to eliminate trial on the issue of patent infringement, should all of the patent's claims be cancelled. It is equally possible for all of the claims in plaintiff's patent to be upheld, or to be narrowed in some degree. In any event, the expert view of the Patent Office examiner will certainly benefit this Court. Thus, the Court is of the opinion that a stay of the trial of this matter should be granted to allow the PTO to complete the reexamination proceeding.

*Loffland Bros. Co. v. Mid-Western Energy Corp.,* 225 U.S.P.Q. 886, 887 (W.D.Okla.1985) (staying trial pending conclusion of the reexamination proceedings).[FN7]

> FN7. Also interesting to note is that the patent at issue in *Loffland* appears quite simple when compared to the '094 patent presently before the Court-the technology in *Loffland* consisted of patent covering an elevating catwalk used on drilling rigs. *See Loffland Bros.,* 225 U.S.P.Q. at 886.

Indeed, some courts consider this factor of primary importance. *See, e.g., Dresser Indus., Inc. v. Ford Motor Co.,* 530 F.Supp. 309, 316 (N.D.Tex.1981) ("The major benefit of staying litigation pending reconsideration of a patent under [reexamination] is that it affords the Court the assistance of the Patent Office's specialized expertise on technical questions of validity."); *cf. Pegasus Development Corp. v. Directv, Inc.,* 2003 WL 21105073, \*2 (D.Del.2003) (deciding that by staying a highly technical case

involving computer programming communication systems, "the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency").

The *Loffland Bros.* court also understood the PTO's expertise to have benefits beyond educating the court. That is, simplification may occur by the very nature of the reexamination procedure itself, as claims, arguments and defenses can be narrowed or entirely disposed of, preserving the resources of the parties and the court. The Federal Circuit has explained that a major "purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceedings)."*Gould,* 705 F.2d at 1342 (Markey, C.J.); *see also Canady,* 271 F.Supp.2d at 68 ("[C]ourts often stay proceedings, such as in the instant case, to wait for reexamination results that will simplify litigation by eliminating, clarifying, or limiting the claims.")."If not found invalid, the reexamination will at least likely result in a narrowing and simplifying of the issues before the Court."*Middleton, Inc.,* 2004 WL 1968669 at \*3. "This is because the scope of the patent claims, which the PTO may narrow or otherwise limit, controls the outcome of any subsequent infringement analysis."*Id.; see also, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed.Cir.2002).

**\*6** Combining these benefits, countless courts have touted the value of streamlining voluminous and complicated patent cases. For example, the court in *Motson* found that the benefits derived from the PTO's reexamination outweighed the fact that much effort had already been expended by the parties:

[E]ntry of a stay, pending reexamination by the PTO, may simplify or even eliminate the need for trial on the remaining validity challenge in this matter. The reexamination procedure has the potential to either uphold or narrow the claims in the plaintiff's patent. In any event, the technical expertise of the PTO examiner may be helpful to the Court should further consideration of the matter be necessary after reexamination.... Although discovery and briefing expenses have already been incurred, a trial at this

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

point on the sole remaining issue in the case may compound those costs unnecessarily if the PTO reexamination eliminates the need for a trial or creates a need to relitigate other issues.

*Motson,* 2005 WL 3465664 at *1-2.

Despite being less than two-and-a-half months from trial and despite the substantial monetary expenditures by each party, the court in *Gioello Enterprises* provided a similar explanation for granting a stay:

Presently, this case is scheduled for trial on April 13, 2001. According to the PTO's order granting the request for reexamination, it is possible that submission of statements will not be complete until April 12, 2001. Additionally, the outstanding motions for summary judgment by Mattel claim invalidity and non-infringement-two issues the PTO's decision could render moot. Since the court must decide the summary judgment motions well in advance of trial, it would have to address the arguments raised before the PTO. Such a situation raises resource questions.

*Gioello Enterprises, Ltd.,* 2001 WL 125340 at *1.

This question of "resources" was detailed by the Southern District of New York in *Softview Computer Products Corp. and Ergo View Technologies Corp. v. Haworth, Inc.,* 56 U.S.P.Q.2d 1633 (S.D.N.Y.2000), a case bearing many resemblances to the matter *sub judice.* There, the court addressed a stay pending PTO reexamination of allegedly relevant prior art. While the motion was brought by the *plaintiff* in that case, the instructiveness of the court's language applies equally to the present matter:

Although [defendant] correctly notes that plaintiffs have not acted with dispatch in seeking reexamination and that plaintiffs have pursued an extremely burdensome discovery program, the cost to [defendant] of the litigation to date will not be affected by the grant or denial of a stay; denying the stay will not, without more, entitle [defendant] to recover fees it has already spent litigating this case. In addition, if the parties continue to litigate the validity of the claims in this Court, and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court will have wasted time and the parties will have spent additional funds

addressing an invalid claim or claims. Thus, although the denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims.

*7 Second, although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served ... and the Pretrial Order has not yet been prepared. I[t] would be a serious waste of both the parties' and the Court's resources if the ... summary judgment proceedings went forward and the claims were subsequently declared invalid or were amended as a result of the reexamination proceeding.

Third, a stay will necessarily simplify the issues. If the reexamination proceeding invalidates or narrows a claim or claims, the issues at trial will be simplified. Similarly, if the reexamination proceeding reaffirms all the claims as issued, the Court will then have the benefit of the PTO's expert analysis of the prior art that allegedly invalidates or limits the claims.

*Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636;*see also Bausch & Lomb Inc.,* 914 F.Supp. at 953 ("If this Court were to deny the stay and proceed to trial, it is possible that the time, resources, and significant efforts of all those involved in such a trial would be wasted. Because a finding by this Court that the '607 patent is not invalid would not bind the PTO, the PTO could reach the opposite conclusion at any time thereafter. Not only would such a scenario cause Alcon significant harm[,] but it also would be a tremendous waste of the time and resources of all those involved in a trial before me. Such an outcome is unacceptable. Because the reexamination is to be conducted "with special dispatch" (35 U.S.C. § 305), I find that a stay of the proceedings before me will not greatly prejudice any party and will serve to promote judicial economy.").

In the present matter, Charter argues that a stay "will simplify the issues, avoid inconsistent rulings and conserve the resources of the Court and the parties."*Defendant's Motion,* at 7. Broadcast and IO Research, on the other hand, summarily state that the possibility of simplification is "equivocal."

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 7
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

*Plaintiff's Response*, at 3. For the reasons detailed above as well as those to follow, the Court finds that this factor weighs heavily in favor of granting a stay.

The heart of this complicated patent case involves the impact of several prior art references-an issue the PTO is far better suited to address given the technology at issue in this case. *Ethicon, Inc.*, 849 F.2d at 1427. Moreover, because this prior art was not before the PTO during its original patent examination, the Court would benefit immensely from the PTO analysis of it. *Accord Softview Computer Prods. Corp.*, 56 U.S.P.Q.2d at 1636;*Emhart Indus., Inc.*, 3 U.S.P.Q.2d at 1890, 1892 n. 3;*Indust Wireless Spectrum Techs., Inc. v. Motorola Corp.*, 57 U.S.P.Q.2d 1662, 1663 (N.D.Ill.2001); *Brown*, 10 U.S.P.Q.2d at 1496 (noting that "[t]he PTO is in a better position than the Court to evaluate the validity of the patent [at issue] in view of the prior art references.").

*8 Judged solely by this factor, a stay would further the interests of judicial economy and the conservation of the parties' resources, as well as that of the court. Charter's pending reexamination petition involves the same issues currently before this Court. If the PTO, utilizing its unique expertise, determines that all or some of the '094 claims are invalid, that determination will either dispose of this litigation entirely or at least aid the Court in adjudicating this case. *See In re Cygnus Telecomms. Tech., LLC, Patent Litig.*, 385 F.Supp.2d 1022, 1023 (N.D.Cal.2005) ("A stay is particularly justified where the outcome of the reexamination would be likely to assist the court in determining patent validity and, if the claims were canceled in the reexamination, would eliminate the need to try the infringement issue."). Moreover, "[s]ince the PTO cannot stay the reexamination once a request has been granted, the court's issuance of a stay is the only way to avoid the potential for conflict."*Gioello Enterprises, Ltd.*, 2001 WL 125340 at *2;*see also Bayer AG v. Novartis Crop Prot. Inc .*, 55 U.S.P.Q.2d 1509, 1511 (M.D.La.2000) (holding that simultaneous litigation of patent issues "would create an economic hardship on the parties and also result in the ineffective administration of justice"); *Hewlett-Packard Co. v. Acuson Corp.*, 1993 WL 149994, *2 (N.D.Cal.1993) ("Ordinarily, courts need not expend unnecessary judicial resources by attempting to resolve claims which may be amended, eliminated, or

lucidly narrowed by the patent reexamination process and the expertise of its officers."); *Childers Foods, Inc. v. Rockingham Poultry Mktg. Co-op., Inc.*, 203 F.Supp. 794, 796 (D.Va.1962) (noting that simultaneous proceedings in federal district court and the PTO are "wasteful and extravagant" where issues to be decided are very similar). The Court, unlike the PTO, can exercise its direction to avoid this conflict and potential for waste.[FN8]

> FN8. The Court is also cognizant of the fact that the PTO grants more than nine of every ten petitions for reexamination. *See*UNITED STATES PATENT AND TRADEMARK OFFICE,*Ex Parte Reexamination Filing Data*, at 1, ¶ 5 (Sept. 30, 2005) (noting 91% acceptance out of 7,510 requests). If and when the PTO grants Charter's petition, history also teaches that there is a 74% likelihood that the PTO will eliminate, amend or otherwise limit the claims at issue, which will significantly alter the nature and amount of work for the attorneys, the court and the jury. *See id.* at 2, ¶ 9;*Tap Pharm. Prods. Inc.*, 70 U.S.P.Q.2d at 1320.

## II. Time and Timing

Broadcast and IO Research argue that this factor "is decidedly pro-Plaintiffs," as "[t]rial is less than three months away. *Plaintiffs' Response*, at 5.[FN9] Charter acknowledges the trial setting, but insists that the proximity of trial, standing alone, is not a reason to blindly deny an otherwise appropriate stay.

> FN9. Indeed, Plaintiffs' entire argument regarding this factor consists of that single statement.

This factor, at first glance, likely weighs in favor of the Plaintiffs and thus against a stay. Although discovery is not complete, see *Stipulation Regarding Additional Discovery* at 2, a trial date has been set for September 11, 2006. If these two litigation aspects were all that courts considered when assessing this factor, it might lean towards Broadcast and IO Research. However, courts considering this factor do not stop at discovery and trial settings, but rather, routinely inquire as to the occurrence summary judgment arguments, rulings on summary judgment, and the status of the final pretrial order, among other

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 8
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

elements. *See, e.g., Gioello Enterprises, Ltd.,* 2001 WL 125340 at *1 (noting trial was set, but expressing concern for pending summary judgment motions); *Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636 (same concern as to "extremely voluminous summary judgment motions" and unfinished final pretrial order); *Bausch & Lomb Inc.,* 914 F.Supp. at 953 (same); *Middleton, Inc.,* 2004 WL 198669 at *4 (same).

**\*9** In sum, the proximity of the trial date does not preclude entry of a stay. "Courts have granted stays even where discovery has been completed, and even when a trial date has been scheduled or is forthcoming."*Ralph Gonnocci Revocable Living Trust v. Three M Tool & Mach. Inc.,* 68 U.S.P.Q.2d 1755, 1757 (E.D.Mich.2003); *see also Perricone v. Unimed Nutritional Services, Inc.,* 2002 WL 31075868, *3 (D.Conn.2002) (noting that courts "have granted stays pending re-examination proceedings notwithstanding the well-developed posture of the litigation"). For every court that yields to completed discovery and a looming trial date, another court finds these dates outweighed by other factors-be it the complexity of the suit, the value of PTO expertise, simplification of the issues, lack of hardship to the nonmovant, or the overall burden of duplicitous litigation on the parties and on the court. Put simply, trial time doesn't always tell the tale. *See, e.g., Gould,* 705 F.2d at 1342 (order granting motion to stay proceedings five years into litigation and twenty days before scheduled trial date); *Middleton, Inc.,* 2004 WL 198669 at *10 (granting motion to stay proceedings eight years after start of litigation and less than two months before trial); *Loffland Bros.,* 225 U.S.P.Q. at 887 (order granting motion to stay proceedings after significant discovery, rulings on dispositive motions, pretrial conference and setting of initial trial date); *see also Softview Computer Prods. Corp.,* 56 U.S.P.Q.2d at 1636 (granting stay; noting that "although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served ... and the Pretrial Order has not yet been prepared."); *Robert H. Harris Co.,* 19 U.S.P.Q.2d at 1789 (granting stay despite the fact that case was set for trial in less than a month); *Motson,* 2005 WL 3465664 at *2 (granting stay despite discovery being complete and summary judgment decided).[FN10]

FN10. A more detailed balancing process was explained by the court in *Ralph Gonnocci Revocable Living Trust,* who ultimately ruled in favor of a stay:

> Undoubtably the parties have spent considerable time and resources thus far-substantial discovery has been conducted and the parties have submitted witness lists and three lengthy summary judgment motions. Yet far more time and resources remain to be spent before this matter is concluded. Two responses to motions for summary judgment must be submitted, the Court has not begun to review those motions, and much remains to be done by the parties and the Court to prepare this case for trial.

> *Id.* at 1758.

In the present case, although trial is set for mid-September, significant work remains for the parties and the Court. First, numerous voluminous dispositive motions are pending, including, but not limited to, Broadcast and IO Research's motion for summary judgment of infringement, Charter's motion for summary judgment of non-infringement and Charter's motion for summary judgment of invalidity. Furthermore, the parties have recently stipulated to additional discovery, including supplemental document production, supplemental responses to written discovery, supplemental expert reports, rebuttal expert reports, and expert depositions related to those supplemental expert reports. *Stipulation Regarding Discovery And Expert Report Supplementation,* at 2 (filed June 22, 2006). According to this stipulation, the parties hope to conclude this work in late August. *Id.*[FN11] In addition to preparing their final pretrial memorandums and other trial presentations, numerous pretrial filings remain for both parties, including submission of deposition designations, oppositions to more than forty motions *in limine* (according to Charter, and not disputed by Broadcast or IO Research), as well as proposed jury instructions and special verdict forms. Charter argues that

FN11. To this end, the Court fails to see the significance of Plaintiffs' argument that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 9
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

*Charter* acted as the initiator of the stipulation, for the fact remains that *both* parties stipulated to additional discovery.

**\*10** Neither the Court nor the parties should expend additional resources when it is uncertain which, if any, of the four asserted claims will survive the reexamination process. The reexamination proceedings before the PTO may well [alter], moot or resolve the issues set for trial in less than three months, and staying the trial pending conclusion of the PTO's review will eliminate the ... additional expense of trial preparation [and the] risk of inconsistent rulings.
*Defendant's Motion,* at 13.

The Court agrees. *See Tap Pharm. Prods. Inc., 70 U.S.P.Q.2d at 1320* (noting similarly, i.e., "There is a significant chance that the PTO will either invalidate this patent or drastically decrease its scope. This creates a very real possibility that the parties will waste their resources litigating over issues that will ultimately be rendered moot by the PTO's findings. Simplification of the issues will allow both parties to conserve time and resources."). A more detailed glance at the timing factor reveals, beyond any peradventure of doubt, that a stay is appropriate in this case.

### III. Will A Stay Unduly Prejudice the Nonmoving Party or Present a Clear Tactical Advantage for the Moving Party?

This factor is best summarized by one question: *do the Plaintiffs have an adequate remedy at law?*Because they do, this factor weighs heavily in favor or staying the case. The Plaintiffs seek *only* monetary damages and for that reason, have an adequate remedy at law should they prevail on the merits. *See, e.g., Robert H. Harris Co., 19 U.S.P.Q.2d at 1788.*

Plaintiffs make the vague argument that a delay in trial is unfair. However, this argument fails to address the crucial question of the prejudice factor-i.e., will a stay unduly prejudice the legal remedy sought by the nonmovants?*Softview Computer Prods. Corp., 56 U.S.P.Q.2d at 1636;Ingro v. Tyco Indus., Inc., 227 U.S.P.Q. 69, 70 (N.D.Ill.1985).* Clearly it will not. If the PTO does not invalidate or otherwise alter the claims of the '094 patent, the Plaintiffs' legal remedy

remains unaffected, and they will have over a decade to exploit the '094 patent. Moreover, if the claims are narrowed, *both* sets of parties will have benefitted by avoiding the needless waste of resources before this Court, and again, the Plaintiffs will be able to pursue their claim for money damages at trial. Finally, if the claims are strengthened, the Plaintiffs' position will be as well, and their likelihood of monetary damages will increase. *See, e.g., Motson, 2005 WL 3465664 at \*1* ("[I]f the PTO upholds the validity of plaintiff's patent, 'the plaintiff's rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain.'") (quoting *Pegasus Dev. Corp., 2003 WL 21105073 at \*2).* Indeed, the only possibility of irreparable harm to Broadcast and IO Research would exist if the Court chose *not* to stay the case. That is, if the Court finds that the '094 patent is valid and that Charter has infringed it, and orders Charter to pay damages to Broadcast and IO Research, then Broadcast and IO Research "would have no ability to recover those damages if at a later date the PTO determine[s] that the ['094] patent is invalid." *Bausch & Lomb Inc., 914 F.Supp. at 952.* The Court finds such a possibility unacceptable.

**\*11** In sum, this factor weighs in favor staying the case because monetary relief-the only relief Plaintiffs seek-is fully capable of restoring Plaintiffs to the *status quo ante. Accord Brown, 18 U.S.P.Q.2d at 1496* ("While the Court recognizes that the reexamination could cause significant delay in the proceedings, the complexity of the case and the fact that Mr. Brown can be fully compensated should he prevail at the reexamination and trial support staying this action.").[FN12]

> FN12. Moreover, a stay would not affect the issue of damages accruing during the pendency of the reexamination period should Plaintiffs ultimately prevail at trial. The Federal Circuit has considered the impact of a completed reexamination upon the viability of infringement claims relating to the reexamined patent. *See, e.g., Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1346 (Fed .Cir.1998).* The general rule is that the owner of a reexamined patent "is entitled to infringement damages, *inter alia,* for the period between the date of issuance of the original claims and the date of issuance of

the reexamined claims if the original and reexamined claims are 'identical.' " *Id.* (citing 35 U.S.C. §§ 252 and 307(b); *Tennant Co. v. Hako Minuteman, Inc.,* 878 F.2d 1413, 1417, (Fed.Cir.1989)).

**IV. Conclusion**

A future trial date, standing alone, does not obviate otherwise unassailable reasons to stay these proceedings. At the very least, awaiting outcome of reexamination will facilitate motion disposition and trial, as valuable efficiencies will be gained by awaiting the input of the PTO on the scope of the claims in light of the prior art that will be considered during the reexamination proceedings.

The Court's decision mirrors, in many respects, that made in *Middleton* by the Honorable James E. Gritzner of the United States District Court for the Southern District of Iowa. By the time Judge Gritzner ruled on the defendant's motion to stay, the "long and convoluted" case before him was eight years old-"proceeding from the United States District Court for the Northern District of Illinois to the Federal Circuit and back multiple times."*Middleton, Inc.,* 2004 WL 1968669 at * 1. Like this Court, Judge Gritzner was faced with the choice of ruling on numerous motions for summary judgment-in fact, three motions presenting legal questions nearly identical to the motions presently before this Court-or staying the case pending PTO reexamination. *Id.* The case was set for trial in less than two months. *Id.* The plaintiff in *Middleton*-much like Broadcast and IO Research-resisted the motion to stay "based primarily on the short time left before trial and the delay in seeking reconsideration."*Id.* Judge Gritzner's thorough and thoughtful explanation warrants repeating:

In the present case, the litigation has been ongoing for over eight years. The trial date is set and is scheduled for the week of October 12, 2004 [i.e., less than two months away]. In addition, several motions for summary judgment remain pending that may be dispositive of some or all of the issues remaining in the case. Discovery is completed, and the parties are most likely well into their trial preparation. Thus, the parties have already spent a considerable amount of time and money on the pending litigation. On its face, these facts seem to weigh against granting a stay.

However, these facts should be weighed against the benefits of issuing a stay. As argued by [the defendant], the following factors weigh in favor of issuing a stay: (1) a stay will be the most efficient use of judicial resources by preventing duplication of effort; (2) the reexamination may simplify and narrow the issues in the case; and (3) the Court will be able to benefit from the expertise of the PTO. Moreover, a stay issued pending reexamination "is not for such a protracted or indefinite period" as reexamination proceedings are to " 'be conducted with special dispatch." ' *Gould,* 705 F.2d at 1341 (quoting 35 U.S.C. § 305). Thus, while some courts have denied a stay based on the end of discovery and the proximity of trial, *see Toro Co. [v. L.R. Nelson Corp.], 223 U.S.P.Q. [636,] 638* [ (C.D.Ill.1984) ]; the ultimate determination is within the Court's discretion based on a weighing of the benefits of issuing a stay versus any added expenses resulting from the stay.

**\*12** In the present action, the Court finds the element of judicial economy does in fact weigh in favor of granting the motion to stay. First, a stay would preserve the costs of a trial on the merits that may be obviated by the results of the reexamination. Second, even if a trial is ultimately required, the Court can have all issues heard in one trial on the proper scope of the patent claims. In addition to limiting the issues at trial, the reexamination decision may also limit the issues in the currently pending dispositive motions. Finally, the Court will be able to use the expertise of the PTO in making further determinations as related to the proper patent claims. In that regard, the Court is influenced by the breadth of the reexamination and the number of prior art references under active review.

The Court acknowledges the considerable expense already endured by the parties in the present action but notes that these costs will not be recouped by denying a stay and proceeding to a trial. This may actually compound the parties' expenses if some or all of the issues need to be retried later as a result of the reexamination. In addition, the Court disagrees with [Plaintiff's] contention that only incremental resources will be expended if the action proceeds to trial. It is simply not efficient to rule on three motions for summary judgment, complete pretrial, and hold a full jury trial if all or part have to be redone. The apparent scope of the reexamination, the technical

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 11
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)
**2006 WL 1897165 (D.Colo.)**

expertise of the PTO, and the relationship to the issues in this case suggest to the Court a great likelihood that the continuing work of this Court would be impacted by the reexamination. The judicial efforts that a stay would preserve outweigh any additional cost in staying the proceedings even at this late juncture.

*Id.* at *5-6.

This Court finishes where the Southern District of Iowa did two short years ago.

Accordingly, and for the foregoing reasons, it is hereby

**ORDERED** that Defendant Charter Communications, Inc.'s Motion to Stay Pending Reexamination of the U.S. Patent 6,076,094 By United States Patent and Trademark Office shall be, and now is, **GRANTED.**It is further

**ORDERED** that the proceedings in the above-captioned case are **STAYED** from the date of this Order until further notice. It is further

**ORDERED** that the parties shall immediately advise the Court of the PTO's decision to grant or deny Defendant's petition for reexamination of the '094 patent, this Court continuing or lifting the present stay pending that initial determination. It is further

**ORDERED** that the parties shall advise the Court of any final decision that results from the PTO's reexamination of the '094 patent.

D.Colo.,2006.
Broadcast Innovation, L.L.C. v. Charter Communication, Inc.
Not Reported in F.Supp.2d, 2006 WL 1897165 (D.Colo.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)
**1995 WL 228988 (N.D.Ill.)**

Page 1

▷Clintec Nutrition Co. v. Abbott Laboratories
N.D.Ill.,1995.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
CLINTEC NUTRITION COMPANY,
Plaintiff/Counter Defendant,
v.
ABBOTT LABORATORIES, Defendant/Counter
Plaintiff.
No. 94 C 3152.

April 14, 1995.

Robert M. Barrett, Robert M. Ward, Paula J. Flint,
Hill, Steadman & Simpson, Chicago, IL, for plaintiff.
George Carter Lombardi, Peter C. McCabe, III, T.
Alexis MacDowall, Winston & Strawn, Chicago, IL,
Eric S. Palles, Div. Counsel, Office of the Gen.
Counsel, Abbott Park, IL, for defendant.

MEMORANDUM OPINION AND ORDER

ASHMAN, United States Magistrate Judge.
*1 This is a patent infringement claim filed under 35
U.S.C. § 271 by plaintiff, Clintec Nutrition Company
("Clintec"), against defendant, Abbott Laboratories
("Abbott"). Clintec manufactures and markets a
nutritional formula called Nutrivent under Patent No.
5,166,189 ("the '189 Patent") which is designed for
use in heart patients. Abbott manufactures and
markets a nutritional formula called Pulmocare which
directly competes with Nutrivent. Clintec alleges that
Abbott reformulated Pulmocare from a non-
infringing formula into an infringing one. Clintec
seeks a permanent injunction and damages resulting
from Abbott's alleged infringement.

On January 18, 1995, Abbott filed a counterclaim
seeking a declaratory judgment that the '189 Patent is
unenforceable by reason of inequitable conduct in
obtaining the patent. Specifically, Abbott alleges that
Clintec failed to cite two products as "prior art" and
made material misrepresentations about Nutrivent.
Abbott contends that this conduct entitles it to
judgment on Clintec's claims asserted in the
Complaint.

This case is before the Court on Abbott's Motion to
Stay All Proceedings Except Those Relating to the
Issue of Inequitable Conduct Pending Resolution of
Clintec's Reissue Application.

*Facts*

Briefly, the undisputed relevant facts are as follows:

Clintec is an Illinois partnership whose principal
place of business is in Deerfield, Illinois. Abbott is an
Illinois corporation with its principal office in North
Chicago, Illinois. Ross Products Division ("Ross") is
a division of Abbott with its principal office in
Columbus, Ohio. (Complaint, ¶¶ 2, 3; Counterclaim,
¶¶ 1, 2.)

In 1984, Abbott, through Ross, introduced a specialty
enteral [FN1] product designed for pulmonary patients
under the name of Pulmocare. This product was sold
as formulated for about ten years without any
improvements or alterations. (Abbott's Answer to
Interrogatory 2(B), Plaintiff's Exh. B.) In 1992,
Clintec introduced a specialty enteral product for
pulmonary patients that, it alleges, remedied certain
deficiencies in Pulmocare, under the trademark
Nutrivent. On November 24, 1992, the U.S. Patent
and Trademark Office ("PTO") issued Patent No.
5,166,189 entitled, "ENTERAL DIET FOR
PATIENTS WITH PULMONARY DISEASE," to
Susan L. Trimbo, W. Bruce Rowe and M. Umberto
Bracco. Patent '189 was then assigned to Clintec,
and Clintec maintains that Nutrivent is protected by
that patent. On May 20, 1994, Clintec brought the
instant action, pursuant to 35 U.S.C. § 271, alleging
that Abbott began marketing a reformulated
Pulmocare product sometime in 1993 so that it now
infringes on Clintec's '189 Patent.

On November 23, 1994, Clintec filed a reissue
application for the '189 Patent pursuant to 35 U.S.C.
§ 251. Section 251 allows a patent owner to file a
reissue application to enlarge the scope of the claims
of the original patent if the reissue application is filed
within two years of the grant of the original patent.
This reissue application is presently before the PTO.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 2
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)
**1995 WL 228988 (N.D.Ill.)**

*Abbott's Motion To Stay All Proceedings Except
Those Relating to Inequitable Conduct*

Abbott's motion is essentially two motions rolled into
one: first, Abbott seeks a stay of Clintec's underlying
infringement case including a stay of discovery
pending disposition by the PTO regarding Clintec's
reissue application; and, second, Abbott seeks to have
the issue of inequitable conduct bifurcated and to
have litigation, including discovery, proceed as to
this issue.

A. *Motion to Stay*

Both sides agree that in the interests of justice the
Court may, in its discretion, exercise its inherent
power to stay a cause of action. *See Ethicon, Inc. v.
Quigg,* 849 F.2d 1422 (Fed.Cir.1988). In deciding a
motion to stay, the Court must weigh the competing
interests: *i.e.,* the possible damage of granting a stay
versus the hardship or inequity of forcing a case
onward; and the Court must consider whether the
stay will result in a simplification or a complication
of the issues, proof and questions of law. *Teradyne,
Inc. v. Hewlett-Packard Co.,* No. 91-C-0344, 1993
U.S.Dist. LEXIS at *21 (N.D.Cal. Jan. 7, 1993).

Abbott argues that these competing interests favor a
stay in this case. Most compelling is the fact that the
reissue application filed by Clintec re-presents the
original 21 claims in addition to 35 new claims;
therefore, the PTO's reexamination will necessarily
involve a reconsideration of the patent in the same
manner as the original application.[FN2] Based on such
a reexamination, the PTO could expand or reduce
Clintec's claims which obviously could ultimately
affect the claims in this case. In fact, it appears that
the likelihood of a change in the '189 Patent is
substantial; the *Teradyne* court found that "in 77
percent of all reexamination applications, the claims
are either amended or cancelled during
reexamination." *Teradyne* *22, quoting *Output
Technology Corp. v. Dataproducts Corp.,*1991 WL
332547, 22 U.S.P.Q.2d 1072, 1074
(W.D.Wash.1991).

*2 Abbott contends that there are seven distinct
advantages to staying the pending patent litigation
and allowing the PTO to examine the reissue
application:

1. All prior art presented to the Court will have been
first considered by the PTO with its particular
expertise;

2. Many discovery problems relating to prior art can
be alleviated by PTO examination;

3. In those cases resulting in effective invalidity of
the patent, the suit will likely be dismissed;

4. The outcome of the reexamination may encourage
a settlement without further use of the Court;

5. The record of examination would likely be entered
at trial, thereby reducing the complexity and length of
the litigation;

6. Issues, defenses, and evidence will be more easily
limited in pre-trial conferences after reexamination;
and

7. The cost will likely be reduced for both parties and
the Court.

*Fas-Line Sales & Rentals, Inc. v. E-Z Lay Pipe
Corp.,* 1979 WL 25005, 203 U.S.P.Q. 497, 499
(W.D.Okla.1979), quoting *Fisher Controls Co. v.
Control Components, Inc.,* 443 F.Supp. 581, 582
(S.D.Iowa 1977).

Clintec agrees, albeit reluctantly, that either this case
or the reissue application should be stayed and that
the two cases should not proceed simultaneously;
however, it argues for a stay of the reissue
application. Clintec's main concern seems to be that if
the case here is stayed, it will be placed at a tactical
disadvantage if it is forced to defend against Abbott's
inequitable conduct claim while being unable to
pursue its own claims for infringement. Clintec
suggests that if the stay will result in a tactical
disadvantage to Clintec, the stay must be denied.
*ASCII Corp. v. STD Entertainment USA,* 844 F.Supp.
1378, 1380 (N.D.Cal.1994) (holding that it is within
the discretion of the court to deny a motion to stay if
it will impose severe prejudice on one side).
However, in *ASCII,* the court found that a stay
pending the outcome of a PTO reexamination and/or
reissuance proceedings would facilitate resolution of
the infringement dispute because, among other

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)
**1995 WL 228988 (N.D.Ill.)**

things, the case was in its initial stages, little discovery had been taken, no trial date had been set and the parties had not agreed to go forward with the case. *ASCII Corp.*, 844 F.Supp. at 1381.

Similarly, in this case, suit was filed in May, 1994 and to date two depositions have been taken and some paper discovery has been completed; no trial date has been set, and the parties have not agreed to go forward with the case.

It should be noted that in each of the cases cited by Abbott in support of its motion to stay, the reexamination was requested by the same party that sought the stay. In this case, Clintec contends that the reissue application was filed in order to broaden its patent and has no bearing on this infringement suit which is focused solely on past actions of Abbott. Clintec asserts that under the MANUAL OF PATENT EXAMINING PROCEDURE, § 1442.02 "Litigation Not Stayed" (Defendant's Exh. 2), "in order to avoid duplication of effort, action on reissue applications in which there is an indication of concurrent litigation will be suspended automatically unless a stay of the litigation is in effect, the litigation is terminated, there are no significant overlapping issues or the applicant desires the application to be examined at that time." In other words, Clintec argues that it filed the reissue application with the intent that the reexamination be stayed pending resolution of this infringement suit so no duplicative proceedings will result.

**\*3** However, given the fact that the entire '189 Patent is now before the PTO for reexamination and given the statistical evidence set forth in *Teradyne*, there is at least a decent possibility that the patent may be restricted (notwithstanding Clintec's strong belief that the PTO will only broaden the patent based on new claims-there are no guarantees). It is clear the reissue application issues could overlap to this case. Therefore, in the interests of judicial economy it does not make sense, and Clintec provides no good reasons, to proceed with the infringement suit when the patent on which it is based could be altered after the PTO reexamines it.

A stay will not work any apparent undue hardship or prejudice to Clintec: discovery has been limited, no trial date has been set and Clintec has a remedy at law (damages) which will not be prejudiced by a stay

pending PTO reexamination of the '189 Patent. Courts have noted that one of the purposes of the reexamination procedure is to eliminate trial of an issue (when a claim is cancelled) or to facilitate trial of that issue by providing the expert view of the PTO (when the claim survives reexamination), and have uniformly granted and upheld stays in such circumstances as these. See *Gould v. Control Laser Corp.*, 705 F.2d 1340 (Fed.Cir.1983). Clintec's main argument pertains to the next stage of this motion-whether or not to bifurcate the inequitable conduct part and to proceed with that part of the case while the underlying infringement suit is stayed.

*B. Motion To Bifurcate and To Proceed On the Issue of Inequitable Conduct*

**\*4** Under FED.R.CIV.P. 42(b), the Court has broad discretion in granting separate trials and may order a separate trial of any issue "in furtherance of convenience or to avoid prejudice." The movant bears the burden of justifying bifurcation. *See Output Technology Corp.*, 22 U.S.P.Q.2d at 1073. In evaluating bifurcation issues, courts have been mindful to preserve the inviolate right to a jury trial guaranteed by the Seventh Amendment to the Constitution. Consequently, the Court's discretion to order an equitable issue tried first is narrowly limited and must be exercised to preserve a jury trial.

Abbott seeks bifurcation of its inequitable conduct counterclaim from the issues of infringement and validity presented in Clintec's Complaint. The thrust of Abbott's motion is based on convenience grounds: specifically, if this Court finds that Clintec engaged in inequitable conduct in the prosecution of the '189 Patent, the patent would be unenforceable and Clintec's claims would be moot regardless of the outcome of the reissue reexamination. *Kingsdown Med. Consultants v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed.Cir.1988). Further, Abbott argues that the issue of inequitable conduct is sufficiently separate from the issues regarding the infringement action. Abbott contends that the inequitable conduct issue relates to the *enforceability* of the patent; whereas the infringement issues relate to the scope of the patent and that the PTO's reexamination will only address the scope of the patent.

It is undisputed that inequitable conduct resides in failure to disclose material information, or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 4
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)
**1995 WL 228988 (N.D.Ill.)**

submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence. *Kingsdown Med. Consultants, 863 F.2d at 874.*

Abbott identifies four areas of information which it alleges constitute inequitable conduct by Clintec in obtaining the '189 Patent:

1. Failure to cite, intentionally or through gross negligence, a product called TraumaCal as prior art to the PTO even though it had been marketed to patients with pulmonary disease since 1983.

2. Failure to cite a product known as Respalis as prior art to the PTO even though it was marketed in France to pulmonary patients since 1988 and cited in brochures and "looks surprisingly like Nutrivent."

3. Clintec's representation that its composition has been found to provide advantages over prior art formulas was false or seriously misleading (in light of inventor Susan Trimbo's deposition testimony).

4. Clintec's assertion in the original application that the critical difference between Nutrivent and Pulmocare was the "need for at least 18% caloric distribution from the protein source" was false (given Susan Trimbo's deposition testimony).

Abbott contends that because the PTO no longer evaluates reissue applications on the basis of inequitable conduct, this is an issue that must be decided in the courts. *See* Manual of Patent Examining 1448 (Abbott's Memorandum in Support, Exh. 4). Abbott asserts that the issue is whether Clintec withheld such material during prosecution of the '189 Patent, with the intent to deceive the PTO. If so, the '189 Patent is unenforceable and Clintec's infringement suit is moot.

**\*5** Clintec responds that Abbott's motion fails to satisfy the three prong analysis required for bifurcation:

1. The movant must make a *prima facie* showing of success;

2. Success by the movant would save time by

eliminating the necessity for resolution of more complex issues;

3. Further delay will not prejudice the non-moving party.

*See Choat v. Rome Indus., Inc,* 467 F.Supp. 378 (N.D.Ga.1979), citing *Ludlow Corp. v. Textile Rubber & Chem Co., Inc.,* 77 F.R.D. 752 (N.D.Ga.1978).

Specifically, Clintec asserts that Abbott has not satisfied parts 1 or 3: Abbott allegedly fails to make a *prima facie* showing of success; in addition, Clintec asserts that it will be unduly prejudiced by having to proceed on the inequitable conduct suit while the infringement suit awaits PTO reexamination.

Clintec attacks the sufficiency of each of Abbott's four allegations of inequitable conduct contending that TraumaCal and Respalis are not relevant prior art and that the alleged false information was not in fact false. Essentially, Clintec argues the merits of Abbott's suit. While it does not assert that any of the four allegations, if true, would not constitute inequitable conduct as alleged, Clintec instead attempts to refute their existence, relevance and effect. At this stage of the case, it is not possible for the Court to make a logical determination of the likelihood that Abbott will prevail on its counterclaim. The Court can and does determine that Abbott's allegations, if true, do state a cause of action. Thus part 1 has been satisfied.

On the issue of prejudice if the Court should stay its case and allow Abbott's counterclaim to go forward, Clintec makes a better challenge. As Clintec points out, the issues overlap. Thus, proceeding on one claim and not the other would be grossly unfair. It is unfair and inconvenient to bifurcate cases or discovery where overlapping issues exist. *Willemijn Houdstermaatschaapij BV v. Appollo Computer Inc.,* 707 F.Supp. 1429 (D.Del.1989); *White Chemical Corp. v. Walsh Chemical Corp.,* 116 F.R.D. 580 (W.D.N.C.1987). As Clintec points out, separate trials should be the exception and not the rule in patent cases, *Kennecott Corp. v. Kyocera Intern. Inc.,* 1988 WL 268170, 7 U.S.P.Q.2d 1911 (S.D.Cal.1988), and should not be ordered unless clearly necessary. *Wolens v. F.W. Woolworth Co.,* 1980 WL 30264, 209 U.S.P.Q. 569 (N.D.Ill.1980).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 5
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)
**1995 WL 228988 (N.D.Ill.)**

Clintec successfully distinguishes Abbott's case law by noting that in *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1214 (Fed.Cir.1987), there was no dispute as to prior art and that the issues of validity and infringement were truly separate from the inequitable conduct claim-thus, bifurcation was proper. By contrast, here there is a dispute over whether or not TraumaCal and Respalis were in fact prior art and the resolution of that dispute directly affects the validity of the patent and the enforceability of the patent, Thus, the validity and inequitable conduct issues are intertwined.

**\*6** The Court also notes that a jury has been requested in this case. The issues of whether TraumaCal or Respalis is prior art, an issue in Clintec's infringement case, should be decided by a jury. When so decided, the Court may be bound by this finding of fact in Abbott's non-jury claim of inequitable conduct. *Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 995 (Fed.Cir.1995). By proceeding only with Abbott's counterclaim, the Court, thus, effectively eliminates Clintec's jury request on the issue of prior art. Such a situation certainly prejudices Clintec's position and for this reason bifurcation does not appear to be proper here.

Even if the issue of inequitable conduct were found to be sufficiently separate from issues of validity and patent interpretation and even if bifurcation were proper, the issue of whether to stay the inequitable conduct suit would remain. On one hand, Abbott's allegations of inequitable conduct, if proven by clear and convincing evidence, would provide a defense to an infringement suit by rendering the '189 Patent unenforceable, and Clintec will ultimately have to address this issue. On the other hand, it is interesting to note that the first two reasons given by Abbott for staying the infringement suit were:

1. All prior art presented to the Court will have been first considered by the PTO with its particular expertise.

2. Many discovery problems relating to prior art can be alleviated by PTO examination.

What's good for the goose is good for the gander. Such advantages could also be found for staying the Abbott's inequitable claim suit. Since prior art will

necessarily be considered by the PTO during the reexamination process in evaluating the reissue application (not in terms of inequitable conduct but as a matter of determining the validity of Clintec's claims),[FN3] it would seem to make sense to stay Abbott's claim for inequitable conduct which relies heavily on allegations regarding prior art. It is undisputed that Abbott must prove the two elements of materiality and intent to prove its claim for inequitable conduct. The PTO's reexamination of the patent-including prior art-is likely to consider and provide an expert opinion as to prior art such as TraumaCal and Respalis. The arguments in favor of staying Clintec's suit apply with equal vigor to Abbott's suit.

Therefore, the Court orders that all proceedings in this case including discovery, as to both the complaint and the counterclaim, are stayed until the disposition of the plaintiff's Reissue Application, except for the following:

1. Plaintiff shall provide defendant with copies of all documents filed with the PTO and transcribed interviews with PTO examiners in connection with the Reissue Application.

2. In the event either party has cause to believe that any evidence will become inaccessible or substantially more costly to obtain, then upon such cause shown by motion to the Court, this order may be amended.

> FN1. Enteral or Enteric is broadly defined as relating to the intestines; can also refer to a medicinal preparation treated to pass through the stomach unaltered and disintegrate in the intestines. WEBSTER'S MEDICAL DESK DICTIONARY, 213 (1st ed. 1986).

> FN2. Patent Office Regulation 1.176 "Examination of Reissue" directs, in pertinent part:

> > [a]n original claim if represented in the reissue application, is subject to reexamination, and the entire application will be examined in the same manner as the original applications ...

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 6
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)
**1995 WL 228988 (N.D.Ill.)**


> 37 C.F.R. § 1.176 (1993). (Defendant's
> Motion in Support, Exh. 1.)


> FN3. Defenses raised against validity of the
> patent, on charges of fraud or inequitable
> conduct in litigation involving the patent
> would normally be material to patentability
> of the reissue application ... and should, at
> least be fully described, or submitted [to the
> PTO]. *See* MANUAL OF PATENT
> EXAMINING PROCEDURE, § 1442.04
> "Litigation Involving Patent." (Defendant's
> Exh. 2.)

N.D.Ill.,1995.
Clintec Nutrition Co. v. Abbott Laboratories
Not Reported in F.Supp., 1995 WL 228988 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 1
Not Reported in F.Supp., 1985 WL 4952 (E.D.Pa.), 7 ITRD 1788, 54 USLW 2420, 229 U.S.P.Q. 469
**1985 WL 4952 (E.D.Pa.)**

**C**TOMPKINS SEALS, INC., Plaintiff, v. THE WEST COMPANY, Defendant and Third-Party Plaintiff, v. TOMPKINS RUBBER CO. and BRIDANA ApS, Third-Party Defendants.

UNITED STATES DISTRICT COURT; E.D. PENNSYLVANIA.
TOMPKINS SEALS, INC., Plaintiff,
v.
THE WEST COMPANY, Defendant and Third-Party Plaintiff,
v.
TOMPKINS RUBBER CO. and BRIDANA ApS, Third-Party Defendants.
**C.A. NO. 85-4929**

December 17, 1985

Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Ltd., Philadelphia, Pa., for plaintiff.
Eugene E. Renz, Jr, John P. Donohue, Media, Pa., for THE WEST COMPANY.
Alan H. Bernstein, Philadelphia; Pa., for TOMPKINS RUBBER CO, and BRIDANA ApS.
Lyn M. Schlitt, Michael P. Mabile, Carolyn E. Galbreath, U.S. International Trade Com'n, Washington, D.C., for U.S. INTERNATIONAL TRADE COMMISSION.

<u>MEMORANDUM OPINION AND ORDER</u>

WEINER, District Judge.
**\*1** Plaintiff, Tompkins Seals, Inc. ('Tompkins') brought this action on August 23, 1985 seeking a declaratory judgment to the effect that it is not infringing upon the defendant West Company's ('West') trademark or trade dress in violation of the Lanham Act, <u>15 U.S.C. §§ 1114</u> and <u>1125</u>, by distributing and offering for sale pharmaceutical closures under the trademark FLIPTOP.

On October 11, 1985, West filed a complaint with the United States International Trade Commission ('ITC') under Section 337 of the Tariff Act of 1930, as amended, <u>19 U.S.C. § 1337</u>, charging Tompkins with unfair methods of competition and unfair acts in the importation and sale of pharmaceutical closures

in the United States.

On October 15, 1985, West filed a third-party complaint naming Tompkins Rubber Company and Bridana Aps, as third-party defendants in this declaratory judgment action. Presently before the court are plaintiff's motion for a temporary injunction to enjoin defendant from pursuing its complaint with the ITC, and defendant's motion to stay plaintiff's declaratory judgment proceedings before this court pending the outcome of defendant's action presently before the ITC. On October 29, 1985, the ITC filed a motion to intervene for the purpose of opposing plaintiff's motion for a temporary injunction. This court granted ITC's motion on October 30, 1985. The ITC subsequently, on November 8, 1985, voted to initiate an investigation into the charges contained in West's complaint.[FN1]

Plaintiff claims it is entitled to a temporary injunction because 1) it will suffer irreparable harm if it is forced to prepare for simultaneous adjudications before this court and the ITC, 2) such simultaneous proceedings may result in a conflict in the rulings of this court and the ITC and, if appeals are taken, a conflict between the Court of Appeals for the Third Circuit and the Federal Circuit Court of Appeals, and 3) contrary decisions by this court and the ITC would inhibit the ability of this court to grant relief to plaintiff. Because it is the opinion of this court that granting defendant's motion for a stay of this declaratory judgment action will alleviate all of plaintiff's claims, we shall deny plaintiff's motion for a temporary injunction and grant defendant's motion for a stay.

Tompkins claims it will suffer irreparable harm if its motion for a temporary injunction is not granted. Specifically, Tompkins states that having to divide its efforts between two proceedings with essentially the same basic issues, evidence, witnesses and discovery requirements is burdensome, harassing and a waste of judicial time and money. We believe the proper solution is to grant a stay in Tompkins' declaratory judgment proceeding before this court. Doing so will enable Tompkins to devote its full attention to the ITC proceeding and, at the same time, eliminate any possibility of waste of judicial time and money that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1985 WL 4952 (E.D.Pa.), 7 ITRD 1788, 54 USLW 2420, 229 U.S.P.Q. 469
**1985 WL 4952 (E.D.Pa.)**

Tompkins claims would result from simultaneous proceedings. Moreover, staying the district court proceedings will also eliminate any possibility of a conflict between the ruling of this court and that of the ITC. Finally, staying the declaratory proceeding before this court will also prevent a conflict in remedies.

**\*2** Plaintiff has not offered any appropriate grounds for denying defendant's motion to stay the district court proceedings. Plaintiff first argues that it has a right to have its action adjudicated before this court based on the fact that district courts have original jurisdiction over any civil action relating to trademarks as well as over any unfair competition claims which are joined with a related claim under the trademark laws.28 U.S.C. § 1338(a)(b). However, Congress has also granted the ITC jurisdiction over unfair methods of competition and unfair acts in the importation of articles into the United States.19 U.S.C. § 1337(a)(b). Thus, Congress, as the source of this court's trademark jurisdiction and the ITC's jurisdiction, has made the choice to permit an overlap of issues in these two fora. It cannot, therefore, be said that the prosecution of an ITC action is an unlawful intrusion upon this court's trademark jurisdiction.

Plaintiff next opposes defendant's motion for a stay of the declaratory judgment proceeding on the ground that the Court of Appeals for the Third Circuit has held that declaratory judgment actions should take priority over later filed proceedings on the same subject matter. Plaintiff has given too broad an interpretation to the Court of Appeals rulings its cites. Plaintiff directs our attention to language in Crosley Corporation v. Hazeltine Corporation, 122 F.2d 925 (3d Cir. 1941) ('Crosley') where the court stated at 930:

The intent of the Declaratory Judgment Act is to enable an alleged infringer to avoid a multiplicity of suits by the patent owner. When the district court of the domicile of a patent owner has been asked by an infringer to determine by declaratory judgment the issues of the patent's validity and infringement, it would neutralize the beneficial effect of the Declaratory Judgment Act as well as impose an unwarranted burden upon the federal judiciary, to permit the patent owner thereafter to prosecute infringement suits in other district courts against the

same infringer.' (emphasis added).

This language was designed to prevent a patent owner from subjecting an infringer to a multiplicity of suits in several district courts. All that is at issue in the case sub judice is the prosecution of one other suit before the ITC, a specialized administrative agency. An ITC action is entirely different from a declaratory action in district court. As mentioned in footnote one, in a section 337 investigation, the ITC must perform a five-step analysis before it can make a finding of unfair practices in import trade. A negative finding on any one of the five-steps will prevent the complainant from obtaining relief. The district court, on the other hand, does not partake in a five-step analysis but, in granting declaratory relief, will merely inquire whether any unfair acts exist. In addition, even if each of the five statutory elements for a violation of setion 337 is found, the ITC must still consider the public interest. Finally, the nature of the ITC remedy is in rem while the nature of the district court remedy is in personam only.

**\*3** The other cases plaintiff cites, Crosley Corporation v. Westinghouse Electric and Manufacturing Co., 130 F.2d 474 (3d Cir. 1942); Triangle Conduit and Cable Co., Inc. v. National Electric Products Corp., 125 F.2d 1008 (3d Cir. 1942); and Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co., 189 F.2d 31 (3d Cir. 1951), also refer to a declaratory judgment action filed in one district court before a subsequent infringement action was filed in another federal district court. The facts in the case sub judice are distinguishable. Defendant is not filing a multiplicity of suits in many district courts. It is pursuing an unfair competition action before the ITC. Permitting defendant to prosecute its case before the ITC, will not impose an unwarranted burden upon the federal judiciary since defendant will not be prosecuting its case before district courts which are different from the one in which plaintiff brought its declaratory judgment action.

Plaintiff next argues that this court should not grant a stay because this court can grant broader and more extensive relief that the ITC can. We do not agree. Pursuant to 19 U.S.C. § 1337(d)(e)(f), the ITC is empowered to issue exclusion orders and/or cease and desist orders. If entered, an exclusion order would direct the United States Customs Service to exclude all pharmaceutical closures that infringe

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1985 WL 4952 (E.D.Pa.), 7 ITRD 1788, 54 USLW 2420, 229 U.S.P.Q. 469
**1985 WL 4952 (E.D.Pa.)**

upon the subject trademarks and trade dress from entry into the United States, including those produced or imported by persons who were not parties to the ITC's investigation.19 U.S.C. § 1337(d). Such an in rem order would exclude <u>all</u> importations of infringing closures. To achieve this result in district court, defendant would have to file multiple suits in numerous district courts against all infringers. Thus, the ITC remedy is in fact broader.

Finally, we believe the doctrine of primary jurisdiction does require us to defer to the jurisdiction of the ITC. The doctrine of primary jurisdiction has developed to guide courts in determining how to proceed when some or all of the issues in the litigation are concurrently cognizable before an administrative agency.<u>Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington Suburban Sanitary Commission, 607 F.2d 378, 381 (D.C. Cir. 1979)</u>. The doctrine 'comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.'<u>United States v. Western Pacific R. Co., 352 U. S. 59, 64 (1956)</u>. This court has used the doctrine to defer to the special competence of the Trademark Trial and Appeal Board in deciding on the registrability of a trademark.<u>Driving Force, Inc. v. Manpower, Inc., 498 F.Supp. 21 (E.D. Pa. 1980)</u>. Plaintiff seeks to distinguish the facts of the <u>Manpower</u> decision from those of the case <u>sub judice</u> by noting that the <u>Manpower</u> case involved the special competence of the Trademark Trial and Appeal Board whereas the case <u>sub judice</u> concerns the special competence of the International Trade Commission. However, we believe the ITC does possess a special competence regarding claims of unfair competition and trademark infringement which a district court does not possess. Pursuant to <u>19 U.S.C. § 1337</u>, Congress has expressly given the ITC power and guidelines over claims of unfair competition and unfair acts in the importation of articles into the United States. Thus, the ITC has undoubtedly had a great deal more experience than a district court in matters of this kind. Also significant is the fact that the ITC took it upon itself to enter the present controversy as an intervenor to oppose Tompkin's motion seeking to prevent West from pursuing its complaint before the ITC. We believe

that the ITC is better equipped than are the courts to make the determination as to unfair methods of competition.

<u>ORDER</u>

**\*4** The motion of the plaintiff for a temporary injunction to enjoin the defendant from pursuing its complaint with the International Trade Commission is DENIED.

The motion of the defendant for a stay of this declaratory judgment action is GRANTED.

This action is placed in suspense until the completion of the proceedings before the International Trade Commission and any appeals resulting therefrom

IT IS SO ORDERED.

> <u>FN1</u> Section 337 proceedings are initiated by the ITC upon a complaint by a private party although the ITC may institute an investigation on its own motion.19 C.F.R. § 210-12. After the ITC institutes a section 337 investigation, the proceedings are referred to an administrative law judge who conducts the investigation and an administrative hearing.<u>19 C.F.R. §§ 210.20-210.44</u>. In a section 337 investigation the ITC must determine 1) whether there are imports into the United States, 2) whether there is an industry in the United States, 3) whether there are unfair acts or methods of competition, 4) whether the effect or tendency of the unfair acts or methods of competition is to destroy or substantially injury the industry, and 5) whether the industry is efficiently and economically operated. At the conclusion of the hearing, the ALJ issues an initial determination.<u>19 C.F.R. § 210.53</u>. The initial decision may be reviewed by the ITC on its own motion or the motion of a party, and the Commission may adopt, reverse or modify the ALJ's determination or, if appropriate, remand for further proceedings.<u>19 C.F.R. § 210.53(h)210.54</u>. If the Commission finds a violation of section 337, it then determines the appropriate remedy, which may include an exclusive order, which directs the U.S.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1985 WL 4952 (E.D.Pa.), 7 ITRD 1788, 54 USLW 2420, 229 U.S.P.Q. 469
**1985 WL 4952 (E.D.Pa.)**

Customs Service to bar the subject articles from importation into the United States, or issue a cease and desist order.

Prior to ordering a remedy, the Commission is required to evaluate the impact of the ordered remedy on the public interest by considering the effect 'upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers.'19 U.S.C. §§ 1337(d) and (f).

Thereafter, the ITC transmits its determination and order to the President, who has 60 days within which to approve the determination or disapprove it for 'policy reasons.' 19 U.S.C. § 1337(g). The final determination is then appealable within 60 days to the Federal Circuit Court of Appeals.19 U.S.C. § 1337(c).

Section 337 investigations must be concluded within one year, except in complicated cases, which can be extended to 18 months.19 U.S.C. § 1337(b)(1).

Tompkins Seals, Inc. v. West Co.
Not Reported in F.Supp., 1985 WL 4952 (E.D.Pa.), 7 ITRD 1788, 54 USLW 2420, 229 U.S.P.Q. 469

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT N

Case 1:08-cv-00361-UNA    Document 19-16    Filed 07/29/2008    Page 2 of 3

# UNITED STATES INTERNATIONAL TRADE COMMISSION

| | | |
|---|---|---|
| Search: Advanced | Trade Remedies | Industry & Economic Analysis | Tariff Information C |
| All | > Antidumping & Countervailing Duties | > Intellectual Property | > Global and specia |
| GO | | | |
| Home | | |
| Site Glossary    Site Map | | |

**Trade Remedy Investigations**
- Antidumping and countervailing duty investigations
- Intellectual property infringement and other unfair acts (section 337 investigations)
- Global and special safeguards

**Industry and Economic Analysis**
- Ongoing Investigations
- Research & Analysis

**Other Statutory Determinations**

**Tariff Information Center**
- Official Harmonized Tariff Schedule
- Other Related Information

**News Releases**

**Notices**

**Archive**

**Publications**

**Employment Center**

**Help/Contact Us**

## TRADE REMEDY INVESTIGATIONS

### Intellectual property infringement and other unfair acts

**Section 337 investigations** conducted by the U.S. International Trade Commission most often involve claims regarding intellectual property rights, including allegations of patent infringement and trademark infringement by imported goods. Both utility and design patents, as well as registered and common law trademarks, may be asserted in these investigations. Other forms of unfair competition involving imported products, such as infringement of registered copyrights, mask works or boat hull designs, misappropriation of trade secrets or trade dress, passing off, and false advertising, may also be asserted. Additionally, antitrust claims relating to imported goods may be asserted. The primary remedy available in Section 337 investigations is an exclusion order that directs Customs to stop infringing imports from entering the United States. In addition, the Commission may issue cease and desist orders against named importers and other persons engaged in unfair acts that violate Section 337. Expedited relief in the form of temporary exclusion orders and temporary cease and desist orders may also be available in certain exceptional circumstances. Section 337 investigations, which are conducted pursuant to 19 U.S.C. § 1337 and the Administrative Procedure Act, include trial proceedings before administrative law judges and review by the Commission.

Section 337 resources

- Frequently Asked Questions
- Law: 19 U.S.C. §1337
- Section 337 Rules of Practice and Procedure (19 C.F.R. Part 210)
- 337-related Commission Notices
- 337 Investigational History
- EDIS (copies of public documents filed with the USITC)
- Guidelines for Filing Prosecution Histories and Technical References on DVD/CD Media (when filing new Section 337 Complaints)
- Contact the Office of Unfair Import Investigations

**337 INVESTI**

Recent 337

337 Investi

Outstanding Orders

Section 337

**RELATE**

Frequent Question

Law: 19 §1337

USITC Ru

Intellectu Rights Br Customs Protectio

---

United States International Trade Commission
500 E Street, SW, Washington, DC 20436

Telephone: 202-205-2000

Privacy, Accessibility, Freedom of Information, and other Website Policies and
Important Links

# EXHIBIT O

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN NITRILE GLOVES** | **Investigation No. 337-TA-608** |

**AND**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN NITRILE RUBBER GLOVES** | **Investigation No. 337-TA-612** |

**NOTICE OF COMMISSION DETERMINATION NOT TO REVIEW AN INITIAL
DETERMINATION FINDING THREE RESPONDENTS IN DEFAULT**

**AGENCY**:     U.S. International Trade Commission.

**ACTION**:     Notice.

**SUMMARY**: Notice is hereby given that the U.S. International Trade Commission has
determined not to review the presiding administrative law judge's ("ALJ") initial determination
("ID") (Order No. 22) finding three respondents in default.

**FOR FURTHER INFORMATION CONTACT**: Michelle Walters, Office of the General
Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436,
telephone (202) 708-5468. Copies of non-confidential documents filed in connection with this
investigation are or will be available for inspection during official business hours (8:45 a.m. to
5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street,
S.W., Washington, D.C. 20436, telephone (202) 205-2000. General information concerning the
Commission may also be obtained by accessing its Internet server at *http://www.usitc.gov*. The
public record for this investigation may be viewed on the Commission's electronic docket
(EDIS) at *http://edis.usitc.gov*. Hearing-impaired persons are advised that information on this
matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION**: The Commission instituted Inv. No. 337-TA-608 on
July 6, 2007, based on a complaint filed by Tillotson Corporation d.b.a. Best Manufacturing

Company ("Tillotson").  The complaint alleges violations of section 337 of the Tariff Act of 1930 (19 U.S.C. § 1337) in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain nitrile gloves by reason of infringement of various claims in United States Patent No. Re. 35,616.  The complaint named over thirty respondents.  On September 19, 2007, the ALJ consolidated Inv. No. 337-TA-608 with Inv. No. 337-TA-612

On August 22, 2007, Tillotson filed a motion for an order to show cause and default against six respondents: Basic Medical Industries, Inc. ("Basic Medical"); Glovco (M) Bhd. ("Glovco"); Ideal Healthcare Group Co. Ltd. ("Ideal Healthcare"); Seal Polymer Industries Bhd. ("Seal Polymer"); Supermax Corporation Bhd. ("Supermax"); and Yee Lee Corporation Bhd. ("Yee Lee").  On September 10, 2007, the ALJ issued Order No. 17 ordering these respondents to show why they should not be found in default for failing to respond to the complaint and notice of investigation.

Respondents Seal Polymer, Supermax, and Yee Lee all filed responses requesting more time to respond to the complaint.  The ALJ granted these requests.  However, the ALJ found pursuant to Commission Rule 210.16, 19 U.S.C. § 210.16, that Basic Medical, Glovco, and Ideal Healthcare were in default because they failed to respond to the complaint and notice of investigation and failed to respond to the ALJ's order to show cause why they should not be found in default.  The ALJ also found that they have waived their rights to appear, be served with documents, and to contest the allegations against them.  No petitions for review of this ID were filed.  The Commission has determined not to review the ID.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), and in section 210.42 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.42).

By order of the Commission.

/s/
William R. Bishop
Acting Secretary to the Commission

Issued: October 15, 2007

2